# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

CASE NO. -------

Dr. Bozorgmehr Pouyeh,
Plaintiff,

v.

Public Heath Trust of Jackson
Health System (a.k.a. the "Trust"),

and

Chief Executive Officer of the
Trust, Mr. Carlos A. Migoya,

Program Director of ophthalmology
residency program, Dr. Steven J.
Gedde,

Program Director of preliminary
medicine and internal medicine,
*current*: Dr. Stefanie R. Brown,
*former*: Dr. Doe[1]

Program Director of Harrington
(a.k.a. Latin America) Program, Dr.
J. Donald Temple

In their individual capacity,

Defendants
_____/

FILED by _____ D.C.

AUG 19 2016

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

# <u>ORIGINAL COMPLAINT</u>

# <u>AND REQUEST FOR A JURY TRAIL</u>

_____

[1] Dr. Doe is the pseudo-name for the former program director of internal medicine and preliminary medicine

1

# TABLE OF CONTENTS

Nature of this action ................................................................................................................ 7

Jurisdiction and venue .............................................................................................................. 7

Parties ........................................................................................................................................ 7

    I.    Plaintiff ........................................................................................................................... 7

    II.   Defendants ...................................................................................................................... 8

         a)   The defendants act under color of State law ........................................................ 10

Definition of the terms used in the complaint ........................................................................ 11

    I.    NRMP Match and how it works ................................................................................... 11

    II.   ERAS .............................................................................................................................. 13

    III.  San Francisco Matching Program (SF Match) ........................................................... 13

    IV.  ECFMG certification ..................................................................................................... 14

    V.   AAMC ............................................................................................................................ 15

    VI.  ACGME ......................................................................................................................... 15

    VII.  USMLE Exams: ............................................................................................................ 15

        USMLE Step 1 .............................................................................................................. 16

        USMLE Step 2 .............................................................................................................. 16

         a)   USMLE Step 2 CK .............................................................................................. 16

         b)   USMLE Step 2 CS .............................................................................................. 17

        USMLE Step 3 .............................................................................................................. 17

    VIII. IMG .............................................................................................................................. 17

         a)   US-IMGs .............................................................................................................. 18

         b)   Non-US-IMG ....................................................................................................... 18

    IX.  US-MG (USMG) ........................................................................................................... 18

         a)   US-Senior ............................................................................................................ 18

    X.   US-applicants ................................................................................................................. 19

    XI.  US-born applicants ........................................................................................................ 19

    XII.  Internal medicine residency program ........................................................................... 19

    XIII. Preliminary medicine (internship) program.................................................................. 19

    XIV. Ophthalmology residency program .............................................................................. 20

Factual allegations ................................................................................................................... 20

    I.    Plaintiff's qualifications compared to similarly-situated applicants.............................. 25

USMLE Step 1 exam ........................................................................................................ 25

USMLE Step 2 CK exam ................................................................................................. 27

USMLE Step 2 CS exam .................................................................................................. 29

USMLE Step 3 exam ........................................................................................................ 30

Supervised and unsupervised medical practice in Iran .................................................... 30

Clinical experience in the United States .......................................................................... 31

Post-doctorate research fellowship in cornea, publications, and presentations ............... 33

Plaintiff's qualities as explained in the letters of recommendation ................................. 38

    b)   Motivation, sense of responsibility, steadfastness, intellect, desire to learn ................. 39

    c)   Excellent USMLE scores, medical knowledge, and intelligence .................................. 41

    d)   Creativity, inquisitive mind, meticulousness, perfectionism, self-learning, team-playing and collaboration ..................................................................................................................... 43

    e)   Communication and interpersonal skills, bed-side manner ........................................... 45

    f)   Clinical Experience in the USA, examination and presentation of the patients in the rounds, participating in conferences .................................................................................................. 46

    g)   Exceptionally good resident, an asset to the medical residency, and aspiring future physician in academic field and research ........................................................................................... 47

Medical school ................................................................................................................. 48

Extracurricular, volunteer, and leadership activities during his medical school ............. 49

Plaintiff's grades in Clerkship and Internship in Tehran University of Medical Sciences ....... 51

    h)   Clerkship Grades: ......................................................................................................... 52

    i)   Internship Grades: ........................................................................................................ 52

    j)   Comparison to US medical schools ............................................................................. 53

Dr. Pouyeh is more knowledgeable than some faculty members and professors of ophthalmology in the defendants' residency program and in the USA ............................................................. 54

II.   Arbitrary and systematic exclusion of IMGs and foreign doctors from medical residency in the USA and futility of Dr. Pouyeh's attempt to apply any further ............................................................ 55

III.   Percentage of IMGs in the applicant pool ............................................................ 61

IV.   Close association between being an IMG and being a 'non US-born' applicant, as well as being a US-Senior/US-MG and being a US-born applicant ............................................................ 62

V.   Harms Dr. Pouyeh has been sustaining because of the acts and omissions of the defendants ............. 63

Claims .............................................................................................................................. 69

I.   Claims related to setting quota, as well as using race, ethnicity, national origin, and citizenship status in hiring in Internal Medicine and Preliminary Medicine ............................................. 69

Count I- Violation of Equal Protection of 14th amendment: setting quota for the applicants in internal medicine residency program, and using race/ethnicity, national origin, and citizenship status in hiring process ............................................................................................................................. 69

    a)   Quota for Hispanics/Latinos under the name of 'Harrington Program' or 'Lain America Program' in internal medicine residency program: ................................................................... 69

    b)   Quota for other Hispanics from Puerto Rico ............................................................... 72

    c)   Arabs: ........................................................................................................................ 75

    d)   Update for 2016 ......................................................................................................... 77

    e)   Asking about national origin, race / ethnicity, and citizenship status in the application ............... 78

Count II- Violation of 42 U.S.C § 2000-e and FCRA: setting quota and using race/ ethnicity, and national origin in decision-making for hiring for internal medicine residency and preliminary medicine. ........................................................................................................................ 81

Count III– Violation of 42 U.S.C. §§ 1981 and 1983 ............................................................. 82

II.   Claims related to favoring students of University of Miami and US-seniors of all US medical schools and against IMGs in ophthalmology residency as well as internal medicine and preliminary medicine. ...... 84

Count IV- Violation of Equal Protection of 14th Amendment and 42 USC §1983: favoring the medical students/graduates of the University of Miami in ophthalmology residency as well as internal medicine and preliminary medicine. ........................................................................................... 84

Count V - Violation of Equal Protection of 14th Amendment and 42 USC §1983: the practice of hiring 4th year medical "students", a.k.a. US-Seniors, before their graduation from medical school and obtaining their medical school diploma, discriminates against International Medical school "Graduates", who have already graduated from medical school and obtained their medical diploma. ........................................... 89

III.   Claims related to USMLE exams ........................................................................................ 94

Count VI – Violation of Equal Protection of 14th amendment and 42 USC § 1983: treating the applicants arbitrarily differently for the requirement of passing USMLE exams before or after ranking them for internal medicine, preliminary medicine, or ophthalmology, as well as using different score cut-off for USMLE exams ........................................................................................................... 94

Count VII- Violation of 42 U.S.C. 2000-e2 (I), and FCRA: discrimination based on national origin and race/ethnicity by using different cut-off for USMLE exam scores or adjust the scores as well as the requirement for passing the USMLE exams ................................................................... 99

Count VIII - Violation of Equal Protection and Due Process of 14th amendment, and 42 U.S.C. §1983: setting a requirement or preference for IMGs applicant to internal medicine residency program and preliminary medicine to pass USMLE Step 2 CS on *the first attempt* ............................. 102

    a)   Equal Protection and due process ....................................................................... 102

    b)   Substantive Due Process (Liberty) ...................................................................... 105

IV.   Claims related to setting a cut off of 5-year graduation from medical school in internal medicine and preliminary medicine ................................................................................................... 107

Count IX - Violation of Equal Protection and due process of 14th amendment, and 42 USC §1983: setting a requirement or preference for IMGs to apply to internal medicine and preliminary medicine within 5 years of medical graduation............................................................................................ 107

    a)   Equal Protection and due process .................................................................. 108

    b)   Substantive due process (liberty)................................................................. 111

Count X – Violation of 42 U.S.C. § 2000-e et seq and FCRA: Giving preference in internal medicine and preliminary medicine to the applicants who have graduated from medical school within 5 years discriminates based on national origin. ............................................................................. 113

    a)   Disparate impact........................................................................................... 113

    b)   Intentional discrimination ............................................................................ 114

V.   Claims related to discrimination in ophthalmology residency ............................ 115

Count XI -Violation of Equal Protection and Due Process of 14th amendment for exclusion of IMGs from ophthalmology residency.............................................................................................. 115

    a)   Equal Protection ........................................................................................... 119

    b)   Substantive Due Process (Liberty) and due process.................................... 123

Count XII– Violation of 42 U.S.C § 2000e and FCRA: Exclusion of IMGs from ophthalmology residency is discrimination based on national origin.................................................................... 125

    a)   Disparate impact........................................................................................... 125

    b)   Intentional discrimination ............................................................................ 126

VI.   Claims exclusively related to preliminary medicine ......................................... 131

Count XIII–violation of 42 U.S.C § 2000-e and FCRA: "preliminary medicine" hardly ever considers IMGs if they specify "ophthalmology residency" as their desired specialty after preliminary medicine; which disproportionately excludes non-American national origins who plan to pursue ophthalmology. ........................................................................................................................ 131

Count XV: Violation of Equal Protection of 14th Amendment and 42 USC § 1983: Setting Quota for Preliminary Medicine –Neurology .............................................................................. 134

Count XV: Violation of 42 USC § 2000d-3 based on national origin and race ..................... 134

Reliefs sought ................................................................................................................. 136

Request for a jury trial .................................................................................................... 138

Exh.1: List of the ophthalmology residents and their medical schools at relevant time ..................... 1

Exh.2: Requirement for internal medicine residency position ............................................... 2

Exh.3: EEOC charges and Right to Sue Letters ................................................................... 3

Exh.4: Latin American or Harrington Program..................................................................... 4

Exh.5: Probability of matching to internal medicine based on USMLE Step1 score........................ 5

Exh.6: Probability of matching to ophthalmology based on USMLE Step 1 score ......................... 6

Exh.7: Probability of matching to internal medicine based on USMLE Step 2 score........................ 7

Exh.8: Number of abstracts, presentations, publications for applicants in internal medicine in 2011 and 2014 8

Exh.9:  Tabular summary of "Match Poll 2011" for ophthalmology residency ...................................................9

Exh.10: Plaintiff's letters of recommendation for medical residencies............................................................ 10

Exh.11: Percentage of the Program Directors typically interview and rank IMGs, US-Seniors, and US-MGs 11

Exh.12: USMLE Step1 of matched applicants in all specialties 2009-2014 ..................................................... 12

Exh. 13: Plaintiff's USMLE Step 1, Step 2 CK and Step 2 CS scores and ECFMG certification ................... 13

Exh.14 : predictive factors in success of IMGs in ophthalmology residency match......................................... 14

Exh.15: Residents in "categorical" Internal medicine and "Latin American program" as well "preliminary" medicine ............................................................................................................................................................... 15

Exh.16: 20 to 30 percent of the US-seniors and the majority of osteopathic applicants match without taking USMLE Step 2 CK......................................................................................................................................... 16

Exh.17: Residents in Diagnostic Radiology .................................................................................................. 17

## NATURE OF THIS ACTION

1.     Proceeding as a pro se party, "Plaintiff", Dr. Bozorgmehr Pouyeh, a male Iranian

national origin, of Iranian race[2], and a medical graduate of Tehran University of Medical Sciences in

Iran, who has been an applicant every year between 2010 and 2015 to the defendants' post-graduate

"preliminary medicine" and "internal medicine", as well as "ophthalmology" medical residency

programs, seeks preliminary and permanent injunctive reliefs for hiring into these positions, which

he qualifies, and preliminarily and permanently injunctions enjoining the defendants from employing

the discriminatory policies and practices in hiring for these positions. He also seeks other reliefs to

make him whole and close to the status he would be, absence of the discrimination.

## JURISDICTION AND VENUE

2.     This action arises under section 1 of fourteenth amendment to the United States

Constitution and federal statutes 42 U.S.C. §§ 1981, 1983, 2000e *et seq*, and 2000d-3 as well as

Florida Civil Right Act of 1992, FL Statute §760.07 (FCRA). This court has subject matter

jurisdiction under 28 U.S.C. §§ 1331 and 1343 as well as 28 U.S.C. § 1652.

3.     Venue is proper in Southern District of Florida, Miami branch, under 28 U.S.C. §

1391 because the events giving rise to the claims detailed herein occurred in Miami-Dade county,

FL.

## PARTIES

### *I.  Plaintiff*

---

[2] *Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114-15 (5th Cir.1986) (holding that persons of Iranian descent are a protected race under 42 U.S.C. § 1981, although anthropologists classify them as Caucasian)

4.      Dr. Bozormgher Pouyeh, "Plaintiff", is a national origin of Iran and of Iranian/Persian race/ethnicity[3] who obtained his M.D. (medical doctor) degree in 2004 from Tehran University of Medical Sciences, in Tehran, Iran. Plaintiff immigrated as a legal permanent resident of the USA in 2007.

5.      In 2010, 2011, 2012, 2013, 2014, and 2015, Plaintiff applied to internal medicine residency, preliminary medicine internship, and ophthalmology residency positions of the defendants and he was not hired.

6.      Plaintiff was not hired although he was more qualified than the residents who were hired in these positions, as will be explained in the subsequent paragraphs.

## II. Defendants

7.      Defendant Public Health Trust of Jackson Health System, the "Trust", is a subdivision of Miami-Dade county local government created under the State of Florida, which governs, operates, and maintains Jackson Memorial Hospital and other health-care facilities in Jackson health System[4]. According to the Basic Affiliation Agreement 2011 between University of Miami and the Trust, " WHEREAS, the parties *desire to supersede the 2004 Basic Affiliation Agreement in order to define clearly the obligations of each party and to set forth the intent of the parties that*:...... (vi) when the University provides or permits its employees or agents to provide Patient Services, including administering and supervising clinical supervision and residency training of interns, residents, and fellows, it does so as an agent of the Trust" [5] [Emphasis added]

---

[3] *Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114-15 (5th Cir.1986) (holding that persons of Iranian descent are a protected race under § 1981, although anthropologists classify them as Caucasian)

[4] Basic Affiliation agreement between University of Miami and Public Health Trust (BAA),  2011, at 2.

[5] BAA,  2011, at 2.

8.     Defendant Chief Executive Officer of the Trust, Mr. "Carlos A. Migoya has served as President and CEO of Jackson Health System since May 2011"[6]. He is sued in his individual capacity in this lawsuit. Chief Executive Officer "shall make appointments of physicians [in residency and internship programs] after considering recommendations of the respective Chiefs of Service [a.k.a. program director]"[7].

> Physicians in residency training programs, including Residents of the Hospitals and other Trust facilities, shall be appointed in such quantities and disciplines as approved by the Trust in consideration of the guidelines set by the American Council on Graduate Medical Education. The Chief Executive Officer of the Trust shall make such appointments after considering recommendations of the respective Chiefs of Service.

9.     Defendant "Chief of Service", a.k.a. "Program Director", of ophthalmology residency program at Bascom Palmer Eye Institute, Dr. Steven J. Gedde, is a faculty member and employee of University of Miami at Bascom Palmer Eye Institute and in the capacity of chief of service or program director of the "Trust", he is the employee/agent of the Trust. "Any participation of the University or *its employees* or agents in any aspect of the residency Training Program is solely in the capacity *as agents of the Trust*."[8] Chief Executive Officer "shall make appointments of physicians in residency and internship programs *after considering recommendations of the respective Chiefs of Service of the residency*"[9] [Emphasis added]. "Each Chief of Service shall be accountable to the Trust,...., with respect to .... the operation of Residency training programs."[10] "President of the Trust shall have final and exclusive authority to appoint all Chiefs of Service."[11] "Program Director", of ophthalmology residency is sued in his individual capacity.

---

[6] http://www.jacksonhealth.org/about-CEO-bio.asp Accessed on 7/5/16
[7] BAA 2011, at 13
[8] BAA 2011, at 11.
[9] BAA 2011, at 13
[10] BAA, 2011, at 11.
[11] BAA, 2011, at 12.

10.     Defendant Chief of Service (Program Director) of 'internal medicine' residency program and 'preliminary medicine' internship program performs is in similar capacity as Chief of Service (Program Director) of ophthalmology residency program but in internal medicine residency program and preliminary medicine internship. According to Dr. Stefanie R. Brown "In June 2015, I accepted the honor of the appointment as Program Director for Internal Medicine [and preliminary medicine]."[12] The former program director of internal medicine and preliminary medicine at the relevant time is named in this lawsuit under the pseudo-name Dr. Doe. The current and former program directors of internal medicine/preliminary medicine are sued in their individual capacity.

11.     Defendant Dr. J. Donald Temple "is the director of the William Harrington Medical Training Programs for Latin America and the Caribbean".[13] "He assisted in the administration of the program from 1985 to 1992, when he was named as program director [of Latin America Program]"[14] he is sued in his individual capacity.

### a)  The defendants act under color of State law.

12.     First, they are employees or agents of a subdivision of Miami-Dade County local government (the Trust) and in that capacity they are acting under color of State law.

13.     Second, plaintiff applied to these positions because of all States mandate all medical graduates have some years of post-graduate medical practice under supervision of licensed physicians in an ACGME-approved medical residency program, such as the defendants' residency programs, as a prerequisite for licensure for unsupervised medical practice, i.e. obtain State Medical Board license. For example, in Florida,

FS § 458.311    Licensure by examination; requirements; fees:

---

[12] http://www.jmhmedicine.com/program-director/
[13] http://imi.med.miami.edu/meet-our-team/education/j.-donald-temple-m.d
[14] Id.

(f)   Meets one of the following medical education and postgraduate training **requirements:**

2.a.   **Is a graduate of an allopathic foreign medical school registered with the World Health Organization** and certified pursuant to s. 458.314 as having met the standards required to accredit medical schools in the United States or reasonably comparable standards;

c.   Has completed **an approved residency** of at least 1 year.

14.     Thus, the defendants are acting under color of State law, not only because they are part of Miami-Dade county local government and in such capacity they are acting under color of State law, but also because the reason for applying to their residency programs and the hiring for this position is State law. All States require post-graduate medical training in an approved residency program, such as the defendants' residency program. In such capacity, any acts and omissions of them are under color of State law.

## DEFINITION OF THE TERMS USED IN THE COMPLAINT

15.     These words and abbreviations are used throughout the complaint and the exhibits plaintiff will present from relevant authorities and some knowledge about these terms is essential to understand this lawsuit.

### I.   *NRMP Match and how it works*

16.     "The National Resident Matching Program" (NRMP), also called "the Match", is a United States-based private non-profit non-governmental organization created in 1952 to help match medical school students with residency programs"[15].

17.     After the applicants apply to the residency programs, "programs review applications and invite selected candidates for interviews held between October and February. After the interview period is over, the applicants and programs each compile "rank-ordered lists". For programs, this is a

---

[15] https://en.wikipedia.org/wiki/National_Resident_Matching_Program

list of applicants in order from most to least preferable. Similarly, for the applicant, the rank-ordered list is a list of programs in order from most to least preferable. In some cases, applicants may also submit secondary lists to simultaneously apply for programs that begin in the second year of residency"[16]. For example, an applicant to preliminary medicine may also apply to second year residency for neurology or ophthalmology and secure both positions through the match at the same time. There is no limit on how many programs or specialties an applicant can rank, as long as the applicant can afford paying the related application fee and have actually have received an interview and interviewed the programs.

18.    "Prospective medical residents enter into contracts with and submit to the NRMP a ranked list of desired medical resident positions with various institutions ("Student Match Contract"). The institutions themselves also enter into contracts with the NRMP and submit ranked lists of the medical students whom they are interested in hiring ("Institutional Match Contract"). On a date certain, the NRMP through a [computer] algorithm "matches" the students' lists against the institutions' rankings, resulting in the assignment of each prospective medical resident to one residency program"[17]. "Match appointments are binding."[18]

19.    The deadline for submit the rank-order list is usually by February and the match result is announced usually on 23rd of March.

20.    A medical student or medical graduate "is required to enter into the Match if he or she wishes to gain employment in a residency program accredited by the Accreditation Council for Graduate Medical Education ("ACGME"). An individual's participation in an ACGME-accredited residency program in turn is a prerequisite for specialty certification upon completion of the residency by American Board of Medical Specialties ("ABMS"), .... Eventual specialty certification

---

[16] https://en.wikipedia.org/wiki/National_Resident_Matching_Program
[17] *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119 (D.C. 2004)
[18] http://www.nrmp.org/applicant-match-tips/

by an ABMS board is considered critical to prospective residents inasmuch as they desire to be "certified" to practice within a specialty following the completion of their residencies."[19]

21.    Some specialties have separate match. For example, ophthalmology residency programs are in San Francisco Matching Program (SF Match) and none of them participate in NRMP match.

## II. ERAS

22.    "The Electronic Residency Application Service ("ERAS"), is a service operated by the Association of American Medical Colleges (AAMC) through which, the applicants to ACGME-approved post-graduate medical training (i.e. medical internship and residency) programs apply. ERAS transmits a uniform application, letters of recommendation (LoRs), Medical Student Performance Evaluations (MSPEs) a.k.a. "Dean's Letter", medical school transcripts, USMLE Step 1 and Step 2 CK and Step 2 CS, and Step 3 (if available) transcripts, medical school diploma and other supporting credentials from applicants and their designated dean's office to residency program directors." [20]

23.    Residency programs can use ERAS service, or use their own application form.

24.    Ophthalmology residency programs or plastic surgery residency programs use application service of another matching program, San Francisco matching program. So while San Francisco Matching program provides both application service and matching service for ophthalmology residency, NRMP is solely a matching program and ERAS transmits the applications to many residency programs, except for ophthalmology.

## III.    San Francisco Matching Program (SF Match)

---

[19] *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119 (D.C. 2004).
[20] https://en.wikipedia.org/wiki/Electronic_Residency_Application_Service

25.     SF Match works similar to NRMP match. Ophthalmology residency programs and Plastic Surgery Residency Programs are in San Francisco Matching Program (SF Match) and none of them participate in NRMP match.   Ophthalmology residency programs or plastic surgery residency programs use application service of San Francisco matching program and not ERAS.

26.     The deadline to submit rank-order list is sooner than NRMP Match and the results are announced sooner than NRMP match as well. Usually after SF match announces the match result in ophthalmology, NRMP starts accepting rank-order list for other specialties, including preliminary medicine (pre-requisite for ophthalmology).

### IV. ECFMG certification

27.     Education Commission for Foreign Medical Graduates, "ECFMG", "Through more than five decades of certifying IMGs, has developed unparalleled expertise on the world's medical schools, the credentials they issue to their graduates, and the verification of those credentials."[21]

28.     "Certification by ECFMG is the standard for evaluating the qualifications of these physicians before they enter U.S. graduate medical education (GME), where they provide supervised patient care"[22].

29.     For obtaining ECFMG certification, an applicant must have completed a medical school listed in World Health Organization' World Directory of Medical Schools and has been approved by ECFMG, and pass USMLE Step 1, Step 2 CK, and Step 2 CS.   IMGs must provide their medical school diploma and medical school transcript to ECFMG as well to obtain ECFMG certification.

30.     ECFMG Certification also is a requirement for IMGs to take USMLE Step 3 as well as entering into medical residency.

---

[21] http://www.ecfmg.org/about/index.html
[22] Id.

## V. AAMC

31.     "The Association of American Medical Colleges ("AAMC") is a not-for-profit association that represents accredited medical schools in the United States, major teaching hospitals and health systems, and academic and scientific societies."[23]

32.     It operates ERAS (Electronic Residency Application Service).

## VI. ACGME

33.     American Council on Graduate Medical Education (ACGME) "is a private, 501(c)(3), not-for-profit organization that sets standards for US graduate medical education (residency and fellowship) programs and the institutions that sponsors them, and renders accreditation decisions based on compliance with these standards. In academic year 2015-2016, there were approximately 800 ACGME-accredited institutions sponsoring approximately 10,000 residency and fellowship programs in 150 specialties and subspecialties."[24]

## VII.     USMLE Exams:

34.     United States Medical Licensing Exam (USMLE) "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care."[25] "It is a three-step examination (Step 1, Step 2, and Step 3) for medical licensure in the United States and is sponsored by the Federation of State Medical Boards (FSMB) and the National Board of Medical Examiners® (NBME®)."[26]. Scores are based on the performance of US examinees in M.D. granting (allopathic) US medical schools.

---

[23] *Association of American Medical Colleges v. Doe*, No. 4: 14-cv-72 (N.D. Ind. Nov. 19, 2014).
[24] http://www.acgme.org/What-We-Do/Overview
[25] http://www.usmle.org/
[26] Id.

### USMLE Step 1

35.    "Step 1 assesses whether the examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy."[27] It is a set of computer-based multiple choice questions. By the time plaintiff took the exam, "the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools are approximately 218 and 23, respectively, with most scores falling between 140 and 260. A score of 185 is set by USMLE to pass Step 1. The standard error of measurement for this scale is six points. The Standard Error of Measurement provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar contents."[28]

### USMLE Step 2

36.    "Step 2 assesses whether you can apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision and includes emphasis on health promotion and disease prevention. Step 2 ensures that due attention is devoted to principles of clinical sciences and basic patient-centered skills that provide the foundation for the safe and competent practice of medicine."[29] Step 2 is further divided into two exams: Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills).

#### a)  USMLE Step 2 CK

37.    "Step 2 CK is constructed according to an integrated content outline that organizes clinical science material along two dimensions: physician task and disease category."[30] Step 2 CK is also a set of computer-based multiple choice questions.  By the time plaintiff took the exam, "the

---

[27] http://www.usmle.org/step-1/
[28] Plaintiff's Step 1 score report
[29] http://www.usmle.org/step-2-ck/
[30] http://www.usmle.org/step-2-ck/

mean and standard deviation for first-time examinees from U.S. and Canadian medical schools are approximately 226 and 23, respectively, with most scores falling between 140 and 260. A score of 184 is set by USMLE to pass Step 2. The standard error of measurement for this scale is seven points."[31]  "The Standard Error of Measurement provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar contents."[32]

### b)  USMLE Step 2 CS

38.     "Step 2 CS uses standardized patients (a.k.a. "SP") to test medical students and graduates on their ability to gather information from patients, perform physical examinations, and communicate their findings to patients and colleagues."[33]

39.     For entering into medical residency passing USMLE exams Step 1, Step 2 CK and Step 2 CS is mandatory for all applicants.

### USMLE Step 3

40.     Step 3 is not required for entering into medical residency. However, passing Step 3, along with Step 1 and Step 2, is required by the States for obtaining license to practice medicine.

41.     "Step 3 assesses whether you can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings."[34]

### VIII.     IMG

42.     International Medical (school) Graduates, a.k.a. IMG, are the applicants to medical residency programs who graduated from medical schools outside of the United States and Puerto

---

[31] Plaintiff's Step 2 score report
[32] Plaintiff's Step 2 score report
[33] http://www.usmle.org/step-2-cs/
[34] http://www.usmle.org/step-3/

Rico. They have to obtain certification by ECFMG (Education Commission for Foreign medical school Graduate). IMG are also called FMG (foreign medical graduate).

43.    All IMGs are from allopathic medical schools. Osteopathic (D.O. granting) medical schools are solely in the USA.

### a)  US-IMGs

44.    US-IMGs are US-citizens who graduated from international medical schools. NRMP US-citizen IMGs from this group if they went to a medical outside of the United States and were originally a citizen of another country.

### b)  Non-US-IMG

45.    Non-US-IMGs are not US-citizen. Plaintiff has always been categorized in this group by NRMP, even after he became a US citizen.

## IX. US-MG (USMG)

46.    Graduates of M.D. granting (allopathic) medical schools inside the USA and Puerto Rico. Graduates of D.O. granting (osteopathic) medical schools inside the USA are not counted in NRMP statistics as USMGs and they have a separate category in the reported statistics.

### a)  US-Senior

47.    4th year medical students in M.D. granting (allopathic) inside US or Puerto Rico medical Schools. According to NRMP data[35] for the relevant time to this lawsuit, between 93% and 98% of them match to post-graduate medical residency before the end of their fourth year of medical school. Match result is announced in the middle of March. The senior medical students then graduate in May-June and start their post-graduate medical residency on July, 1st.

---

[35] Match result of 2016, Table 4, page 6. Available at http://www.nrmp.org/wp-content/uploads/2016/04/Main-Match-Results-and-Data-2016.pdf  (last viewed on 06/02/2016)

48.     US medical graduates are literally [the remaining 2% to 7% of] US-Seniors of the previous year who could not obtain a post-graduate position, and they will graduate and apply to residency the following year. According to NRMP data[36], 40% to 50% of these applicants match to a medical residency in the following year of their medical graduation.

## X.  US-applicants

49.     It generally denotes the applicants who participated to either allopathic (M.D. granting) or osteopathic (D.O. granting) medical schools in the USA.

## XI. US-born applicants

50.     It means the applicants of US national origin to medical residency.

## XII.      Internal medicine residency program

51.     Internal medicine residency program is a 3-year post-graduate program after medical school graduation. Post-graduate residency and internship programs are employment in nature.

## XIII.      Preliminary medicine (internship) program

52.     Preliminary medicine is post-graduate internship program for some medical specialties such as radiology, dermatology, neurology, and ophthalmology. It shares the core rotations with first-year of internal medicine residency program and the program director of internal medicine is also the program director of preliminary medicine. The difference between preliminary medicine and first year internal medicine is that in some residency programs, they have some electives specifically for that medical specialty; for example, if an intern is pursuing neurology or ophthalmology the following year after preliminary medicine, he can choose ophthalmology or neurology elective for 1-month or 2 months as the elective rotation during his preliminary medicine to prepare himself in advance for the upcoming year. Also, some programs have special quota, designated for some specialties. For example, the preliminary medicine of the defendants has quota

---

[36] Id.

for the interns who pursue neurology next year. Based on this and some other reasons, preliminary medicine programs usually ask about the plan of the applicant for their second year post-graduate training after preliminary medicine. Applicants submit the same application to the program for internal medicine and preliminary medicine and they can choose to apply to internal medicine or preliminary medicine, or both with paying one application fee. Plaintiff chose to apply to both and the application was sent to the residency program through ERAS. Obviously, preliminary medicine is an employment position similar to internal medicine residency program.

### XIV.        *Ophthalmology residency program*

53.      Ophthalmology residency is a 3-year post-graduate program after the completion of an internship program, for example the defendants' preliminary medicine. Residents in ophthalmology become eye specialist and eye surgeon. As explained before, ophthalmology residency is an employment position.

## FACTUAL ALLEGATIONS

54.      Plaintiff, Dr. Bozorgmehr Pouyeh, was born and grew up in Iran and obtained his doctor of medicine (M.D.) degree from Tehran University of Medical Sciences, in Tehran, Iran in 2004. He served his mandatory military service, as most males in Iran do, and then he became legal permanent resident of the United States since 2007 and completed his USMLE exams Step 1, Step 2 CK and Step 2 CS by 2010.

55.      In 2010, he started his observership in Jackson Memorial Hospital and later became a research fellow at Bascom Palmer Eye Institute/University of Miami and Miami VA medical center.

56.      He applied to preliminary medicine (internship) and internal medicine residency program, as well as ophthalmology residency program of the defendants in 2010, 2011, 2012, 2013, 2014, and 2015.

57.     The defendants in internal medicine and preliminary medicine use ERAS service. The same application is used to apply for internal medicine, or preliminary medicine, or both and one application fee is paid for any of these situations. The application to ophthalmology is different and is through SF match and plaintiff has to pay separate application fee.

58.     Similar to other applicants who apply to ophthalmology residency, the ophthalmology residency was his Plan A and internal medicine was his Plan B. (some applicants may choose another specialty as Plan B, such as family medicine, or surgery, or neurology)

59.     As explained, before ophthalmology residency, one-year internship is required and for this reason, Plaintiff applied to the defendants' preliminary medicine program. Although Ophthalmology residency starts after preliminary medicine, both positions are usually secured in the same year. In fact, SF match result for ophthalmology is available about 2 months before NRMP announces the result of residency and internship programs for other medical specialties, including preliminary medicine and internal medicine.

60.     This has two implications: first, it is clear that matching to ophthalmology is not rest upon matching to preliminary medicine or completion of it and in fact the ophthalmology position is secured *before* the announcement of matching result for preliminary medicine.

61.     Second, if Plaintiff would match to ophthalmology residency as SF match announces it earlier, he could communicate to the internal medicine so that the program only ranks him for preliminary medicine in NRMP match, and not for internal medicine. But if he did not match ophthalmology, the program could rank him for either internal medicine or preliminary medicine.

62.     The defendants never hired plaintiff for either ophthalmology residency, or for internal medicine or preliminary medicine position all these years. The defendants never invited him for an interview in internal medicine or preliminary medicine.

63. Plaintiff was more qualified than the residents whom the defendants hired for ophthalmology, preliminary medicine, and internal medicine positions and in fact some of his accomplishments were exceptional and unique, as will be explained in details below, and he was not hired because of the discriminatory policies and requirements (or preferences) used by the defendants. These discriminatory policies and requirements (or preferences) are explored in details in each corresponding claim(s), but Dr. Pouyeh lists them here:

a) The ophthalmology residency program at Bascom Palmer Eye Institute has a policy to exclude IMGs, and only hire US-Seniors (and in theory, US-MGs). (Counts XI and XII) (Exh.1: List of the ophthalmology residents and their medical schools at relevant time)

b) Preliminary medicine does not take IMGs if their plan is to pursue ophthalmology residency. (Count XIII) In addition, the defendants' policies for hiring the applicants for internal medicine also apply to preliminary medicine as the program screens out the same application based on the discriminatory criteria listed below.

c) Internal medicine residency program gives preference to the IMGs who apply within 5-year of their medical graduation. (Exh.2: Requirements for internal medicine). Plaintiff graduated in 2004 and applied since 2010, which is more than 5 years of his medical school graduation and has standing for this claim[37]. (Counts IX and X)

d) Internal medicine residency program gives preference to the IMGs who have passed USMLE Step 1, Step 2 CK, and Step 2 CS on the first attempt (Exh.2: Requirement for internal medicine) and have received ECFMG certification before the deadline for

---

[37] In addition, the defendants in internal medicine require the IMGs have some months, preferably 3 to 6 months, clinical experience in the US. Plaintiff does not have standing to challenge this part because he has 24 months observeship, and clinical research in Jackson Memorial Hospital and Bascom Palmer Eye Institute and Miami VA medical center and he assumes he meets this requirement, but he adds that this requirement also disproportionally exclude foreign applicants and is discrimination based on national origin in violation of Title VII.

rank order list of NRMP match (Id.). Plaintiff passed Step 1 and Step 2 CK on the first attempt but failed Step 2 CS once and has standing for this claim. (Counts VIII).

e) The defendants in internal medicine and preliminary medicine treat US-Senior applicants differently from IMGs for the requirement of passing the USMLE exams before applying to their program. These claims also have equal force for ophthalmology residency, which excludes radically IMGs, regardless of their qualifications and credentials, including USMLE exams. Additionally, the defendants for internal medicine residency program apply different score cut-off *at their discretion and whimsically:* "We do not have specific score requirement" (Id.) "give preference to applicants with USMLE scores +/- 1 standard deviation from the national mean for Internal Medicine matched applicants. This information is available from the NRMP® website." (Id). (Counts VI and VII)

f) The defendants in ophthalmology and internal medicine and preliminary medicine residencies discriminate, and have quota, in favor of the applicants who matriculated to University of Miami Medical School. (Count IV)

g) The defendants in ophthalmology and internal medicine and preliminary medicine residencies hire 4th year medical students (US-Seniors) when these applicants have not completed the required rotations in medical school and have not obtained their medical school diploma and they are not qualified, or as qualified as medical graduates, to apply to these residencies. (Count V)

h) The defendants have quota for IMG Latinos (under Harrington a.k.a. Latin America Program) in internal medicine and preliminary medicine. (Exh.4: Latin American or Harrington Program). They are involved in race/ethnicity and national origin

discrimination, favoring Hispanics and Arabs and disadvantaging other IMGs from other parts of the world. They also use ERAS application, which mandates the applicants specify their race, national origin, ethnicity, native language, and citizenship status in the application and these prohibited factors after considered in hiring. (Counts I, II, and III)

64.     For the claims related to failure to hire for ophthalmology residency under 42 U.S.C. § 2000e et seq. and FCRA, Plaintiff filed EEOC charge against Public Heath Trust of Jackson Health System for ophthalmology residency discrimination based on national origin within 180 days of the last incidence of the discrimination and filed this suit within 90 days of receiving the corresponding Right to Sue Letter from EEOC. (Exh.3: EEOC charges and Right to Sue Letters)

65.     For the claims related to failure to hire for preliminary medicine and internal medicine residency under 42 U.S.C. § 2000e et seq. and FCRA, Dr. Pouyeh filed EEOC charge against Public Heath Trust of Jackson Health System for discrimination based on national origin, race, and sex within 180 days of the last incidence of the discrimination and filed this suit within 90 days of receiving the corresponding Right to Sue Letter from EEOC.

66.     As the EEOC charges show, filing to EEOC is equivalent to filing a dual charge with Florida Commission on Human Relation for the purpose of meeting the requirements of filing a claim under FCRA.

67.     Plaintiff has sustained numerous damages from the acts and omissions of the defendants, and for setting these policies, requirements, and preferences. Because he cannot work without medical residency, he has become a homeless since December 2015, and was hospitalized for having suicidal thoughts and depression and now debt collection companies are calling for

unpaid debt for the medical bills which may already have been reflected in his credit report. These damages will be explained in more details its specified section.

68.     Plaintiff requests declarative relief that the defendants' policies and preferences and requirements are discriminatory and in violation of pertinent US constitution and federal Statute, preliminary and permanent injunctions enjoining the defendants  from applying these discriminatory policies and preferences and requirement, preliminary and permanent injunctions for hiring Dr. Pouyeh to either the preliminary medicine/ophthalmology track or internal medicine track, back pay, front pay, compensatory and punitive damages from the defendants for the damages Plaintiff sustained since 2010, and any other reliefs that make Plaintiff whole.

## I.   *Plaintiff's qualifications compared to similarly-situated applicants*

### USMLE Step 1 exam

69.     The USMLE Step 1 score is based on the score of examinees from *U.S. and Canadian medical schools*. By the time the plaintiff's exam score was reported on May 8th, 2008 "the mean and standard deviation for first-time examinees from *U.S. and Canadian medical schools* [were] approximately 218 and 23, respectively, with most scores falling between 140 and 260. A score of 185 [was] set by USMLE to pass Step 1. The standard error of measurement for this scale [was] six points. The Standard Error of Measurement provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar contents."[38] [emphasis added].

70.     Dr. Pouyeh has excellent score in USMLE Step 1. He scored 246 in this exam *on the first attempt.* (Exh. 13: Plaintiff's USMLE Step 1, Step 2 CK and Step 2 CS scores)

---

[38] Dr. Pouyeh's step 1 score report

71.     Based on NRMP data for 2011 and 2014, with Plaintiff's score of 246 in USMLE Step 1 exam, the probability of matching to internal medicine approaches to 100% for US-Seniors, nation-wide. (Exh.5: probability of matching to internal medicine based on Step1 2011-2014)

72.     The diagram also shows overt discrimination against Independent applicants (the majority of Independent applicants are IMGs), as it shows with the same scores, the probability of matching for Independent applicants (the majority are IMGs) is less. For example, the probably of matching with a score of 246 for Independent applicants is about 65% in internal medicine. (Id.)

73.     The diagram shows a US-senior with the lowest score of < 180, has 80% of matching to internal medicine residency program. (Id.)

74.     Yousuf, et al. in a paper published in 2012 in "Ophthalmology", the official journal of American Academy of Ophthalmology, showed that the probability of matching to ophthalmology residency in 2011 was more than 84% for *US-seniors* with a score of >240 and it approaches to 90% with Plaintiff's score of 246[39]. (Exh.6:  Probability of matching to ophthalmology residency based on Step 1)

75.     In another paper published in "Ophthalmology" in 2013, Allison R. Loh, et al reviewed the match result of *US-applicants* between 2003 and 2008[40]. They found that the probability of matching to ophthalmology residency program with a USMLE Step 1 score of $\geq$ 246 is 93% for *US-Seniors*[41]. (Exh. 6: probability of matching to ophthalmology residency based on Step 1)

---

[39] Yousuf, et al. "Ophthalmology residency Match Outcomes for 2011", Ophthalmology, 2012; 119:642-646. Figure 4
[40] Loh AR, et al. "Predictors of matching in an ophthalmology residency program.", Ophthalmology, 2013 Apr;120(4):865-70
[41] Id. Table 1. Characteristics of US applicants in Ophthalmology Residency 2003-2008.

76.     In this study, there were 1,164 applicants from medical schools outside of the United States between 2003 and 2008 and, the total number of the applicants was 4601. Thus, IMGs constitute 1164/4601=25.2% of the pool of applicants.

77.     Another paper published in 2014 in "Ophthalmology", the official journal of American Academy of Ophthalmology, the authors found that for the same time (between 2003 and 2008), 167 IMGs were matched into ophthalmology[42]. It means, the match rate for IMGs, or the *average* probability of matching for IMG between 2003 and 2008, was 167/1164=14.3%. For comparison, the match rate for US-Seniors, or the *average* probability of matching between 2003 and 2008, was 75%[43].

78.     Based on NRMP data of 2009, 2011, and 2014, Dr. Pouyeh's USMLE Step 1 score is above the score of 75% of **the matched** applicants in **almost all** specialties (i.e. internal medicine as well as anesthesiology, dermatology, diagnostic radiology, emergency medicine, family medicine, general surgery, neurological surgery, neurology, obstetrics and gynecology, orthopedic surgery, otolaryngology, pathology, pediatrics, physical medicine, plastic surgery, psychiatry, radiation oncology, and transitional year), *nation-wide*. (Exh.12: Step1 of the matched applicants in all specialties 2009-2014.pdf).

79.     Similarly for ophthalmology, among the 2,475 of US-applicants who *matched* ophthalmology residency between 2003 and 2008, 532 (21.5%) had USMLE Step 1 score $\geq$ 246 and 78.5% of them who matched had a score less than 246[44].

**USMLE Step 2 CK exam**

---

[42] "Predictors of Matching in Ophthalmology Residency for International Medical Graduates", Todd H. Driver, et al, Ophthalmology, 2014; 121: 974-975.
[43] "Predictors of Matching in Ophthalmology Residency for International Medical Graduates", Todd H. Driver, et al, Ophthalmology, 2014; 121: 974-975, Table 1.
[44] Id. Table 1. Characteristics of US applicants in Ophthalmology Residency 2003-2008.

80.    USMLE Step 2 score is based on the score of examinees from *U.S. and Canadian medical schools*. By the time Plaintiff's exam score was reported on May 26th, 2009, "the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools [were] approximately 226 and 23, respectively, with most scores falling between 140 and 260. A score of 184 [was] set by USMLE to pass Step 2. The standard error of measurement for this scale [was] seven points."[45]

81.    Dr. Pouyeh also excelled in USMLE Step 2 exam and scored 232 *on the first attempt.* (Exh. 13: Plaintiff's USMLE Step 1, Step 2 CK , and Step 2 CS scores). It means his score was above 61% of the examinees.

82.    Residency programs generally do not consider USMLE Step 2 CK score of US seniors for ranking them for the match. According to NRMP report in 2009, 2011, and 2014, Step 2 CK score of between 20% and 30% of US seniors were unavailable by the time they matched to a medical residency program. (Exh.16: 20% to 30% of US-Seniors match and the majority of osteopathic applicants match without taking USMLE Step 2 CK).

83.    Similarly, in ophthalmology residency match in 2011, 46% of the US-senior applicants did not report their USMLE Step 2 score to residency programs[46].

84.    In fact, in another paper on "predictors of Matching to ophthalmology Residency Program"[47], the authors did not even investigate whether USMLE Step 2 has any significance in the probability of matching to ophthalmology residency for US-applicants.

85.    Internet forum called Student Doctor Network ran Match Poll 2011 for ophthalmology residency[48] (Exh.9), a member of this forum under the pseudo-name "Sands of

---

[45] Plaintiff's Step 2 score report
[46] "Ophthalmology residency Match Outcomes for 2011", by Yousuf, et al., Ophthalmology, 2012; 119:642-646. P 643.
[47] "Predictors of matching in an ophthalmology residency program.", Loh AR, et al. Ophthalmology. 2013 Apr;120(4):865-70

Sahra", indicated that he or she matched to the defendants' ophthalmology residency program at Bascom palmer Eye Institute (BPEI) without reporting his/her USMLE Step 2 score.

86.    Similarly, as Exh.7 shows, in 2011 91.7% (407/ (407+37)) of the US-Seniors and in 2014 93.1% (379/(379+28)) of the US-Seniors who did not take their USMLE Step 2 CK score, matched into internal medicine residency.

87.    This means that, US-Seniors will match to residency programs (including internal medicine residency, preliminary medicine, or ophthalmology residency) **regardless of their USMLE Step 2 CK score**, nation-wide.

### USMLE Step 2 CS exam

88.    "The standardized patients (SPs) assess communication skills, interpersonal skills, and English-speaking skills via carefully developed rating scales on which the standardized patients (SPs) have received intensive training."[49]

89.    Scoring report is in the form of Pass/Fail and does not provide numeric values.

90.    Dr. Pouyeh passed this exam *on the second attempt*, and the passing report was made available on March 23rd, 2010. Plaintiff failed this exam once, reported on Oct 15th, 2009.

91.    A significant number of the US seniors are interviewed and they are matched to a residency position even before they take Step 2 CS. Some of them take the exam after they get a residency position but before the time they graduate from medical school in June. "US students have taken Step 2 CS late in their senior year, prior to graduation."[50]

92.    US seniors will match to residency even if they have not taken Step 2 CS. Nonetheless, for international applicants, many residency programs, including of the defendants'

---

[48] http://forums.studentdoctor.net/threads/sdn-ophthalmology-2011-match-stats.788298/
[49] http://www.usmle.org/step-2-cs/#scoring
[50] https://en.wikipedia.org/wiki/USMLE_Step_2_Clinical_Skills

internal medicine and preliminary medicine program, require IMG to pass Step 2 CS before the residency program rank them or review the application.

### USMLE Step 3 exam

93.     Passing Step 3 is not required for entering into a post-graduate residency or internship training program in the USA, including the defendants' residency positions.

94.     Usually, this exam is taken in the first, second or third year of post-graduate medical residency.

95.     Nevertheless, Dr. Pouyeh passed this exam on the first attempt on August 11th, 2014 without having post-graduate training in the UnitedStates. Entering into residency is not a requirement for taking Step 3 but passing USMLE Step 1, Step 2 CK, and Step 2 CS is the requirement for taking Step 3.

96.     "Step 3 assesses whether you can apply medical knowledge and understanding of biomedical and clinical science essential for the *unsupervised* practice of medicine, with emphasis on *patient management* in *ambulatory settings.*"[51]

97.     Passing this exam means Dr. Pouyeh is prepared to practice medicine *unsupervised* in the United States.

98.     Passing this exam, without the benefit of post-graduate training in US residency, indicates that Plaintiff is more qualified that US-seniors, who enter in residency without taking Step 3 and are still learning how to practice medicine *under supervision.*

### Supervised and unsupervised medical practice in Iran

99.     Dr. Pouyeh practiced medicine under supervision between 2002 and 2004 as an intern in some teaching hospitals belonging to Tehran University of Medical Sciences in Tehran, Iran.

---

[51] http://www.usmle.org/step-3/

100.    **He** also practiced medicine without supervision as a licensed physician in Iran between 2004 and 2006; after graduation from medical and as part of performing his mandatory military service. Military service is mandatory for males and without serving in military service, Dr. Pouyeh was not authorized to obtain his passport and release his medical diploma.

101.    His duty as a serving physician and medical officer was similar to a generalist, such as internal medicine or family physician. He provided primary care to the military personnel and trained soldiers on public health and prevention of STIs (Sexually Transmitted Infections).

102.    Graduates of US medical schools have their first clinical experience under supervision during post-graduate medical residency and internship, and not by the time they apply to residency position. They only can practice medicine independently after some years of post-graduate clinical experience under supervision. Before graduation from medical school, they are only medical students, not intern or medical resident and they do not have license to practice medicine.

103.    Dr. Pouyeh has a unique clinical experience (supervised, and unsupervised) in Iran and none of US medical school graduates or US-seniors can meet this unparalleled qualification.

104.    Some of IMGs are also seasoned and experienced doctors and even faculty of a medical school before they immigrate to United States.

### Clinical experience in the United States

105.    The website of internal medicine residency program indicates that the applicants must have US clinical experience and it is preferred that they have 3 to 6 months US clinical experience. (Exh.2)

106.    The website does not specify what is considered as US clinical experience. Observership / externship, US-elective clerkship rotation, clinical research positions are some types

of US clinical experience. (Performing medical treatment without a license is crime in all states and IMGs cannot treat patients until they complete some years in post-graduate medical residency).

107.    None of the IMG residents in the defendants' residency programs had the U.S. clinical experience comparable to Plaintiff's, in terms of duration, quality, diversity in different specialties, as well as the breadth and depth of exposure and experience.

108.    Dr. Pouyeh has a total of 24 months US clinical experience (from 5/2010 to 8/2012). He had observership/externship 1 month at Jackson Memorial Hospital and Sylvester (for University of Miami) **general surgery**[52] program, 1 month in **internal medicine (sub: oncology)**[53] program at Sylvester (belonging to University of Miami and Jackson Memorial Hospital), 21 months at the Jackson Memorial Hospital-University of Miami's Bascom Palmer **ophthalmology**[54] program, 1 month at Jackson-Memorial Hospital **neurology**[55] program, and 1 month at Jackson-Memorial **internal medicine (sub: nephrology)**[56] program.

109.    During these observership/externship programs, he examined patients, wrote progress notes in patients' electronic chart and presented the patients to the faculty member, participated in Grand Rounds as well as lectures, observed medical and surgical procedures and scrubbed in and

---

[52] 05/2010 - 06/2010, Sylvester-University of Miami , FL, United States; Externship (GENERAL SURGERY); Dr. Moffat, Dr. Livingston; Shadowed the supervisors in their clinic. Performed history and physicals on the patients and presented them to the supervisors on rounds. Scrubbed into multiple surgeries, including hepatic lobectomy.

[53] 06/2010 - 07/2010 ; Sylvester-University of Miami , FL, United States; Observership (HEMATOLOGY AND ONCOLOGY), Dr. Karandish; Assistant Professor of IM Performed history and physicals and presented patients on rounds. Participated in conferences.

[54] 07/2010 - 04/2012; Bascom Palmer Eye Institute- University of Miami , FL, United States; Observership (OPHTHALMOLOGY), Shadowed Dr. Galor, Dr. Suh, Dr. Yoo, Dr. Alfonso Took history and examined cornea and glaucoma patients under supervision. Attended Cornea Conferences, Grand Rounds, and Dr.Rosenfeld's Journal Clubs on Avastin and Lucentis. Reviewed pathology slides with Dr. Dubovy. Observed toric lens implantation (by Dr. Galor), penetrating keratoplasty (by Dr. Forster), vitrectomy and re-attachment of the retina (by Dr. Gregori)

[55] 04/2012 - 06/2012; Jackson Memorial Hospital , FL, United States; Externship (NEUROLOGY), Drs. Katsnelson, Ortiz, and Koch; Obtained history and performed neurological examinations everyday. Wrote progress notes, suggested plans, and presented the patients to the supervisors on daily rounds. Presented two papers about the Watchman device (Lancet 2009 Aug 15;374(9689):534-42) and CLOSURE I trial(N Engl J Med 2012; 366:991-999)

[56] 07/2012 - 08/2012; Jackson Memorial Hospital , FL, United States; Externship (NEPHROLOGY), Dr. Ali Nayer; Associate Professor of Nephrology; Obtained history and performed physical examinations on new patients, presented differential diagnoses, and developed plans with the supervisor on daily rounds. Wrote progress notes for the patients and presented them on rounds daily.

attended operating rooms, presented papers, attended journal clubs, examined pathology slides (related to ophthalmology). See the footnotes 52 and 56 for more detailed explanation.

110.   Clinical research study in a US research center is also considered as US clinical experience. Plaintiff has 22 months clinical research experience at Miami VA Medical Center, between 09/2010 and 07/2012.

111.   He helped in setting up the research clinic and execution of an epidemiologic, cross-sectional, clinical study for dry eye syndrome in older Veteran men. As a research coordinator, he interviewed the potential participants and explained the clinical research study to the participants and obtained informed consent from them, and pull out relevant information related to the research participants' medical conditions and medications from their VA electronic medical chart, and put notes in the VA electronic medical chart about their research.

112.   The IMGs residents of the defendants at relevant time had less than 24 months of clinical experience in the USA[57], and the US medical graduates had limited clinical exposure during their medical school.

113.   None of the residents in the defendants' residency programs had this amount of US clinical experience, in terms of duration, quality, diversity in different specialties, as well as the breadth and depth of exposure and experience.

### Post-doctorate research fellowship in cornea, publications, and presentations

114.   Besides conducting an epidemiologic, clinical research at the Miami VA, Dr. Pouyeh has research experience for two years (July 2010-July 2012) during his post-doctorate research fellowship in cornea at Bascom Palmer Eye Institute and Miami VA medical center. He was very

---

[57] Plaintiff does not have standing to challenge this part of the requirement, but he adds that this requirement also disproportionally exclude foreign applicants in violation of Title VII and most IMGs do not have US-clinical experience and the purpose of State to mandate IMGs have some years of supervised practice in medical residency is to make sure that IMGs applicants have enough experience to practice medicine in the USA. Setting this requirement as a condition to enter medical residency is a catch-22 condition and ignores and negates the principle purpose and philosophy of mandating IMGs do medical residency.

productive **during** this time as he produced 17 abstracts, papers and poster presentations in ophthalmology during this time.

115.    In two years, he prepared 7 papers for publication in peer-reviewed, ophthalmology journals and was first-author on 4 of them.

116.    He also published 1 peer-reviewed book chapter on fungal keratitis, also first-author on the book chapter.

117.    He also presented 7 posters in ARVO (the Association for Research in Vision and Ophthalmology) in two years and 2 more at the Miami VA Medical Center, all in ophthalmology.

118.    It is notable that preparing a paper takes *at least* six months. Submitting 7 papers and one book chapter as first-author and presenting 9 posters in two years indicates that Dr. Pouyeh is steadfast and hardworking.

119.    Whereas Plaintiff has 17 publications and presentations, only 24% (747 out of 3118) of US-Seniors, applicant to internal medicine in 2011, indicated that they have 5 or more publications, abstracts, or presentations and this report does not specify how many of them were solely research projects and how many of them, if ever, were ultimately accepted by a journal and how prestigious was the journal and the quality of the published paper. (Exh.8: number of abstracts, presentations, and publications). Compared to independent (the majority are IMGs) applicants in internal medicine residency programs, only 17.7% (840 out of 4,756) applicants in 2011 indicated that they have 5 or more publications, abstract, or presentation. (Exh.8). It is notable that 29% (915 out of 3118) of US-Seniors matched to internal medicine residency even without any publications or research projects.

120.    In 2014, only 29.7% (961 out of 3235) US-seniors and 20.6% (1113 out of 5501) of the independent applicants indicated that they have 5 or more abstract, presentation, or publications.

(Exh.8) and 20.6% (667 out of 3235) of the matched US-Seniors indicated that they did not have any publications, research projects, or presentations.

121.    In a paper published in American Academy Journal, "Ophthalmology", among IMGs who *matched* into ophthalmology residency, 31.2% had no publications, 44% had 1-2 publications, and 24% had 3 or more publications[58]. The authors of this paper did not distinguish whether these publications were in the field of ophthalmology or not.

122.    Dr. Pouyeh's papers were published in highly ranked ophthalmology journals in the world and he was *first-author* in 4 papers.  3 of these 4 papers were published in in highly ranked ophthalmology journals in the world ophthalmology with an Impact Factor (IF)[59] > 3.0. He was *first-author* in one paper[60] in "Ophthalmology", the official journal of American Academy of Ophthalmology, a highly esteemed journal in the field of ophthalmology with an impact factor or IF=6.1 (as for 2014); *first-author* in one paper[61] in American journal of ophthalmology with IF=3.871 (as for 2014); *first-author* in one paper[62] in Journal of Cataract and Refractive Surgery with IF=3.020 (as for 2015); and *first-author* in another review paper[63].

---

[58] "Predictors of Matching in Ophthalmology Residency for International Medical Graduates", Todd H. Driver, et al, Ophthalmology, 2014; 121: 974-975.  Table 2.
[59] "The Impact Factor (IF) of an academic journal is a measure reflecting the yearly average number of citations to recent articles published in that journal. **It is frequently used as a proxy for the relative importance of a journal within its field,** with journals with higher impact factors deemed to be more important than those with lower ones." https://en.wikipedia.org/wiki/Impact_factor
[60] Pouyeh B, Feuer WJ, Yoo SH, Shi W, Suh LH. Refractive stability after Phaco-DSAEK. Ophthalmology. 2012 Oct; 119(10):2190-2190 PMID:23034292
[61] Pouyeh B, Viteri E, Feuer W, Lee DJ, Florez H, Fabian JA, Perez VL, Galor A. Impact of ocular surface symptoms on quality of life in a United States Veteran Affairs population. American Journal of Ophthalmology. 2012 Jun, 153(6): 1061- 66 PMID: 22330309
[62] Pouyeh B, Galor A, Junk AK, Pelletier J, Wellik SR, Gregori NZ, Trentacoste J. Surgical and refractive outcomes in cataract surgery with toric intraocular lens implantation in a resident-teaching institution. Journal of Cataract and Refractive Surgery. 2011 Sept; 37(9):1623-8. PMID: 21855762
[63] Pouyeh B, Galor A, Miller D, Alfonso E. New horizons in one of ophthalmology challenges: fungal keratitis. Expert Review of ophthalmology. 2011 Oct; 6(5): 529-40.

123.    He was also an author in one paper[64] in American Journal of Ophthalmology with

IF=3.871 (as for 2014), one paper[65] in "Cornea" with IF=2.042 (as for 2015); and one paper[66] in

Journal of refractive surgery with IF= 3.314 (as for 2015).

124.    Among the IMGs matched into ophthalmology residency, while 31.7% had two or

more publications in journals with IF >3.0, only 17.1% were *first-author* in two or more journals

with IF> 3.0. Among IMG who did not matched, only 5.3% were *first-author* in two or more

journals with IF> 3.0. The authors of this paper[67] did not distinguish whether these publications with

IF > 3.0 were in the field of ophthalmology or in other medical specialties.

125.    Plaintiff could not find any official statistics from SF Match or any paper for US-

applicants' publications who applied to ophthalmology residency, but the number should not differ

significantly from the rest of the US-applicants in NRMP match.

126.    In support of this conclusion, an internet forum sheds some light. "Match Poll

2011"[68] shows among 13 matched US-Seniors in the forum for "Match Poll 2011", nine indicated

that they did not have any ophthalmology publications (Exh.9: Tabular summary of Match Poll

2011), and 5 had no publications at all. (Id.) Only one of them, "junkmail86", had many publications

in the field of ophthalmology. (Id.)

127.    One of the participants in the forum, under the pseudo-name "Sands of Sahra",

matched to the defendants' ophthalmology residency program (Bascom Palmer Eye Institute a.k.a.

---

[64] Galor A, Feuer W, Lee DJ, Florez H, Carter D, Prunty WJ, Pouyeh B, Perez VL. Prevalence and risk factors of dry eye syndrome in a veteran population. American Journal of Ophthalmology. 2011 Sept; 152(3): 377-384.e2. PMID: 21684522
[65] Galor A, Gardner H, Feuer B, Pouyeh B, Florez H. Effect of Mediterranean dietary pattern and Vitamin D levels on dry eye syndrome.Cornea. 2014 May; 33(5):437-41. PMID: 24622300
[66] Lee BW, Galor A, Feuer WJ, Pouyeh B, Pelletier J, Vaddavali P, Lemelman B, See C, Yoo SH. Agreement between Pentacam and IOLMaster in patients undergoing toric intraocular lens implantation. Journal of refractive surgery. 2013 Feb; 29(2):114-20 PMID:23380412
[67] "Predictors of Matching in Ophthalmology Residency for International Medical Graduates", Todd H. Driver, et al, Ophthalmology, 2014; 121: 974-975.
[68] from http://forums.studentdoctor.net/threads/sdn-ophthalmology-2011-match-stats.788298/ visited on 6/24/2016.

BPEI).   This person had similar score in USMLE Step 1 with Plaintiff, no Step 2 score, and no publications in ophthalmology but 5 research projects (which is not clear whether they were ultimately published.) It is clear that Plaintiff was more qualified than "Sands of Sahra". (Id.)

128.    Dr. Pouyeh later could advance to become one of the reviewers of the highly esteemed journal in the field of ophthalmology, *Ophthalmology*, the official journal of American Academy of Ophthalmology, with IF> 6.1. In 2013-2014, he peer-reviewed and critically appraised a couple of papers submitted to this journal[69].

129.    This accomplishment is unique and exceptional among all the applicants to the residency programs. This accomplishment is not easily attainable by the junior faculty members who obviously have completed their medical residency and even their subspecialty and fellowship and have some published papers, let alone by novice medical graduates in the defendants' residency programs. The reason for this accomplishment is that Dr. Pouyeh published *high-quality* papers in *highly esteemed* journals; and not just numerous, low-quality papers, for the sheer purpose of increasing the number of his publications in his CV. "the research is accepted for publication in a *reputable* scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of *good science*". Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F. 3d 1311 - Court of Appeals, 9th Circuit (1995).

130.    Some of these residents in the defendants' residency programs did not have even one publication by the time they were hired.

131.    Besides research work, he was also active in other aspects of clinical ophthalmology. He shadowed Dr. Galor, Dr. Suh, Dr. Yoo, Dr. Alfonso in their clinics, took history and examined

---

[69] Per policy of the journal, the reviewers' identity remains confidential. Plaintiff nonetheless has the correspondence with the editor of this journal.

cornea and glaucoma patients under supervision. He attended Cornea Conferences, Grand Rounds, and Dr.Rosenfeld's Journal Clubs on retinal diseases and related medications (Avastin and Lucentis). He reviewed pathology slides for ophthalmology with Dr. Dubovy. He also observed cataract surgery and toric lens implantation (by Dr. Galor), repairing cornea injuries with penetrating keratoplasty (by Dr. Forster), as well as vitrectomy and re-attachment of the retina (by Dr. Gregori). Plaintiff also participated in the lectures for US-seniors doing their ophthalmology elective at Bascom Palmer Eye Institute.

132.    None of the US-MG residents in the defendants' ophthalmology residency program have this amount of experience in the field of ophthalmology. Some of them may have 1-month elective ophthalmology rotation, and rarely two 1-month ophthalmology rotations, but none of them have 24-months experience and this amount of exposure.

### Plaintiff's qualities as explained in the letters of recommendation

133.    Plaintiff included in his application for internal medicine and preliminary positions two letters of recommendation from internal medicine doctors: Dr. Ali Nayer is (or was) a specialist in internal medicine and subspecialist in nephrology at Jackson Memorial Hospital and a faculty member of University of Miami. Dr. Kaveh Karandish is (or was) a specialist in internal medicine and a hospitalist at Silvester cancer center for University of Miami and Jackson Memorial Hospital. He also included a letter from Dr. Leejee Suh, an ophthalmologist at Bascom Palmer Eye Institute - University of Miami, and Dr. Gustavo Ortiz, a specialist in neurology and a faculty member of Jackson Memorial Hospital.

134.    Plaintiff for his ophthalmology residency application included 4 letters of recommendation: A letter from Dr. Eduardo C. Alfonso, Chairman of Bascom Palmer Eye Institute, a letter from Dr. Anat Galor, an ophthalmologist at Bascom Palmer Eye Institute and Miami VA

medical center, a letter from **Dr. Leejee Suh**, an ophthalmologist at Bascom Palmer Eye Institute - University of Miami, and a letter from Dr. Gustavo Ortiz, a specialist in neurology and a faculty member of Jackson Memorial Hospital.

135.    Plaintiff waived his right to access to the letter of recommendation written by Dr. Ortize and  Dr. Suh, but he had a copy of them in an enclosed envelop and for this lawsuit, he opened those envelops and he quotes them here. Plaintiff also waived his right to access to the letter of recommendation written by Dr. Nayer and did not have any copy of it to quote here but Dr. Nayer told Plaintiff he wrote a strong letter and Plantiff assumes the qualities Dr. Nayer noted about Plaintiff in that letter should not be significantly different from other letters he mentions here. He also quotes from the letters written by Dr. Galor and Dr. Alfonso. (Exh.10: Plaintiff's letters of recommendation for medical residencies)

### b) *Motivation, sense of responsibility, steadfastness, intellect, desire to learn*

136.    Dr. Galor [ophthalmologist]: "During his time in Miami, Bozorgmehr (Ryan) distinguish himself academically with his abundant enthusiasm, intelligence, and proactive character." (Exh.10)

137.    Dr. Alfonso [ophthalmologist]: "The most impressive characteristics of Ryan are his intellect, his motivation, and his sense of responsibly". (Exh.10)

138.    Dr. Alfonso: "Dr. Pouyeh, …., has been an outstanding research fellow. He has worked on numerous projects on infectious keratitis and has written a review article on this subject with Dr. Galor and me. *He researched literature critically and made some keen observations of area that we would potentially further investigate to make significant changes in the diagnosis and management of fungal keratitis. I give him all the credit for having done this work.*" [Emphasis added]

139.    Dr. Ortiz [neurologist]: "He was always pro-active, either by asking intelligent questions, or by willing to answer the questions I was asking to the team." (Exh.10)

140.    Dr. Ortiz: "Dr. Pouyeh has shown strong determination and willingness to get into Residency training in the United States."

141.    Dr. Galor [ophthalmologist]: "He helped with the planning and execution of a cross-sectional study that evaluated the epidemiology and risk factors of dry eye syndrome in older men. In assisting with the planning of the study, *Ryan enthusiastically reviewed the literature to ensure that all necessary information was captured in our data collection sheet. Ryan spent extra hours setting up the study clinic at the outset.*" [Emphasis added]

142.    Dr. Galor: "He helped with the planning and execution of a cross-sectional study that evaluated the epidemiology and risk factors of dry eye syndrome in older men..... *he took upon himself* to *master Microsoft Access* in order automate the imputation of data into the Access program and to develop an electronic source document for the study." [Emphasis added]

143.    Dr. Galor: "Each week, we see between 5 and 8 research participants and are able to complete all the necessary testing by noon because Ryan *spent countless hours on his own initiative* learning *Microsoft* Access and developing this program." [Emphasis added]

144.    Dr. Galor: "Ryan's work ethic has been excellent and his character and integrity are beyond question. He is always ready to help out with whatever job is at hand. He is committed to finish the work even in the most difficult situations. He has proved to be extremely dedicated, reliable, conscientious worker."

145.    Dr. Galor: "Ryan was involved in a retrospective study evaluating the surgical and refractive outcomes in resident-performed cataract surgery using toric intraocular lenses. This project involved the interpretation of numerous ophthalmology documents including clinical notes,

40

surgical dictations, Pentacam data, and IOL master notations. Although Ryan had no previous experience with this material, he worked diligently to understand the subject and assimilated the complex material with great facility. *Ryan's mastery of the subject was accomplished through independent and assiduous review of pertinent literature, and was galvanized by self-motivation*.....Given his hard work and dedication, a manuscript on which he is first author has been accepted on the journal of cataract and refractive surgery" [Emphasis added]

146.    Dr. Galor: "I continue to be very impressed with Bozorgmehr's enthusiasm and drive".

147.    Dr. Karandish [internal medicine specialist]: "He participated in the rounds and conferences and demonstrated tremendous amount of enthusiasm in the field of internal medicine and hematology-oncology. .... During this period, Dr. Pouyeh showed great motivation and intelligence. He actively participated in our daily rounds, presented meticulous facts about his patients and discussed the differential diagnoses and plans." (Exh.10)

148.    Dr. Suh [ophthalmologist]: "He impressed me with his work ethic, inquisitive manner, and desire to learn." (Exh.10)

149.    Dr. Suh: "He worked with me on looking at long term refractive outcome after combined cataract surgery/intraocular lens implantation/endothelial keratoplasty. He was diligent in learning the material and meticulous with data collection and data interpretation. His ability to analyze data was impressive, mainly driven by his interest in the subject material."

### c)  *Excellent USMLE scores, medical knowledge, and intelligence*

150.    Dr. Alfonso: "He is an outstanding student. He has not only graduated with honors and first in his high school, college and medical school classes in Iran, but also has done exemplary

well in the ECFMG certificate [i.e. USMLE exams], where he has scores in the 96 and 99 percentile."

151.    Dr. Ortiz: "I have been able to recognize he is a well-mannered and very intelligent medical doctor."

152.    Dr. Ortiz [neurologist]: "Very soon it became evident to me that this knowledge in medicine was superior to the average of the observers. He was able to participate in rounds, discussing differential diagnosis and therapeutic alternatives almost *as if he was another resident of the team."* [Emphasis added]

153.    Dr. Ortiz: "He has obtained very high scores in the United State Medical Listening Examinations (USMLE), which is a perfect reflection of his intelligence and capacity."

154.    Dr. Galor: "During his time in Miami, Bozorgmehr (Ryan) distinguish himself academically with his abundant enthusiasm, intelligence, and proactive character."

155.    Dr. Galor: "Ryan worked on a fungal keratitis review under my supervision and that of Dr. Eduardo Alfonso, Chairman of Bascom Palmer Eye Institute….. I was very impressed by his outstanding medical background and analytic mind when I read his review."

156.    Dr. Karandish [internist]: "I had a chance to interact with him closely on a daily basis and became impressed by his effort and his fund of knowledge. ….He actively participated in our daily rounds, presented meticulous facts about his patients and discussed the differential diagnoses and plans. His superb ECFMG exam scores [i.e. USMLE exams] also indicates that he is a knowledgeable young physician."

157.    Dr. Suh [ophthalmologist]: "Although he has no formal training in ophthalmology, his knowledge base of conditions [i.e. diseases] and differential diagnoses demonstrated a great deal of independent study and inquiry."

158.    Dr. Suh: "His is very bright, highly motivated individual."

d) *Creativity, inquisitive mind, meticulousness, perfectionism, self-learning, team-playing and collaboration*

159.    Dr. Alfonso: "He researched literature critically and *made some keen observations of area that we would potentially further investigate to make significant changes* in the diagnosis and management of fungal keratitis. I give him all the credit for having done this work." [Emphasis added]

160.    Dr. Alfonso: "I see him continuing to pursue an academic career because of his creative and inquisitive mind."

161.    Dr. Ortiz: "He was always *pro-active*, either by asking intelligent questions, or by *willing to answer the questions I was asking to the team*." [Emphasis added]

162.    Dr. Galor: "He helped with the planning and execution of a cross-sectional study that evaluated the epidemiology and risk factors of dry eye syndrome in older men…..and found *many novel and creative ways to improve the execution of the research* and to *help the team*. For example, he took upon himself to master Microsoft Access in order *automate the imputation of data* into the Access program and to develop an electronic source document for the study. I was *amazed to see that my brilliant research fellow* made a computer program within 2 month that reads patients' electronic chart from VA administrative database  to extract the information of their medication, then identifies to which pharmacological group the medications belong, and finally enters the data into the excel [sic] sheet automatically. *This multi-user program greatly facilitated the execution of the study* because *the research team* could work and communicate simultaneously and efficiently via this program." [Emphasis added]

163.    Dr. Galor: "Ryan was involved in a retrospective study evaluating the surgical and refractive outcomes in resident-performed cataract surgery using toric intraocular lenses. …..he has been *very meticulous* and steadfast as the compilation of data for this manuscript involves the imputation of hundreds of numbers into a spreadsheet." [Emphasis added]

164.    Dr. Galor: "Ryan worked on a fungal keratitis review under my supervision and that of Dr. Eduardo Alfonso, Chairman of Bascom Palmer Eye Institute. Ryan *meticulously* read the *full-text of hundreds of papers* on the topic and saw patients with fungal keratitis in Bascom Palmer in order to *master the subject*. He then assimilated the data into a *well thought out, well-written, comprehensive, and informative* review." [Emphasis added]

165.    Dr. Galor: "His review article is unique among other reviews on this topic as he introduced many novel ideas based on his integration of the published data. For example, he introduced artificial neural network as a potentially accurate ancillary method for the diagnosis of fungal keratitis. He also commented that, contrary to current belief, there is limited evidence to justify the use of cyclosporine after performing penetrating keratoplasty in a patient with fungal keratitis." [Emphasis added]

166.    Dr. Galor: "Given these interactions with Dr. Bozorgmehr (Ryan) Pouyeh, I am convinced that he is able to take on any subject or task and dedicate time and energy needed to master it.…I highly recommend him for ophthalmology residency as he *is hardworking, meticulous, eager to learn, and is always thinking about how to take each project and study to the next level*." [Emphasis added]

167.    Dr. Galor: "Ryan enthusiastically attends lectures, cornea conferences, and clinics at Bascom Palmer ….he examines patients and then immediately researches their disease, their medical and surgical treatment, and related research papers."

168.     Dr. Karandish: "He actively participated in our daily rounds, presented meticulous facts about his patients and discussed the differential diagnoses and plans."

169.     Dr. Karandish: "I am certain that he will be a great asset to any residency program *as he is also a great team-player.*" [Emphasis added]

170.     Dr. Suh: "He impressed me with his work ethic, inquisitive manner, and desire to learn."

171.     Dr. Suh: "He started working with me as he was interested in rotating in the clinic and seeing patients."

172.     Dr. Suh: "Although he has no formal training in ophthalmology, his knowledge base of conditions [i.e. diseases] and differential diagnoses demonstrated a great deal of independent study and inquiry."

173.     Dr. Suh: "He worked very hard at examining the data and was able *to collaborate with other physicians* and our biostatistics department to write a manuscript as the first-author, which was ultimately accepted as a letter in a *the highest esteemed ophthalmic journal*, Ophthalmology" [Emphasis added]

174.     Dr. Suh: "His inherent *inquisitive, innovative manner* will allow him *to strive for excellence* in ophthalmology, both in his clinical and research goals. [Emphasis added]

### e)  *Communication and interpersonal skills, bed-side manner*

175.     Dr. Alfonso: "He has spent time with me in the clinic and has been extremely courteous, and appropriate in the patient care encounter."

176.     Dr. Alfonso: "he has significantly increased his command of conversional English to the point that he does very well in history taking and explanation to the patients."

177.    Dr. Ortiz: "During the 2 weeks that he has spent with us in the service, I have been able to recognize he is well-mannered and very intelligent medical doctor."

178.    Dr. Ortiz: "His bedside manners were excellent, and he showed dedication and methodology in examining his patients and reporting daily progress during rounds."

179.    Dr. Ortiz: "During his observership, I asked him to give a presentation on "Wachman device" and his performance was excellent. He gave a very well organized talk, clear to the point."

180.    Dr. Ortiz: "His spoken English is fluid, with excellent grammar, vocabulary and pronunciation."

181.    Dr. Galor: "Ryan works efficiently and effectively, is courteous to patients and staff, and is very organized and punctual."

182.    Dr. Karandish: "He interacted with patients and the staff extremely politely and has a well-rounded personality. He speaks English fluently and has decent communication skills. I personally enjoyed working with him very much."

183.    Dr. Suh: "With patients, he was kind and compassionate."

## f) Clinical Experience in the USA, examination and presentation of the patients in the rounds, participating in conferences

184.    Dr. Alfonso: "He has spent time with me in the clinic and has been extremely courteous, and appropriate in the patient care encounter."

185.    Dr. Ortiz: "His bedside manners were excellent, and he showed dedication and methodology in examining his patients and reporting daily progress during rounds."

186.    Dr. Galor: "Ryan spent extra hours setting up the study clinic at the outset." "Each week, we see between 5 and 8 research participants".

187.    Dr. Galor: "Ryan worked on a fungal keratitis review under my supervision and that of Dr. Eduardo Alfonso, Chairman of Bascom Palmer Eye Institute. … *and saw patients with fungal keratitis in Bascom Palmer* in order to master the subject." [Emphasis added]

188.    Dr. Karandish: "He participated in the rounds and conferences and demonstrated tremendous amount of enthusiasm in the field of internal medicine and hematology-oncology. …. He actively participated in our daily rounds, presented meticulous facts about his patients and discussed the differential diagnoses and plans."

189.    Dr. Suh: "He started working with me as he was interested in rotating in the clinic and seeing patients. With patients, he was kind and compassionate and always willing to learn. Although he has no formal training in ophthalmology, his knowledge base of condition and differential diagnoses demonstrated a great deal of independent study and inquiry."

## g)  *Exceptionally good resident, an asset to the medical residency, and aspiring future physician in academic field and research*

190.    Dr. Alfonso: "I think these qualities will make him an exceptionally good resident in ophthalmology and eventually an ophthalmologist. I see him continuing an academic career. …I strongly support his application for a residency position in ophthalmology."

191.    Dr. Ortiz: "I am sure he will respond to all the exceptions and will enrich whichever program he enters….I strongly support Dr. Bozorgmehr Pouyeh in his application process to enter a Residency Program in the United States and wish him the very best."

192.    Dr. Galor: "I think he will make a superb ophthalmology resident, future ophthalmologist, and successful researcher. I highly recommend him for ophthalmology residency."

193.    Dr. Karandish: "I fully support his application for residency and I am certain that he will be a great asset to any residency program as he is also a great team-player."

194.    Dr. Suh: "His inherent inquisitive, innovative manner will allow him to strive for excellence in ophthalmology, both in his clinical and research goals. I know that with his enthusiasm he will be successful as a future physician and scientist."

### Medical school

195.    Dr. Pouyeh graduated from Tehran University of Medical Sciences in Tehran, Iran in 2004. "It is the oldest and most well-known medical center in Iran"[70].

196.    His medical school is consistently ranked #1 in Iran by Ministry of Health[71]. Acceptance into this medical school is extremely competitive. To be eligible to enter in this medical school, Plaintiff ranking was 29th among 600,000 applicants (scored top 0.04%) in National University Entrance Exam[72], which is equivalent to MCAT (Medical College Admission Test) or SAT in the USA.

197.    Jackson Memorial Hospital has hired in **internal medicine residency program** a resident **from Plaintiff's medical school** ("Tehran University of Medical Sciences"). Her name is Dr. Tara Keihanian. There was another resident from "Tehran University of Medical Sciences" in Jackson Memorial Hospital in **diagnostic radiology residency program**. Her name is Dr. Ladan Lamea. She has finished her residency and now is a faculty of radiology at Jackson Memorial Hospital. Dr. Mehdi Nassiri is another resident in Jackson Memorial Hospital in **pathology residency program,** who also graduated from Plaintiff's medical school. Dr. Mehrdad Nadji is also a medical graduate of Tehran University who completed **pathology residency** program at Jackson Memorial Hospital and has been a **faculty and professor of pathology** at Jackson Memorial Hospital and University of Miami for more than 20 years. Dr. Behnam Djahed is another graduate of

---

[70] Official website of Tehran university  of Medical Sciences: http://gsia.tums.ac.ir/en/page/2280/About  Accessed on 6/30/16
[71] https://en.wikipedia.org/wiki/Tehran_University_of_Medical_Sciences  Accessed on 6/30/16
[72] In Iran it is called "Concour", from French word "Concours" which means contest

Plaintiff's university in **family medicine** residency program in Jackson Memorial Hospital, who is now the director of family medicine of University of Miami and Jackson Memorial Hospital.

198.    The defendants' ophthalmology residency program *excludes* IMGs. Nonetheless, in recent years, graduates of Tehran University of Medical Sciences were also successful to obtain **ophthalmology residency** position in *other* ophthalmology residency programs: (i) Dr. Abed Namavari in Chiacogo, IL in 2016; (ii) Dr. Mehrad Malihi in Rutgers, New Jersey in 2012; (iii) Dr. Pejamn Bakhtiari in Loma Linda, Ca in 2014; (iv) Dr. Babak Jian Seyedahmadi, Rochester, NY before 2012; (v) Dr. Saloomeh Saati in Doheny-USC, CA in 2013; (vi) Dr. Parisa Emami in Kresge Eye Institute, MI in 2016; (vii) Dr Azin Abazari in university of Virginia in 2011; and (viii) Dr. Amir Reza Hajrasouliha in Louisville, KY in 2012[73].

199.    This information further indorses the fact that Tehran University of Medical Sciences trains top physicians among many medical schools in the world and the graduates of this university could defeat all systematic discrimination (explained before and will elaborate further below) against IMGs in the USA and could obtain residency positions and even advance to become faculty member and director of Jackson Memorial Hospital.

### Extracurricular, volunteer, and leadership activities during his medical school

200.    Plaintiff between August 2002 and December 2003 **initiated, organized, and led two foreign language groups simultaneously** during his medical school. The English and French groups were intended to improve medical students' ability to speak medical subjects and present medical journals on English and French, as well as practicing medical questions and exams in English and French, as Iran's constitution mandates all formal communications and teaching materials to be in Persian language and this includes medical terms and exams in medical schools

---

[73] The year indicates the year of entrance into residency with +/- 1 year precision.

and universities.  Before then, Plaintiff was actively learning medical topics and terminology in English and French by himself and participated to extracurricular, private language institutes to learn French and master English. Thanks to these activities, he could obtain high scores in USMLE exams and also have excellent communication and presentation skills and writing skills. As Dr. Ortiz wrote in his letter of recommendation: "During his observership [in May 2012], I asked him to give a presentation on "Wachman device" and his performance was excellent. He gave a very well organized talk, clear to the point."

201.    Between June and August of 2002, Plaintiff **gave lecture** on *critical appraisal of medical literature*. Before then, he participated in classes on this topic and also learnt techniques of *scientific writing*. Thanks to these activities and his writing skills, Plaintiff could write a review article that both Dr. Alfonso and Dr. Galor praised and present innovative ideas in fungal keratitis and challenge past practices for diagnosis and treatment of fungal keratitis.  (¶ 138 and ¶ 164). Also, thanks to this background in critical appraisal of medical literature and scientific writing, Plaintiff could publish high quality papers as first author in prestigious journals. (¶ 173). Plaintiff later could rise to become a reviewer of this highly-esteemed journal and in 2013-2014, and he peer-reviewed and *critically appraised* a couple of papers submitted to the Editor of Ophthalmology. Dr. Alfonso also mentioned in his letter of recommendation: "I think these qualities will make him an exceptionally good resident in ophthalmology and eventually an ophthalmologist. I see him continuing *an academic career."*

202.    Plaintiff also participated in some **volunteer activities during** his medical school. From March to May 2004, he provided free medical care to disadvantaged people in suburb of Tehran, capital of Iran. He counseled them for family planning and prevention of sexually transmitted diseases.

203.     Plaintiff also learnt **computer programming**, in C, and C++ (including Microsoft Foundation Classes a.k.a MFC) as well as Windows API (Application Programming Interface)[74]. Thanks to this background in computer programming, Dr. Pouyeh could learn programming in SQL[75] (database programming) for Microsoft Access and designing electronic forms for the cross-sectional research project within 2 months. (¶ 162).

204.     Plaintiff was also involved in **creative activities** during his medical school. Not only he learnt computer programming, but also playing keyboard. He also published some poems in his native language in the journal of his medical school. He learnt English rhythms and rhyme and also has two poems in English, two quatrains. He also enjoyed French poems as they are similar to Persian poems and very distinguished from English poems, in terms of rhythms.

205.     Plaintiff was also interested in **doing sport**. He won a prize in chess in medical school and before then, he was selected as top chess-player in his high-school. He also has a gold medal in swimming.  He plays soccer and is a fan of soccer. He used to play tennis and used to go for hiking in Iran.

### Plaintiff's grades in Clerkship and Internship in Tehran University of Medical Sciences

206.     Medical school in Iran, as in most part of the world, starts after graduation from high school.

207.     In Iran, *all* schools and universities use 0 to 20 grading system.

---

[74] "In computer programming, an application programming interface (API) is a set of routine definitions, protocols, and tools for building software and applications."  https://en.wikipedia.org/wiki/Application_programming_interface

[75] SQL ( $^{1}/^{1}\varepsilon s$ kjuː ˈɛl/, or $^{1}/^{1}$siːkwəl/; Structured Query Language) is a special-purpose programming language designed for managing data held in a relational database management system (RDBMS), or for stream processing in a relational data stream management system (RDSMS). https://en.wikipedia.org/wiki/SQL

208.    Most USA *public high school system* use this grading system, which was adopted

from Wikipedia[76]

| Letter Grade | Percentage | GPA |
|---|---|---|
| A | 90-100 | 4.0 |
| B | 80-89 | 3.0 |
| C | 70-79 | 2.0 |
| D | 60-69 | 1.0 |
| F | 0-59 | 0.0 |

209.    If we want to convert Iran's 0 to 20 grading system to this grading system, we have A

(18-20), B (16-17.99), C (14-15.99), D (12-13.99), F (less than 12)]. Based on this, Plaintiff's grades

in medical school were:

### h) Clerkship Grades:

210.    A (90%-100%): ENT, obstetrics and gynecology, neurology, biostatistics, general

surgery, practical pharmacology

211.    B (80%-89%): Ophthalmology, pediatrics, urology, dermatology, infectious diseases,

radiology, public health, psychiatry, epidemiology, occupational medicine, rheumatology,

hematology and oncology, histology, physiology, microbiology, biochemistry

### i)  Internship Grades:

212.    A (90%-100%): ENT, medical thesis, pediatrics

213.    B (80%-89%): General surgery, infectious diseases, internal medicine, obstetrics and

gynecology, dermatology *(No ophthalmology rotation)*

---

[76] https://en.wikipedia.org/wiki/Academic_grading_in_the_United_States Accessed on 6/30/2016

### j)   Comparison to US medical schools

214.    The authors of "**Variation and Imprecision of Clerkship Grading in US Medical Schools**" published in August 2012 in the journal 'Academic Medicine', analyzed 2009-2010 third-year clerkship grades from 119 of the 123 (97%) US medical schools[77].

215.    The authors documented eight different grading systems using 27 unique sets of descriptive terminology.[78] They found that "Imprecision of grading was apparent. Institutions frequently used the same wording (e.g., "honors" or "satisfactory") to imply different meanings".

   a)  **High honors**, **honors**, pass, fail.
   b)  Honors, satisfactory plus, <u>satisfactory</u>, fail.
   c)  Honors, <u>satisfactory</u>, low satisfactory, fail.
   d)  Honors, high satisfactory, <u>satisfactory</u>, low satisfactory, unsatisfactory.
   e)  **Honors**, **near honors**, pass, fail.
   f)  Excellent, good, fail.
   g)  Honors, advanced, proficient, fail.
   h)  Honors, letter of commendation, fail.

216.    "Ninety-seven percent (97%) of all U.S. clerkship students were awarded one of the top three grades regardless of the number of grading tiers."[79]

217.    "The percentage of students awarded the top grade in any clerkship exhibited extreme variability (range 2%-93%) from school to school, as well as from clerkship to clerkship *within the same school* (range 18%-81%)"[80]. [emphasis added]

218.    The highest grade was awarded to 23% of the students in schools with three-tiered systems (range 5-51%), to 34% (range 2-84%) in four-tiered systems and to 33% (7-93%) in schools with five grade levels[81].

---

[77] "Variation and imprecision of clerkship grading in U.S. medical schools" Alexander EK, et al. ; Acad Med. 2012 Aug;87(8):1070-6
[78] Id.
[79] Id.
[80] Id.
[81] Id.

219.    The authors concluded that "There exists great heterogeneity of grading systems and imprecision of grade meaning throughout the U.S. medical education system. Systematic changes seeking to increase consistency, transparency, and reliability of grade meaning are needed to improve the student evaluation process at the national level."[82] [Emphasis added]

220.    In another study, "Is it appropriate to use core clerkship grades in the selection of residents?"[83], the authors obtained similar results. They also concluded that "Core clerkship grading systems and the percentage to which institutions grade students as having achieved the highest performance level vary greatly among U.S. medical schools. Within institutions, significant variability exists among clerkships in the percentage of the highest grade given, which makes interpersonal comparison based on core clerkship grades difficult and suggests that *this method may not be a reliable indicator of performance*."[84] [Emphasis added].

### Dr. Pouyeh is more knowledgeable than some faculty members and professors of ophthalmology in the defendants' residency program and in the USA

221.    Dr. Pouyeh is more knowledgeable than some faculty members and professors of ophthalmology in the defendants' residency program and in the USA.

222.    Dr. Pouyeh could become a reviewer of a prestigious ophthalmology journal. In addition, he could find mistakes from the faculty of Bascom Palmer Eye Institute and they made these mistakes because they were not as attentive and meticulous as Dr. Pouyeh in their work and ophthalmic education during their residency.

223.    While some of them have noted this in their letters of recommendation, explaining their mistakes and the mistakes of other well-known ophthalmologists in their publications require

---

[82] Id.
[83] "Curr Surg. 2006 Nov-Dec;63(6):391-6." Takayama H, et al. Curr Surg. 2006 Nov-Dec;63(6):391-6.
[84] Id.

54

another 20 pages and a lot of medical and ophthalmology jargons, which is not suitable to do for this complaint.

224.     Dr. Pouyeh is ready to explain this in details any time requested.

## II. *Arbitrary and systematic exclusion of IMGs and foreign doctors from medical residency in the USA and futility of Dr. Pouyeh's attempt to apply any further*

225.     Dr. Pouyeh with competitive scores of 246 and 232 in USMLE Step 1 and Step 2 CK did not get even 3 interviews for ophthalmology residency.  Plaintiff applied to 87 programs in 2010, 96 programs in 2011, 72 programs in 2012, 10 programs in 2013, 10 programs in 2014, and 10 programs in 2015 in every state and territory in the United States and in all of these years, plaintiff applied to this ophthalmology residency program, as well. Plaintiff has paid $7,035 only for application fee for ophthalmology residency during this time. Similarly, in 2010 and 2011, plaintiff also applied to over 200 residency programs in internal medicine and preliminary medicine and transitional year and general surgery. Dr. Pouyeh applied to 144 programs in 2012 to internal medicine, preliminary medicine, neurology and child neurology, general surgery, and transitional year. In 2013, Dr. Pouyeh applied to 129 residency program in family medicine, internal medicine, preliminary medicine, neurology, and general surgery. In 2014, Plaintiff applied to 55 residency programs in internal medicine, preliminary medicine, and transitional year. In 2015, Plaintiff applied to 52 residency programs. Overall Plaintiff has applied to more than 800 programs in most States in the United States through ERAS and has paid more than $18,000 for application fee and registration and release of USMLE scores to the program during this time. In all of these years, Dr. Pouyeh applied to the defendants' internal medicine and preliminary medicine programs. Plaintiff did not obtain any interviews for preliminary medicine or internal medicine.

226.     As it is evident from the previous paragraph, in the recent years Dr. Pouyeh applied to fewer programs, both in ophthalmology residency and for internal medicine and preliminary

medicine. The reasons are the cost of application fee and the futility of further attempts based on previous experience and other facts that he will explain below and explained else-where in this lawsuit.

227.     Both ERAS application service website and SF Match website mandate the applicants to specify their medical schools in their application and in the internet forms when the applicants register in these websites.

228.     The residency programs can easily screen for specific medical schools by the software they the use to download the applications from the respective website.

229.     NRMP surveyed anonymously 1,960 program directors in 2012[85] and 1,844 program directors in 2014[86] in different specialties in the USA[87]. The surveys provide information on the percentage of the residency programs in each specialty which typically grant interview and rank each applicant group. Dr. Pouyeh averaged the data for each specialty in 2012 and 2014 and summarized the result in a table. (Exh.11: percentage of the program directors typically interview and rank IMGs, US-Seniors, and US-MGs) All specialties together, it shows on average 98.7% of the program directors typically interview and rank US-seniors, 67.8% of them typically interview and rank US-graduates (who could not match as US-senior in previous year), 55.1% of them typically interview and rank the US citizens who graduated from a medical school outside the USA, and 44.6% of them typically interview and rank non-US-citizens graduates of international medical schools.

230.     The surveys are solid proofs how whimsical and arbitrary is the decision of the program directors to hire or not IMGs. The only explanation for the fact that *a fraction* of program

---

[85] 2012 NRMP Program Director Survey, available at:  http://www.nrmp.org/wp-content/uploads/2013/08/programresultsbyspecialty2012.pdf   accessed on 7/21/2016
[86] 2014 NRMP Program Director Survey, available at:  http://www.nrmp.org/wp-content/uploads/2014/09/PD-Survey-Report-2014.pdf  accessed on 7/21/2016
[87] anesthesiology, child neurology, dermatology, diagnostic radiology, emergency medicine, family medicine, internal medicine, internal medicine/pediatrics, neurological surgery, neurology, OBS/GYN, Orthopedic surgery, otolaryngology, pathology, pediatrics, plastic surgery, psychiatry, radiaton oncology, rehabilitation medicine, surgery, thorathic surgery, transitional year, and vascular surgery

directors are open to accept IMGs and this percentage varies in different specialties (Exh.11), is that the decision is totally arbitrary.  The table also shows that there is considerable disparity between the specialties which typically interview IMGs. In orthopedic surgery and dermatology, 16% and 24.6% of the programs indicated that they *typically* interview and rank non-US-IMGs. In contrast, in Pathology and neurology, 87.2% and 82.1% of the programs typically interview and rank non-US-IMGs.

231.    The survey also shows that IMGs are an identifiable, secular group and the exclusion of IMGs is intentional and purposeful.

232.    Although the surveys did not include program directors of ophthalmology residency programs, the fact that IMGs constitute 24.2% of the active US workforce physicians[88] and 7.3% of the active (licensed) ophthalmologists in the USA[89] (i.e. 16.6% disparity between the licensed IMG ophthalmology and the licensed IMG in workforce) as well as the fact that IMGs have constituted 3% to 6% of the matched applicants in SF Match between 2006 and 2016[90], whereas they constitute 25.2% (See ¶ 76) of the applicant pool in ophthalmology (i.e. about 19% to 22% disparity in the applicant pool vs. the hired applicants),  this information underscores the fact that program directors in ophthalmology residency programs behave similar to many other program directors in the USA and they exclude IMGs.

233.    Further comparison between the number of the interviews granted to IMGs and US applicants in ophthalmology residency, supports this conclusion. Ophthalmology Match Poll 2010[91] shows a *US applicant* with Step 1 score 218 and *without* passing Step 2 CK, and with 1 or 2 posters

---

[88] https://members.aamc.org/eweb/upload/Physician%20Specialty%20Databook%202014.pdf , page 24
[89] https://members.aamc.org/eweb/upload/Physician%20Specialty%20Databook%202014.pdf , Table 1.7.  Accessed on 8/10/2016.
[90] San Francisco Matching Program statistics. Available at
https://www.sfmatch.org/SpecialtyInsideAll.aspx?id=6&typ=2&name=Ophthalmology#  Accessed: 6/18/2016.
[91] Available at: http://forums.studentdoctor.net/threads/sdn-2010-ophthalmology-residency-match-poll.693246/
Accessed on 6/18/2016.

in ophthalmology, applied to 29 and received 7 interviews and matched University of Texas, southwestern. With ≥ 6 interviews, the probability of matching to ophthalmology is 90%[92]. Another *US applicant* with Step 1 score 224 and Step 2 CK score of 228 and 1 poster in ophthalmology applied to 80+ programs and received 13 interviews and finally matched his/her #1 choice ophthalmology program. Ophthalmology Match Poll 2011[93] (Exh.9) shows *an IMG,* a member of this forum under pseudo-name "chyclops", with Step 1 score 251 and Step 2 score 248 and 10 publications in ophthalmology applied to 29 programs and received only 2 interviews. With 2 interviews, the chance of matching is 20%[94]. The same year, a US applicant, a member of the forum under pseudo-name "Blood n Thunder", with Step 1 score 209, Step 2 CK score 221 and no ophthalmology publication applied to 70 programs and obtained 3 interviews and matched ophthalmology. (Exh.9) With 3 interviews, the probability of matching is about 35%[95]. One of the participants in the forum, under pseudo-name "Sands of Sahra", matched to the defendants' ophthalmology residency program (Bascom Palmer Eye Institute or BPEI). This person had similar score in USMLE Step 1 with Plaintiff, no Step 2 score, and no publications in ophthalmology but 5 research projects (which is not clear whether they were published.) (Exh.9)

234.    According to a paper titled "Ophthalmology Residency Matching Outcomes for 2011"[96], of the total 764 applicants in 2011 for ophthalmology residency match nationwide, IMGs constituted 22%[97] (n=168), US seniors constituted 68%[98] (n=520), and US-graduates constituted 7%

---

[92] Salman J. Yousuf, Leslie S. Jones, "Ophthalmology Residency Matching Outcomes for 2011", *Ophthalmology* 2012, 119:642-646. Figure 5.
[93] Available at: http://forums.studentdoctor.net/threads/sdn-ophthalmology-2011-match-stats.788298/ Accessed on 6/18/2016.
[94] Salman J. Yousuf, Leslie S. Jones, "Ophthalmology Residency Matching Outcomes for 2011", *Ophthalmology* 2012, 119:642-646. Figure 5.
[95] Id.
[96] Salman J. Yousuf, Leslie S. Jones, "Ophthalmology Residency Matching Outcomes for 2011", *Ophthalmology* 2012, 119:642-646. Page: 643.
[97] Id, Figure 1.
[98] Id. Figure 1.

(n=63) of the applicant pool. According SF Match, as for 2011 Match, only 27 IMGs could match an ophthalmology residency position nationwide and 405 US-seniors and 26 US-graduates. Thus, among the total 458 of *the matched* ophthalmology residents, IMGs constitute 5.9% (27/458) of the matched applicants, US-graduates constituted 5.7% (26/458), and US-Seniors 88.4% (405/458) of the matched applicants. Based on the above data, the match rate or the average probability of matching for IMGs=27/168=16%; for US-seniors=405/520= 77%; and for US-graduate=26/63=41%.

235.    "Chi-Square test" for the two variables (IMG vs. US-MG) shows that the difference in disparity (16% vs. 41%) is not explainable by chance and is statistically significant[99] at P-value < 0.05. Obviously, the disparity between the chances of matching for IMG vs. US-Seniors (16% vs. 77%) is also significant and is gross.

236.    The paper also reported that "Match rates were significantly higher for US seniors when compared with independent applicants (P < 0.001)"[100] despite that fact that "46% of US-Seniors in the 2011 match *did not report* their USMLE Step 2 CK"[101] [emphasis added].

237.    In one study conducted before 1997[102], identical requests were sent to 193 psychiatric residency programs. The letters differed only in two aspects. In one, the applicant was introduced as "American" and from Wayne State University School, and in the other, as "Pakistani" and from King Edward Medical College (Pakistan). The letters were sent one week apart. Five programs responded they were closed. 85% (159 out of 188) responded to American applicant and 46% (87 out of 188) responded to Pakistani applicant. (Relative application response American (85%)

---

[99] Chi-square Test Value is 16.46
[100] Salman J. Yousuf, Leslie S. Jones, "Ophthalmology Residency Matching Outcomes for 2011", *Ophthalmology* 2012, 119:642-646. Page 643
[101] Id.
[102] Balon R, Mufti R, Williams M, Riba M: "Possible discrimination in recruitment of psychiatry residents?" Am J Psych 1997, 154:1608-1609

/foreign (46%) =1.8, p< 0.001 [p < 0.001 means less than 1/1000, the result of this study is by chance]).

238.    In another study, all 283 members of the Association of Program Directors of Surgery were surveyed[103] in 2002 and 125 responded (48%). Among them, 90% were American graduates and 8% foreign graduates. The survey asked the opinion of program directors in:

  a) Standard exams:  69% of the program directors were strongly agreed, or agreed, or neutral that foreign doctors perform better than American doctors on standard exams.

  b) Surgical skills:  79% were strongly agreed, agreed, or neutral that foreign doctor's surgical skill in the operating room is equal or better than American doctors.

  c) In response to this question *"In reality, all things being equal, our program would rather offer positions to American doctor than a foreign doctor"*, 97% were agreed or neural (47% strongly agreed, 40% agreed, 10% neural)

  d) Discrimination against foreign doctors: 71% felt that foreign doctors are discriminated.

239.    All of these studies reported a finding only when it was statistically significant and it was not attributable to chance. None of these studies were conducted because of this particular lawsuit. The studies were published in peer-reviewed, reputable journals.

---

[103]Moore RA, Rhodenbaugh EJ: **The unkindest cut of all: Are international medical school graduates subjected to discrimination by general surgery residency programs?** *Curr Surg* 2002, **59**:228-236.

240.     According to *Batson v Kentucky,* 476 US 79, To establish a prima facie case, a defendant must show that he is a member of a cognizable racial group, that the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race, and that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. *Id.* at 96. In deciding whether the defendant has made the requisite showing, the trial court must consider all relevant circumstances, including whether there is a pattern of strikes against black jurors."

241.     These pieces of evidence establish the allegation of intentional and deliberate, systematic exclusion of IMGs from medical residencies, including ophthalmology residency programs and internal medicine and preliminary medicine in the USA, such as for the defendants' ophthalmology residency program and internal medicine and preliminary medicine programs.

242.     It is also clear that it is futile Dr. Pouyeh attempt to re-apply, even if he could afford the cost of it.

### III.     *Percentage of IMGs in the applicant pool*

243.     For ophthalmology, the calculated percentage of IMGs between 2003 and 2008 was 25.2%. See ¶ 76

244.     In the study published in ophthalmology journal for the match result 2011, IMGs constituted 22% of the applicant pool[104].

245.     According to NRMP data[105], in 2013 number of US-IMGs (matched/non—Matched) was 1594 (841/753) and for non-US-IMGs 3546 (matched/non-Matched) (1690/1856). Thus, according this data 5140 IMGs were applicants to internal medicine. NRMP data for 2014 shows

---

[104] Yousuf, et al. "Ophthalmology residency Match Outcomes for 2011", Ophthalmology, 2012; 119:642-646
[105] http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf  page 73

that there were 9314 applicants to internal medicine[106]. Thus, the percentage of IMGs for internal medicine in the applicant pool is 55.2%, based on NRMP data.

246.   According to ERAS data[107], 8341 applicants from allopathic (M.D.-granting) US medical school and 1809 applicant from osteopathic (DO-granting) US medical school applied to internal medicine. Also, 8113 applicants to internal medicine were US-IMGs and 13,794 were non-US-IMGs. Based on this data, there are 21907 (8113+13794) applicants to internal medicine and 10150 US-applicants. IMGs constitute 68.3% (21907/32057) of the applicants to internal medicine. The ERAS data is more accurate because ERAS system is used to send the application.

247.   The reason for this difference of the percentage of IMGs in the applicant between internal medicine (68.3%) and ophthalmology (25.2%) is that the program directors in internal medicine are more likely to grant interview and take IMGs than ophthalmology residency program directors. Thus, IMGs are less willing to apply to ophthalmology residency, in spite of the fact that ophthalmology is a popular specialty.

248.   Because a large number of residency programs in the USA give preference to US-Seniors than IMGs (Exh.11), IMGs on average apply to more programs than US-seniors to secure enough interviews to increase their chance. Thus, the calculated percentage of IMGs in the applicant pool underestimates the actual percentage of IMGs in a given residency program.

## IV. Close association between being an IMG and being a 'non US-born' applicant, as well as being a US-Senior/US-MG and being a US-born applicant

249.   There is statistically significant association between being a non-US born applicant and matriculating to a medical school outside of the USA (IMG); and being a US-born applicant and matriculating to a medical school inside the USA (US-Senior/US-MG)

---

[106] http://www.nrmp.org/wp-content/uploads/2014/09/Charting-Outcomes-2014-Final.pdf   Table 1, page 3
[107] https://www.aamc.org/download/321562/data/2013factstablec3.pdf

250.    According to NRMP data[108], US-Seniors (allopathic) were 17,487 and US-MG (allopathic) were 1,487 and non-US IMG were 7,568 and U.S. IMG were 5,095. Among these 5,095 U.S. IMG, 2,759 were U.S. born citizens and the rest were not US-born citizens[109]. According to American Association of Medical College, in 2006-2007 only 0.3% (55 out of 17,361) of the medical students matriculated to the allopathic (M.D. granting) medical schools inside the United States were international applicants[110]. (Plaintiff did not find, and do not think, any osteopathic medical schools in the USA take international applicants.)

251.    This is the tabular presentation of the above information:

|  | US-Seniors/ US-MG (allopathic) | IMG (allopathic) |
|---|---|---|
| US-born | 17487+1487-55 | 2759 |
| non US-born | 55 | 7568+ (5095-2759) |

252.    After solving the calculations, the table above becomes:

|  | US-MG/ US-Seniors (allopathic) | IMG (allopathic) |
|---|---|---|
| US-born | 18919 | 2759 |
| non US-born | 55 | 9904 |

253.    Chi-Square Test for Independence shows that there is statistically significant association between being a non-US born applicant and matriculating to a medical school outside of the USA (IMG); and being a US-born applicant and matriculating to a medical school inside the USA (US-Senior/US-MG). (Chi-Square Test Value=21378.57, $Z_D$= 146.21, P-Value < 0.05).

## V. Harms Dr. Pouyeh has been sustaining because of the acts and omissions of the defendants

---

[108] Charting Outcome in the Match for International Medical Graduate in 2013, page 1; available from http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf
[109] Id, chart 14, page 21.
[110] Available at: https://www.aamc.org/download/321462/data/factstablea4.pdf Accessed on 6/19/2016

254.    As explained above (¶ 225), Dr. Pouyeh has paid 7,035 only for application fee for ophthalmology residency and more than $18,000 for application fee for other residency programs including internal medicine and preliminary medicine, since 2010.

255.    Dr. Pouyeh has been unable to practice his profession in the USA since he immigrated to the USA and was unable to earn income because "All states require that anyone wishing to practice medicine as a physician must first obtain a state license to do so. Without such a license, anyone practicing medicine in the state commits a crime."[111]   And for obtaining state license, doing a medical residency in an approved residency program in the USA is mandatory. See supra, ¶ 13

256.    Obviously, he focused his full effort on building up his resume and obtaining a medical residency position as soon as possible. Plaintiff has lived under the federal line of poverty since he immigrated to the USA and his parents, living in Iran, have supported him since then and they have lent him over $75,000 to cover his basic cost of living. The average annual income in Iran is about $6,666[112] and the average annual expense is 7,168[113]. This means Plaintiff's parents have paid about 11 years of average income in Iran to cover 7-year expenses of Plaintiff; just enough to live under federal line of poverty, and Dr. Pouyeh's parents had to cover their own expenses as well while they are old, retired, and with many diseases; and, more complicating, this happened in the light of at least 22.2% inflation rate in Iran following international economic sanctions and boycotts against Iran for its nuclear program; after UN Security Council resolution in 2006.

> "In late June, Iran's Central Bank reported inflation to be at 22.2 percent, although economists say this figure is grossly underestimated. In one week alone, the price of chicken rose 30 percent and the price of vegetables almost 100 percent. Prices are unstable, budgets are being stretched thinner and thinner, and people are seeing the value of their savings quickly disappear…. Compounding these struggles is mounting

---

[111] http://www.criminaldefenselawyer.com/resources/practicing-medicine-without-a-license.htm
[112] http://www.uskowioniran.com/2012/01/income-and-life-in-urban-and-rural.html
[113] Id.

unemployment, soaring to an unofficial rate of 35 percent as factories and businesses must lay off workers because they are unable to import vital goods and raw materials"[114]

257.    It is clear than Plaintiff's parents sacrificed a lot and succumbed to extreme financial difficulties and they are heavily in debt at the age of their retirement when they require a stress-free life.

258.    Plaintiff does not have any more money to apply to residency programs. The sole money he is receiving is food stamp from State of FL. He is not eligible for any other type of support from the government. He has been evicted since December 2015 and has been a homeless, living literally on the street. His uncles and parents helped him financially to get a car sometime after the eviction, and he currently lives in a car but he does not have enough money to pay the installment of the car. If he cannot enter into medical residency immediately, the company will take the car back and Plaintiff will lose his laptop, clothes, and everything he has stored in the car and is unable to pursue his lawsuit.

259.    Because he is homeless now, he cannot cook his food nor store perishable foods in his car and his options to buy food is extremely limited, with respect to the fact that he receives food stamps and he only can buy cold food. He has to buy food on daily basis in small amounts, which costs more than buying a large amount of food. Thus, his food-stamp is not enough to cover the expenses of buying food for the whole day and he is unable to buy nutritious, healthy food. Writing this lawsuit, and pursuing this lawsuit drains out Plaint's mental power very quickly and he needs to consume a large amount of food to restore his energy. With a hungry stomach, plaintiff is unable to think and concentrate and pursue his lawsuit. Hunger causes anger and plaintiff endures and feels it more severely every day and night, because of the agonizing feelings of being discriminated. The

---

[114] http://www.iar-gwu.org/node/428

malnutrition and suppressing the feeling of anger and resent definitely tolls Plaintiff's health in short-term and long-term and stretches out his patience too far.

260.    Sleeping in the car is not easy. Plaintiff feels neck and back pain every morning and he suffers from poor sleep and poor concentration. Cold weather in the winter and hot weather in the summer makes Plaintiff wake up frequently at night and mosquitos are another nuisance at the summer. Sleep-deprivation has been associated with poor-concentration and car accident, depression and irritability, and increased risk of diabetes, among other issues. Prolonged sleep-deprivation is a cruel method used for torture and Plaintiff is being tortured not only by lack of sleep, but also by hunger and malnutrition, and intrusive and crushing thoughts of being discrimination by the defendants. Unless and until Plaintiff is not hired to the medical residency immediately, he is unable to obtain a house and overcome these problems. He simply is unable to pursue his lawsuit because of these relentless hurdles.

261.    Sleeping in the car and keeping all the belongings in the car is dangerous. Plaintiff is prone to be robbed, murdered, or raped at night, especially when he has to leave the window of the car open to ventilate out the hot weather within the car in the summer of Miami. He is living in absolute poverty and statistics show poverty and crimes are related. Lack of sleep and hunger makes people more irritable and plaintiff is not an exception.

262.    In fact, Plaintiff was hospitalized recently for having suicidal thought and depression and was treated by medication. He was totally hopeless and the sole reason he is better now is *this* lawsuit and hope for justice. If he cannot enter into medical residency *immediately*, and he becomes hopeless again and depressed, he cannot pursue the lawsuit anymore. After the discharge from the hospital, Plaintiff could not afford anti-depression medications and in State of Florida, he is not

eligible for Medicaid. **Debt** collector companies call for the unpaid medical debts after hospitalization and physician visits and this may already have reflected in his credit report.

263.    Plaintiff has lost his life. At his age, 38, his classmates in medical school post their photographs in social media with their spouse and children and their cars and houses. They post photographs of their travels and socializing with their friends and colleagues in bars and restaurants. They attend medical conferences and post the photographs of their achievements in their career in social media. They have become specialist and some of them now have obtained academic position in UCLA University in California, Cleveland Clinic in Ohio, Jackson Memorial Hospital (radiology) as well as in other countries including in Iran. He compares his life to them and he feels humiliated and embarrassed.

264.    Because of this humiliating condition, living in absolute poverty, and being in limbo, Dr. Pouyeh is not able to socialize with people and go to restaurants and bars to meet people. He feels his right and opportunity to find a spouse and have children is seized and he is alone and alone in America with no social support.

265.    Plaintiff has already sustained an irreparable harm as no monetary compensation can restore the best years of his life to marry and raise his children, to become a specialist and gain experience in his profession. Even if he starts his residency immediately now, it is impossible to restore these damages by monetary compensation.

266.    He has lived 7 to 8 years of the best years of a human in limbo and in poverty as though he has been in jail during this time. But even if he was in jail, his living condition would be better than his current situation because at least he would not live in limbo; dreaming for a better life in the middle of nowhere. At least, he could have a safe and cool place in the jail to sleep *well*, and not in a hot weather in the car with neck and back pain, and to be afraid of risking his life and his

belonging in the car.  At least, he could marry someone. He has been deprived of all basic needs of a human being:  food, sleep, socializing with people, security, dignity, and sex.

267.    Dr. Pouyeh, as a US citizen, has petitioned immigration visa for his parents and paid the fees but they could not proceed any further because Plaintiff did not have any income to sponsor and financially support his parents for the immigration and he currently is homeless and obviously cannot host them. Plaintiff received a notice from National Visa Center on July 28th, 2016 that if his parents do not submit the required documents, including affidavit of financial support and the remaining of the fees, their application will be closed and they will lose their priority date for visa. This means they have to stay in waiting list again so that another visa priority date becomes available and this is an irreparable harm that no monetary compensation can restore the lost priority.

268.    Plaintiff's parents are depressed, not only because of the financial hardship and debt they have in Iran, but also for not seeing Plaintiff for eight (8) years. Dr. Pouyeh, for many reasons, cannot travel to Iran and they cannot come to the USA either. If Plaintiff can immediately enter medical residency, he can sponsor his parents' immigration visa. His parents are old and have many life-threatening sicknesses and they definitely need Plaintiff, as a doctor and as their son, by their hand to take care of them. They want to see that Dr. Pouyeh has married and they want to caress their grandson and granddaughter before they die. Plaintiff is also depressed and requires seeing his parents and other family members and relatives in Iran. Unless Plaintiff is not redressed immediately, the harm is no way compensable by monetary compensation.

269.    Plaintiff's mother has especially become extremely irritable because of her depression. She has pursued divorce and unless Plaintiff enters into medical residency and pay back his debt to his parents and meet with his parents, the family will be shattered because it is unbearable for Dr. Pouyeh's mother to tolerate further miseries.

270.     Thus, the defendants are destroying the whole family relation and family dynamics of Plaintiff. The defendants actions and omissions, practically is equivalent to killing Plaintiff's (would be) wife and children, demolishing his house and making him sleep on the street as a homeless, and then torturing him by depriving him of enough sleep and food as well as limiting his freedoms, including his freedom to work his desired profession, freedom to socialize with other people, and enjoy familial bond with his parents and relatives by making him be in debt, homeless, and humiliated, and by destroying all the family dynamics and relations. The defendants' action is equivalent *to crime against humanity*. They literally are depriving Plaintiff of his right to be and to live in the USA as a US citizen. They are literally forcing Plaintiff out of the USA, in an implicit conspiration with other entities and individuals to exclude IMGs. (see ¶¶ 225 - 242 )

## CLAIMS

### I.   *Claims related to setting quota, as well as using race, ethnicity, national origin, and citizenship status in hiring in Internal Medicine and Preliminary Medicine*

**Count I- Violation of Equal Protection of 14th amendment: setting quota for the applicants in internal medicine residency program, and using race/ethnicity, national origin, and citizenship status in hiring process**

271.     Paragraphs 1 to 270 are fully incorporated and re-alleged herein.

272.     This claim is against all the defendants expect the director of ophthalmology residency program.

273.     Quotas "impose a fixed number or percentage which must be attained, or which cannot be exceeded" *Sheet Metal Workers v. EEOC*, 478 U. S. 421, 495 (1986)

### a)   *Quota for Hispanics/Latinos under the name of 'Harrington Program' or 'Lain America Program' in internal medicine residency program:*

274.     The defendants have set aside 12 positions (33%) in their internal medicine residency program exclusively for the applicants from Latin America, who require J-1 visa, under 'Harrington Prgoram' or 'Latin America' program. (Exh.4: Latin America Program)

275.     "Having started as a group of three physicians *in 1967*, the Program has *grown substantially* over the years, *12* first year residency positions are *dedicated* each year to *applicants from the Harrington Programs.*"[115] (Exh.4) [emphasis added]

276.     *"Three hundred forty seven (347)* trainees from Peru, Brazil, Colombia, Ecuador and over 15 other Latin American and Caribbean countries have been accepted for training since the Program was founded."[116] (Id.) [emphasis added]

277.     The defendants encourage the applicants from Latin America to apply to its internal medicine residency program through a separate line of hiring and they have designed a separate application for this purpose. (Exh.2: requirement for internal medicine residency program)

> "Applicants from Latin America and the Caribbean who require a J-1 visa are encouraged to apply through the William J. Harrington (Latin American Program). Contact the WJH Program directly for application instructions, application materials and requirements."[117]

278.     The defendants have designed a specific application form, besides ERAS system, for this purpose and encourage these applicants apply to this separate line of hiring.

279.     Applicants from other countries and race/ethnicity cannot compete for these positions.

280.     Setting quota for IMG Latinos in Harrington Program is categorically unconstitutional and in violation of Equal Protection of 14th amendment. *Regents of Univ. of Cal. v. Bakke*, 438 U. S. 265 (1978).

---

[115] https://sites.google.com/site/jmhmedicine1611/services/harrington-program Accessed on 6/23/2016
[116] Id.
[117] http://www.jmhmedicine.com/application-information/

281.    Nonetheless, even statistical analysis shows deliberate and intentional discrimination, as shown in the following paragraphs:

282.    The internal medicine residency program between 2013 and 2015, has hired from Peru (n=6), Mexico (n=6), Dominican Republic (n=5), Colombia (n=4), Venezuela (n=3), Ecuador (n=2), Brazil (n=2), Trinidad (n=1), Paraguay (n=1), Panama (n=1), Nicaragua (n=1), Guatemala (n=1), El Salvador (n=1), and Chile (n=1). (Exh.15: List of residents and their medical school in 'categorical' Internal medicine and 'Latin American program' as well as 'preliminary' medicine). Between 2013 and 2015, Latinos IMGs from Harrington Program have constituted 81.8% (36 out of 44) of the total IMGs in internal medicine residency.

283.    NRMP data[118] shows Mexico (249), Peru (64), Dominican Republic (176), Venezuela (82), and Nepal (94) are the most contributors to the pool of IMGs from *Latin America*. The sum of these numbers is 665, which is still less than the number of applicants from Pakistan and is about 25% of the applicant of India. India (2,687)[119], Pakistan (844)[120], China (380)[121], Nigeria (323)[122], and Iran (284)[123] are *the top five* contributors to the pool of graduates of international medical schools and between 2013 and 2015, only one resident was from Iran and one was from Pakistan, and none (0) from China and none (0) from India between 2013 and 2015.

284.    The total of the number of the applicants from Mexico and Peru based on NRMP data of 2014[124] (249+64=315) is comparable to the number of applicants from Iran[125] (284) and

---

[118] http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf  chart 14, page 21.
[119] Id
[120] Id
[121] Id
[122] Id
[123] Id
[124] Id.
[125] Id.

Nigeria[126] (323). The defendants have hired 12 residents only from these two Latin America countries between 2013 and 2015 (12 / 315 = 3.80%), and none from Nigeria (0.00%) and only 1 from Iran (1 / (284+323) = 0.35%), during the same time.

285.    Based on available data, there is gross and statically significant disparity (about 10 times) between the hired residents of Mexico plus Peru vs. Iran (3.8% vs. 0.35% ).

286.    Even if the quota was not explicitly in place, this gross statistically disparity establishes prima facie of deliberate, purposeful, and intentional discrimination, in violation of 14th amendment of equal protection of 14th amendment to the United States Constitution.

### b) Quota for other Hispanics from Puerto Rico

287.    Besides the quota for IMG Lain America applicants, the defendants *routinely and every year* hire "at least one" applicant from the medical schools of Puerto Rico. (Exh.15)

288.    In 2015, the defendants hired "Sandra Algaze", a Latino/Hispanic from "Universidad Central Del Caribe" in Puerto Rico. In 2014, the defendants hired "Enrique Puig", another Latino/Hispanic from "Ponce School of Medicine" in Puerto Rico. "Antonio Armstrong" is another Latino/Hispanic name and he was hired in 2013 after graduation from "Ponce School of Medicine". Also "Ana Berbel Caban" is another Latino/Hispanic medical graduate of "Ponce School of Medicine", who was hired in 2013. "Elizabeth Vilches" is another Latino/Hispanic who was hired in 2013 from "Universidad Central Del Caribe".

289.    Setting quota to hire "at least one" resident every year from Puerto Rico in internal medicine is also in violation of Equal Protection of 14th amendment.

---

[126] Id.

290.    Beyond setting quota, there is statistically significant deviation from the expected rate of hiring the applicants from Puerto Rico and it cannot be attributed to chance, as will be explained in the following paragraphs.

291.    Each year, 50 applicants from these medical schools in Puerto Rico apply to the defendants' internal medicine residency program.

292.    These 50 applicants among the other 4,000 applicants to the defendants' internal medicine residency program constitute 1.25% of the total applicants.

293.    Excluding the 12 positions set aside for IMG Latinos in Latin America or Harrington Program, 24 positions remain in internal medicine each year.

294.    In 2013, the defendants enrolled 3 applicants (observed number) from Puerto Ricco in internal medicine residency program; instead of the expected number of 0.3 individuals (24 times 1.25%). In this binominal distribution, the calculated standard of deviation is 0.544 and the difference of standard deviation is 4.96, which is statistically significant. *Castaneda v. Partida*, at 496-497, n. 17[127].

295.    If we calculate the enrolled persons between 2013 and 2015, the number of enrolled persons from Puerto Rico is 5 and the expected number would be 0.9 individuals. The standard deviation is 0.94 and the difference of standard deviation is 4.35; which is statistically significant[128].

296.    Another way to show non-random disparity is to calculate the probability of hiring 5 residents from these two medical schools in Puerto Rico out of (24 positions x 3 years) 72 hiring

---

[127] In the formula below, m= 3, N=24, p=0.0125, q=1-p

$$\chi = \frac{(m - Np)}{\sqrt{(Npq)}}$$

[128] A range of four to five standard deviations corresponds to a probability range of 1 chance in 15,786 to 1 chance in 1,742,160. M. Abramowitz & I. Steigan, *Handbook of Mathematical Functions*, National Bureau of Standards, U.S. Government Printing Office, Applied Mathematics Series No. 55 (1966)

attempts between 2013 and 2015 for this binominal distribution[129]. If "$H_0$ = Hiring these residents from Puerto Rico was by chance" and "$H_1$ = It was not by chance", our $H_0$ hypothesis is only 0.0018 likely to happen and *we are 99.72% certain that hiring 5 resident from these two medical schools in Puerto Rico was not by chance.*

297.    We can infer that it was intentional and deliberate favoritism, as the "rule of exclusion" indicates[130].

298.    The hiring process is subjective, and standard-less. The decision-making is obscure and is solely based on the discretion of the program director, or his delegates, and approval of Carlos A. Migoya, President & CEO of Jackson Memorial Hospital. Their decision-making process is subjective, arbitrary, and whimsical. It is not based on transparent rules and procedures.

299.    Similarly, in the preliminary medicine, in 2015, 1/8 positions (12.5%) were filled by Hispanic applicant(s) from Ponce School of Medicine in Puerto Rico. Calculation shows in this binominal distribution, B (8, 0.0125), hiring 1 resident from Puerto Rico means 2.86 standard deviation from the expected value, which is statistically significant.

300.    Setting quota to hire "at least one" resident every year from Puerto Rico in internal medicine and preliminary medicine is in violation of Equal Protection of 14th amendment.

301.    Other applicants are similarly situated to these groups of favored applicants. The sole reasons for differential treatment of these groups are their race/ethnicity or their national origin.

---

[129] In the formula below, n=72, p=0.0125, k=5

$$= np \sum_{k=0}^{n} k \frac{(n-1)!}{(n-k)!k!} p^{k-1}(1-p)^{(n-1)-(k-1)}$$

[130] "The idea behind the rule of exclusion is not at all complex. If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 266 n. 13 (1977); *Washington* v. *Davis*, 426 U. S. 229, 241 (1976); *Eubanks* v. *Louisiana*, 356 U. S., at 587; *Smith* v. *Texas*, 311 U. S., at 131." Castadenta, supra, n.13

302.     The defendants are intentionally and deliberately discriminating in favor of Hispanics and Latinos in Puerto Rico and Latin America, based on race/ethnicity and national origin in violation of Equal Protection of 14th amendment.

### c)  Arabs:

303.     In addition, the defendants have <u>consistently</u> hired <u>every year</u> *at least one* application from <u>Arabian</u> race/ethnicity or a national origin of a country in Arab world. This is a form of setting quota for Arabs, hiring "at least one" Arab in internal medicine residency.

304.     In 2013, one resident was from Kuwait ("Al-Fadhi, Jarrah"). In 2014, one resident was from Kuwait ("Al-Sharan, Loulwa"), and two were from Egypt ("Abdalla, Sherine", and "Kirolos[131], Irene"). In 2015, one was Bahrain.

305.     Between 2013 and 2015, Latinos IMGs of Harrington Program have constituted 81.8% (36 out of 44) of the total IMGs in the defendants internal medicine residency program; Arabs constituted 11.3% (5 out of 44) IMGs, and only 6.8% of the IMGs were from the rest of the world.

306.     The most contributing applicants from Arab world in IMG pool of applicants, according to NRMP data IMG applicant in 2013, are Egypt (325)[132], Syria (184)[133], Iraq (182)[134], Jordan (130)[135], Saudi Arabia (118)[136], Lebanon (115)[137], Libya (70)[138], and Sudan (51)[139]. Thus, the total number of the applicants from the most contributing Arab world countries and Arabian race/ethnicity is 1,175.

---

[131] Kirolos is a popular name in Egypt.  See http://www.namespedia.com/details/Kirolos
[132] http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf  chart 14, page 21
[133] Id.
[134] Id.
[135] Id.
[136] Id.
[137] Id.
[138] Id.
[139] Id.

307.     Between 2013 and 2015, Arabs constituted 11.3% (5 out of 44) of the enrolled IMGs in the defendants' internal medicine residency program and the rest of the world constituted 6.8% (3 out of 44) of the IMGs.  India (2,687)[140], Pakistan (844)[141], China (380)[142], Nigeria (323)[143], and Iran (284)[144] are *the top five* non-Arab contributors to the pool of graduates of international medical schools and between 2013 and 2015, only one resident was from Iran and one was from Pakistan.

308.     The past alumni of internal medicine residency program also consistently show at least one of the residents has Arabic name and is from Arabian race/ethnicity or from Arabic countries (e.g. "Al-Sulaimi, Ali" and "Al-Yatama, Fatima" (applicant in 2011 and graduate of 2015); "Al-Ansari, Yahya" (applicant in 2012 and graduate of 2016);  "Abdul Wahab El Hindi, Shafic" and "Dehrab, Ahmed" (applicant in 2009 and graduate of 2013)).

309.     None of the past alumni had an Iranian name in recent years.

310.     The defendant have set quota for Arabs to hire at least one Arab every year in their internal medicine residency program

311.     Setting quota is categorically unconstitutional in violation of Equal Protection of 14th Amendment.

312.     Statistics also show gross disparity between the ratio of Arabs in the defendants internal medicine residency program to the Arabs in IMG pool; compared to the ratio of non-Arab/non-Hispanic IMGs in the defendants residency to their corresponding population in IMG pool.

---

[140] Id
[141] Id
[142] Id
[143] Id
[144] Id

313.     This gross disparity cannot be explained on neutral basis. The gross disparity *alone* indicates invidious, deliberate, and intentional discrimination. "impact alone can unmask an invidious classification" cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356

314.     Other applicants are similarly situated to these groups of favored IMG applicants. The sole reasons for differential treatment of these groups are their race/ethnicity or their national origin.

315.     The defendants have violated Equal Protection of 14th amendment by setting quota to hire at least one IMG applicant for Arabian race/ethnicity or from Arabian countries every year. Gross disparity also signifies intentional discrimination in favor of Arabs in violation of Equal Protection.

### d)  Update for 2016

316.     By June 2015, the new program director for internal medicine and preliminary medicine was appointed by the CEO and president of the Trust. (See ¶¶ 9, 10) and she is responsible for recommending the prospective residents for internal medicine and preliminary medicine to the CEO and president of the Trust for 2016 (See ¶¶ 9, 10)

317.     She has, under the approval of the Trust and its CEO and president, increased the positions in Categorical medicine from 22 to 27 and reduced the quota for Latin America from 12 to 9. (Exh.15)

318.     The Defendants have excluded the IMGs from these 27 slots in Categorical internal medicine in 2016. (Exh.15)

319.     Similarly, from 2015 to 2016 they have increased the positions for preliminary medicine from 10 to 12, but have excluded all IMGs from preliminary medicine as well. (Exh.15)

320.     It is evident that the defendants are trying to make room to hire more US-applicants, and they are showing more antipathy and xenophobia against IMGs and foreign applicants (even the

Latinos and Hispanics who had quota) and more favoritism to US-applicants, i.e. nativism and national origin consideration. Regarding the fact that about 55.2% to 68.3% of internal medicine applicants are IMGs, in 2013 the defendants filled 41% of the positions with IMGs (81% Latin America), and in 2016 this percentage reduced to 25% and (100% Latin America).

321.     The Trust's diagnostic radiology residency program shows similar changes. In 2011, 4 positions were occupied by IMGs (Indian, Iranian, Pakistani, Colombia) (Exh.17: Residents in Diagnostic Radiology). In 2014, the number of IMGs in the program reduced to 2 (Ireland, and Colombia). In 2015 and 2016, the number of IMGs reduced to zero. (Exh.17) It is notable that in these years, the program director of diagnostic radiology changed.

322.     The CEO and President of the Trust, Mr. Migoya, started to perform in this capcity in since May, 2011 (supra, ¶ 8) and he has final and exclusive authority to appoint the program director of a residency program ( ¶ 9) and the residents (¶ 8).

323.     Since Mr. Migoya started his work, he has changed the program directors of two residency programs which used to take IMGs, (radiology and Internal medicine/preliminary medicine), and the number of IMGs in these residency programs has been reducing afterwards. In contrast, he did not change the director of ophthalmology residency program, who has been excluding IMGs for many years (Exh.1) and has been in this position for at least 10 years.

### e)  *Asking about national origin, race / ethnicity, and citizenship status in the application*

324.     Besides quota and statistically significant disparity, other evidence also signifies intentional discrimination.

325.     The defendants use an application form as part of the "ERAS" system. This application form mandates the applicants specify their race, ethnicity, native language, place of birth,

and the country of citizenship in their application; otherwise the application is incomplete and the applicants are unable to apply.

326.    These factors (race, national origin, ethnicity, citizenship status), are in the front of the application, i.e. the very first page.

327.    As the Supreme Court Justice, justice Alito explained in Fisher II: "Because an applicant's race is identified at the front of the admissions file, reviewers are aware of it throughout the evaluation." 645 F. Supp. 2d, at 597; see also id., at 598 ("[A] candidate's race is known throughout the application process"). Consideration of race therefore pervades every aspect of UT's admissions process." See also *United States ex rel. Barksdale v. Blackburn*, 610 F. 2d 253 - Court of Appeals, 5th Circuit (1980) at 267-8: "At this phase of the procedure the race of the potential jurors was obvious to the members of the jury commission as the individuals were required to appear personally before the commission. In prior cases, the Court has recognized that there is an opportunity for abuse in a system which permits the race of the potential juror to be known by the people selecting the jury. *See Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)"

328.    The defendants had an option to use an application form that would not ask these questions in the application for hiring. The defendants could mandate ERAS system to exclude these questions from the application form if they wanted to comply with the US Constitution and Federal laws. The defendants not only did not do that, but they also designed an additional and separate application form for the Latin America and Caribbean countries applicants for their Lain America a.k.a. Harrington Program, and encourage these applicants to fill out this application in addition to their ERAS.

329.    This reflects the fact the defendants knowingly and deliberately are using race/ethnicity, national origin, as well as citizenship status of the applicants in their decision making for hiring. The defendants consider substantially and significantly race/ethnicity, national origin, and citizenship status of the applicants in their decision making. Race/ethnicity, national origin, and citizenship status of the applicants are motivating factors in the defendants' decision making.

330.    Using race and national origin is in violation of Equal Protection of 14th amendment and must pass strict scrutiny test.

331.    The defendants must have a compelling reason to use these factors in their decision-making for hiring the applicants.

332.    As for Harrington Program, the defendants' stated reason to use these factors in their hiring procedure is: "to train physicians who, upon completion of their training, will return to their home countries with knowledge and experience that, otherwise, would be impossible to obtain. Faculty positions typically await the physicians upon return to their home country." (Exh.4: Latin American Program)

333.    This is not a compelling reason.

334.    In addition, the defendants' program is not narrowly tailored. As the defendants stated on their website, "Having started as a group of three physicians *in 1967*, the Program has *grown substantially* over the years, *12* first year residency positions are *dedicated* each year to *applicants from the Harrington Programs*." "*Three hundred forty seven* trainees from Peru, Brazil, Colombia, Ecuador and over 15 other Latin American and Caribbean countries have been accepted for training since the Program was founded." [emphasis added] (Exh.4)

335.    The fact is, a "quota system" has been used for "a half of century" and has been "expanding" since its inception in 1967. Each year, (12 / 36) = 33% of the positions in internal

80

medicine are set aside for the Latinos of South America (Latinos/Hispanic race/ethnicity or from a national origin of a Latino country). Between 2013 and 2015, Latinos IMGs from Harrington Program have constituted 81.8% (36 out of 44) of the total IMGs in internal medicine residency; Arabs constituted 11.3% (5 out of 44) IMGs, and only 6.8% of the IMGs were from the rest of the world. This is not narrowly tailored and is categorically unconstitutional. *Richmond v. JA Croson Co.,* 488 US 469 (1989)

336.    In addition, the discrimination does not pass even rational basis test; as there is no rational basis to discriminate in favor of Arabs and Latinos, and against other IMGs, such as Iranians, Chinese, Indians, Nigerians, etc.  This type of classification of IMGs, similarly situated in all aspects but for their country and race/ethnicity, has no rational basis.

337.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, but for the defendants' deliberate, purposeful, and intentional discrimination favoring Latinos/Hispanics and Arabs and against other IMGs, plaintiff would be hired.

338.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

### Count II- Violation of 42 U.S.C § 2000-e and FCRA: setting quota and using race/ ethnicity, and national origin in decision-making for hiring for internal medicine residency and preliminary medicine.

339.    Paragraphs 1 to 338 are fully incorporated by reference re-alleged herein.

340.    This claim is against the "Trust".

341.    Setting quota and using race/ ethnicity, and national origin in hiring process violates 42 U.S.C § 2000-e et seq. and FCRA (Florida Civil Right Act).

342.     National origin, and race/ ethnicity played a role in the defendant's hiring process to reject Dr. Pouyeh from internal medicine and preliminary medicine.

343.     The defendant hired Arabs and Hispanics/Latinos at the cost of discriminating against other IMGs.

344.     Based on Dr. Pouyeh's aforementioned qualifications and accomplishments and credentials, but for the defendant's deliberate, purposeful, and intentional discrimination based on national origin and race/ethnicity, Plaintiff would be hired.

345.     Based on the Plaintiff's aforementioned qualifications and accomplishments and credentials, Plaintiff was not hired because race, ethnicity, and national origin of the applicants were motivating factors in the decision-making process of the defendant.

346.     The defendant is liable under 42 USC § 2000-e et seq. and FCRA.

347.     As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendant and requests from the defendant the remedies explained at the end of the complaint.

## Count III– Violation of 42 U.S.C. §§ 1981 and 1983

348.     Paragraphs 1 to 346 are incorporated by reference herein.

349.     This claim is against all the defendants, except for the program director of ophthalmology residency program.

350.     The defendants are acting under color of State law. See ¶¶ 7 to 14.

351.     The defendant CEO and president of the Trust, Mr. Carlos A. Migoya, is individually liable because 1) He "shall make appointments of physicians [in residency and internship programs] after considering recommendations of the respective Chiefs of Service [a.k.a. program director]"[145] ( See ¶8) and he has personally been involved in appointments of the physician to the residency

---

[145] BAA 2011, at 13

programs  and **intentionally** violated the constitutional and federal rights in this claim 2) He has approved the discriminatory and/or unconstitutional policies and preferences in the Trust, and these policies and preferences have been systematic and have been in place for many years. "Each Chief of Service shall be accountable to the Trust,...., with respect to .... the operation of Residency training programs." (See ¶9)  3) He has failed to train the program directors and other agents and employees of the Trust to respect federal and constitutional rights of the applicants to the residency programs and he was deliberately indifferent in this respect because he knew, or in the eyes of a reasonable person he should have known, that his failure to train his subordinates, including the program directors a.k.a chief of services, would result in violation of constitutional and federal rights in this claim. He was the immediate supervisor of the program director of each medical residency program of the Trust (See ¶9) and was responsible for their training in this respect. Had he trained the program directors and other agents and employees of the constitutional and federal rights of the applicants, they would plausibly have not caused the aforementioned injuries to Dr. Pouyeh. These allegations with equal force are applicable to the "Trust".

352.    In addition to the violations explain in previous counts, the defendants are using application forms which mandate the applicants specify their **citizenship status**.

353.    Citizenship/alienage consideration is also prohibited under 42 USC §1981 as well as Equal Protection. (*Ramirez v. Sloss*, 615 F.2d 163, 167-68 & n. 5 (11th Cir. 1980) (citing *Sugarman v. Dougall*, 413 U.S. 634 (1973)). The Supreme Court has held that classifications based on **alienage** are inherently suspect and subject to strict scrutiny under Equal Protection analysis. *Graham v. Richardson*, 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971).

354.    It is well-established that the rights the defendants have violated are protected by U.S. Constitution and Federal laws.

355.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, but for the defendants' deliberate, purposeful, and intentional discrimination, plaintiff would be hired.

356.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, Plaintiff was not hired because race, ethnicity, national origin, and citizenship status of the applicants were motivating factors in the decision-making process of the defendants.

357.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

358.    The defendants violated Equal Protection of 14th amendment to the US Constitution and Federal Laws, 42 USC § 2000-e et seq, and 42 USC § 1981, and pursuant to 42 USC § 1983, they are liable.

## II. *Claims related to favoring students of University of Miami and US-seniors of all US medical schools and against IMGs in ophthalmology residency as well as internal medicine and preliminary medicine.*

### Count IV- Violation of Equal Protection of 14th Amendment and 42 USC §1983: favoring the medical students/graduates of the University of Miami in ophthalmology residency as well as internal medicine and preliminary medicine.

359.    Paragraphs 1 to 270 are fully incorporated and re-alleged herein.

360.    Paragraphs 350 and 351 are fully incorporated and re-alleged herein

361.    This claim is against all the defendants except for the director of Latin America Program.

362.    ERAS application service website as well as SF Match website mandates the applicants to specify their medical schools in their application, as well as the internet forms the websites provide when the applicants register.

363.     The defendants can easily screen for specific medical schools by the software they the use to download the applications from the respective website.

364.     **They have set quota for the University of Miami medical students/graduates in** ophthalmology residency as well as internal medicine and preliminary medicine.

365.     There is an explicit quota for the University of Miami's medical students/graduates in the ophthalmology residency program. Every year, 1 out of 7 (14%) positions is set aside for these applicants. If the program hired two, the next year the program did not hire any. (Exh.1: List of the ophthalmology residents and their medical schools)

366.     The program director of ophthalmology residency on or about January, 15th 2012 explicitly told plaintiff about the quota system in a meeting after SF Match announced the ophthalmology match result. He told Plaintiff that we reserved 1 position/year for the students of University of Miami because the students objected to the Dean of the medical school of the University of Miami that Bascom Palmer Eye Institute does not take ophthalmology residents from the University of Miami's medical school graduates/students.

367.     As for internal medicine, between 2013 and 2015, the defendants filled 35% of the positions in 'internal medicine' residency program *solely* by students/graduates of University of Miami, excluding the position reserved for Latin America applicants in Latin America or Harrington Program. (Exh.15: medical school of the residents in "categorical" internal medicine)

368.     In 2015, the defendants filled 40% of the 'preliminary medicine' (excluding preliminary positions set aside for neurology) positions solely by students/graduates of University of Miami. (Exh.15)

369.    These numbers indicate that in preliminary medicine and internal medicine program between 35 and 40 percent of the positions are set aside for medical students/graduates of University of Miami.

370.    In 2016, 33% of the total position in preliminary medicine (excluding the positions set aside for neurology) and internal medicine are filled by the applicants who matriculated to University of Miami's medical school.

371.    The defendants have a conflict of interest. The program director of the internal medicine and preliminary residency programs, and the program director of ophthalmology residency program, are also employees and faculty members of the University of Miami's medical school. The defendants will lose their job and position as faculty members of the University of Miami if they do not give preference to graduates of University of Miami. Other defendants have close affiliation to the University of Miami, financially and operationally, as Basic Affiliation Agreement between the Trust and the University of Miami shows.

372.    Setting quota is categorically unconstitutional in violation of Equal Protection of 14th amendment.

373.    Statistical analysis also uncovers intentional discrimination in favor of the students/graduates of the University of Miami's medical school in internal medicine and preliminary medicine.

374.    The number of graduates of the University of Miami's medical school at the relevant time was equal to or *less*[146] than 147[147] every academic year.

375.    Only 44.3% of US seniors/graduates of M.D. granting (allopathic) US-medical school apply to internal medicine residency program nation-wide.

---

[146] In recent years, medical schools have expanded their medical student enrollment.
[147] http://admissions.med.miami.edu/md-programs/general-md/class-profile (last viewed on 06/04/2016)

376.    But even the defendants *could prove*, albeit improbable, that *all* of the senior medical students of the University of Miami applied to internal medicine residency program of the defendants, the total number of the medical graduates of university of Miami (n=147) to the number of application the defendants receive (n= 4000) for internal medicine and preliminary medicine every year, constitutes 3.7% of the applicant pool.

377.    There is a *gross* disparity between the enrollment of graduates of University of Miami in internal medicine or preliminary medicine residency (35% to 40%) compared to the contribution of these graduates to the applicant pool for this residency program 3.7%;

378.    Thus, in this binominal distribution the expected number of hired applicants from University of Miami for 3 years (2013-2015) would be (3.7/100)*((36-12)*3) = 2.7 residents in internal medicine[148]. The observed number of hired residents is 25 in internal medicine. (Exh.15) The calculated standard deviation is 1.60 (two-tails) and the difference of standard deviation is 13.9. Thus, there is gross and statistically significant disparity between the observed and the expected number of University of Miami graduates in the internal medicine residency program.

379.    This gross disparity cannot be explained on neutral basis. The gross disparity *alone* indicates invidious, deliberate, and intentional discrimination. "impact alone can unmask an invidious classification" cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356

380.    The hiring process is subjective, and standard-less. The decision-making is obscure and is solely based on the discretion of the program director, or his delegates, and approval of Carlos A. Migoya, President & CEO of Jackson Memorial Hospital. Their decision-making process is subjective, arbitrary, and whimsical. It is not based on transparent rules and procedures.

---

[148] 12 out of 36 positions are reserved for Harrington Program. Thus, graduates of University of Miami can complete with other applicants for the remaining positions. 36-12=24.

381.    The program director of the internal medicine and preliminary residency programs, and the program director of ophthalmology residency program, are also employees and faculty members of the University of Miami's medical school. The defendants have a conflict of interest. The defendants will lose their job and position as faculty members of University of Miami if they do not give preference to students/graduates of the University of Miami. Other defendants in this claim have close affiliation to the University of Miami, financially and operationally.

382.    As the defendants have "no specific score requirement" (Exh.2), it is hard to believe that their decision was based on "objective" and verifiable qualifications. It is unlikely that the rest of 8000 to 9000 applicants to internal medicine and preliminary medicine in 3 years were less qualified these 25 residents from the University of Miami.

383.    The majority of the applicants who were excluded are IMGs. Among the 4000 applicants to the program each year, about 70% are IMGs in the defendants' applicant pool for internal medicine and preliminary medicine. (supra, ¶ 246 )

384.    Thus, the defendants deliberately and intentionally discriminate in favor of the students and graduates of University of Miami and against Dr. Pouyeh and other IMGs (except for the favored group of IMGs explained in previous counts) in internal medicine, preliminary medicine, and ophthalmology residency programs.

385.    The graduates or fourth-year medical student of the University of Miami are similarly situated in every aspect to other applicants matriculated to other allopathic medical schools, inside or outside of the USA.

386.    The defendants have been violating Equal Protection of 14th amendment.

387.    No rational person can relate favoring these applicants and discriminating against IMGs[149] or Dr. Pouyeh to the argument that it will advance public safety or patients' safety, or any other State legitimate interest. This discrimination is not for the purpose of protecting public or patient safety or any other *legitimate* interests.

388.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, but for the defendants' deliberate, purposeful, and intentional discrimination favoring students and graduates of University of Miami over IMGs, plaintiff would be hired to these positions.

389.    The defendants are liable for violation of Equal Protection of 14th amendment to the US constitution under 42 USC §1983.

390.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

**Count V - Violation of Equal Protection of 14th Amendment and 42 USC §1983: the practice of hiring 4th year medical "students", a.k.a. US-Seniors, before their graduation from medical school and obtaining their medical school diploma, discriminates against International Medical school "Graduates", who have already graduated from medical school and obtained their medical diploma.**

391.    Paragraphs 1 to 270 are fully incorporated and re-alleged herein.

392.    Paragraphs 350 and 351 are fully incorporated and re-alleged herein

393.    This claim is against all the defendants except for the director of Latin America Program.

394.    The US-seniors (4th-year US-medical school students) apply to the defendants' residency programs, including internal medicine, preliminary medicine, and ophthalmology

---

[149] Except for the favored group of IMGs, Arabs and Hispanics/Latinos, in internal medicine residency program.

residency programs, 1 or 2 months after the initiation of their fourth-year medical school. It means they have not completed the required curriculums and courses in the fourth year, and they have not obtained credit for these courses. These applicants have not obtained their medical school diploma and they have not completed the remaining courses in their medical school by the time they apply to the residency program and they "have not graduated".

395.    These applicants matched (hired) to the defendants' residency programs in January (for ophthalmology) or March (for internal medicine, preliminary medicine, and most of other residency programs in Jackson Memorial Hospital); but they graduate from medical school *later* in June. As explained before, matching is a binding agreement and means employment agreement and hiring.

396.    As Dr. Pouyeh will explain in the following counts, some of these applicants do not even report whether they have passed USMLE Step 2 CK and Step 2 CS by the time they match (are hired) or by the time they apply to the residency program. Passing USMLE Step 2 CK and Step 2 CS is mandatory to start medical residency.

397.    In contrast, the applicants from international medical schools must complete their medical school and all required courses and obtain their medical diploma, that is, they are International Medical school "graduates". Without submission of medical school transcript and medical school diploma, their application is not considered as complete and the defendants will exclude these applicants as ineligible to apply. The defendants in internal medicine and preliminary medicine require IMGs obtain ECFMG certification *before* NRMP ranking deadline, which is late of January. (Exh.2: requirement for internal medicine and preliminary medicine residency)

398.    For obtaining ECFMG certification, IMGs must have graduated from a medical school registered in World Health Organization' World Directory of Medical Schools and is

approved by ECFMG and provide their medical school diploma along with their medical school transcript to ECFMG to verify them. In addition, IMGs must pass USMLE Step1, Step 2 CK, and Step 2 CS, the same exam medical students in M.D. granting (allopathic) US-medical school take. Thus, an international medical graduate must have passed these exams and has already provided his medical school diploma by the NRMP deadline for ranking the applicants for the residency program. (Late January).

399.    Simply, the defendants treat the applicants differently (disparate treatment) based on whether they matriculated to a medical school inside the United States (including Puerto Rico), or outside of the United States.  If they have matriculated to a medical school in the USA, their application is considered as complete and the defendants will hire them (Matched) *before* these applicant obtain a medical school diploma and pass all curriculums and courses in the medical school; but if the applicants matriculated a medical school outside of the USA, their application in similar situation is rejected. Plaintiff does not know a single IMG hired in the defendants residency programs *before* medical graduation.

400.    "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached" *Village of Arlington Heights,* 429 U.S. at 267.

401.    This disparate treatment of the applicants is an invidious, intentional, and deliberate discrimination in violation of Equal Protection of 14th amendment.

402.    These applicants are similarly situated in every aspect, except that they matriculated to an allopathic medical school inside the USA and international medical school graduate matriculated to an allopathic medical school outside of the USA.

403.     This type of discrimination does not pass rational basis review.

404.     First, the classification (participating a medical school inside or outside of the United States), is totally arbitrary, and it is "not even debatable" to survive the court's scrutiny. This classification serves no legitimate States' interest and has no rational relationship to any legitimate interests. There is no difference between these applicants, except for the geographic location of their medical school.

405.     Second, no *rational person* would consider an applicant, eligible, and an application, complete, unless the required credentials and documents be present in the application.

406.     The requirement of medical school diploma and medical school transcript is rationally related to the applicants' fitness and capacity to be considered as eligible to perform the duties of a post-graduate training in medical intern or resident. "While employment decisions may involve a number of relevant variables, these variables are to a great extent uniform for all employees because they must all have a reasonable relationship to the employee's qualifications to perform the particular job at issue. Identifiable qualifications for a single job provide a common standard by which to assess each employee." *McCleskey v. Kemp*, 481 US 279 (1987), at 295, n.14

407.     It is State's legitimate interest to preserve public and patient health and safety and passing the required curriculums in medical school and obtaining medical school diploma is a prerequisite for this purpose.

408.     If this rational stands, the opposite cannot stand. It means no *rational person* would consider and applicant eligible without completion of medical school and submitting medical school transcript and medical school diploma, *at the time of* submitting the application to the medical residency. No *rational person* would hire these applicants (fourth-year medical students a.k.a. US seniors) because they do not have the required medical diploma by the time they apply.

409.     A survey of 156 (134 responded, response rate: 86%) fourth-year medical students in the USA in 2011 about their experience with, and actual and desired levels of competence for, nine procedural skills showed that "A gap in desired versus actual level of competence existed for all procedures (P < .0001)". and "Participants had performed most skills infrequently and rated themselves as being unable to perform them without assistance."[150] It is evident that these applicants feel that they require additional year of training and have not yet received enough training to perform the duties of residents. In addition, many of them decide about their desired post-graduate specialty - a lifelong decision - at the beginning of fourth-year medical school and without having the opportunity to explore the rest of electives in their fourth-year medical school. Their decision to pursue a career at the beginning of fourth-year is still premature.

410.     The fact that an applicant, solely because he or she went to a medical school inside the United States, is eligible to apply to the medical residency and does not require to present medical school diploma at the time of applying to medical residency is not related to any States' legitimate interests and it is hardly debatable to be for the benefit of the fourth-year medical student as well.

411.     This classification is totally invidious, arbitrary, and capricious and it is solely a whimsical favoritism of the defendants to fourth-year medical students of the US medical schools. These applicants must wait for another year and "graduate" from medical school, and then apply.

412.     By the time they were interviewed and matched (hired), 100% of the residents in ophthalmology residency were fourth-year medical students (US-seniors) and 97% to 100% of the non-IMG residents in internal medicine and preliminary medicine were fourth-year medical students

---

[150] Dehmer, Jeffrey J. et al, "Competence and Confidence With Basic Procedural Skills: The Experience and Opinions of Fourth-Year Medical Students at A Single Institution". Academic Medicine, May 2013 - Volume 88 - Issue 5 - p 682–687

and they did not have medical diploma and they did not complete medical school. None of them were eligible to apply at the outset and be hired.

413.    Furthermore, the fact that the defendants hire these applicants before completion of medical school indicates that *the academic qualification* of US-medical students is not a factor in selection of them. Dr. Pouyeh will further elaborate this fact in the following counts with respect to USMLE exams.

414.    US-Seniors are predominately or exclusively US-born applicants. As explained in ¶¶ 249 - 253, there is statistically significant association between these two. Favoring US-national origin was the reason of, and moving force behind, the defendants' decision.

415.    Strict scrutiny is applied when the motive and purpose is nativism and xenophobia.

416.    Based on the aforementioned accomplishments and qualifications of Plaintiff, but for the defendants' irrational favoritism to fourth-year medical students of US medical schools at the cost of discriminating against graduates of international medical schools, Plaintiff would be hired.

417.    The defendants are liable for violation of Equal Protection to 14th amendment of US constitution under 42 USC §1983.

418.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

### III.    Claims related to USMLE exams

**Count VI – Violation of Equal Protection of 14th amendment and 42 USC § 1983: treating the applicants arbitrarily differently for the requirement of passing USMLE exams before or after ranking them for internal medicine, preliminary medicine, or ophthalmology,  as well as using different score cut-off for USMLE exams**

419.    Paragraphs 1 to 270 and 391 to 418 are fully incorporated and re-alleged herein.

420.    This claim is against all the defendants.

421.    The defendants in internal medicine and preliminary medicine require IMGs to obtain ECFMG certification *before* NRMP ranking deadline, which is in <u>Late January</u>. (Exh.2: requirement for internal medicine residency position)

422.    For obtaining ECFMG certification, IMGs must pass USMLE Step1, Step 2 CK, and Step 2 CS, the same exam medical students in M.D. granting (allopathic) US-medical school take. Thus, an international medical graduate must have passed these exams and has already provided his medical school diploma before NRMP deadline for ranking the applicants for the residency program. (in February).

423.    However, the defendants do not impose such strict limitation on US-applicants (students and graduates of *osteopathic* as well as *allopathic* schools in the USA) (see Exh.2) and some of these applicants match into a residency spot even without passing Step 2 CK or Step 2 CS.

424.    This practice is similar to many other residency programs. According to NRMP "charting outcome" report for 2009, 2011, and 2014, Step 2 CK score of between 20% and 30% of US seniors and the *majority of osteopathic* US-applicants were unavailable by the time they matched to a medical residency program. (Exh.16)

425.    In other words, the defendants' residency program for internal medicine and preliminary medicine interviews and ranks US-applicants for NRMP Match even if they have not passed Step 2 CK or Step 2 CS by the time they apply to the residency program and even for NRMP ranking, but the residency program will not consider IMGs for NRMP Match if they have not passed Step 2 CK, Step 2 CS, or Step 1, and consequently are not ECFMG-certified.

426.    This is also the case for ophthalmology residency and San Francisco Match. According to a paper "Ophthalmology residency Match Outcomes for 2011"[151], 46% of the US-

---

[151] "Ophthalmology residency Match Outcomes for 2011", by Yousuf, et al., Ophthalmology, 2012; 119:642-646.  P 643.

Seniors did not report their Step 2 CK to ophthalmology residency programs. Nonetheless, match rate for them was 83%[152]. (the defendants do not take IMGs in their ophthalmology residency, See counts XII, and XIII)

427.    For example, Match Poll 2011 shows a forum member under the pseudo-name "Sands of Sahra", who is a US-Senior, applied to 36 programs and received 17 interviews and matched to the defendants' ophthalmology residency program (Bascom Palmer Eye Institute, abbreviated as BPEI) without reporting his/her USMLE Step 2 CK score. (Exh.9). Another forum member, "FrankEye", with Step 1 score identical to Plaintiff and no Step 2 CK score, applied to 15 ophthalmology residency programs and received 10 interview invitations, including from Harvard (called Massachusetts Eye and Ear Infirmary, abbreviated as MEEI), Johns Hopkins (called Wilmer), Duke University, Wills Eye Institute, Iowa University, Columbia University, among others. (Exh.9) "Junkemail86" is another forum member with similar Step 1 score to Plaintiff and no Step 2 CK score. He/She applied to 38 programs and received 25 interviews, including from the defendants ophthalmology residency program (Bascom), as well as from Johns Hopkins (Wilmer), Harvard (MEEI or Massachusetts Eye and Ear Infirmary), Duke University, Stanford University, UCSF (Universtiy of California, San Francisco), Columbia University, Yale University, among others.

428.    This disparate treatment between the IMGs and US-applicants with respect to the requirement of passing USMLE exams is an invidious, purposeful, and intentional discrimination in violation of Equal Protection of 14th amendment.

429.    As alleged in previous count, US-applicants (and specifically the applicants from M.D. granting US medical schools) are similarly situated to international medical school graduates in every aspect, and the sole difference is the geographic location of their medical school.

---

[152] Id.

430.   This discrimination has no rational basis and is not related to any State legitimate interest. There is no rational relation between the geographic location of the medical school and public safety or patient safety, or any other legitimate interest; the only objective of this disparate treatment is to protect US-applicants' interest to fill the residency positions, even without passing USMLE Step 2 CK or Step 2 CS.

431.   There is no rational connection between hiring these US-applicants before they take USMLE Step 2 CK or Step 2 CS and protecting public safety or patient safety or any other State legitimate interest. Passing these exams is required by the State to ensure patient and public safety. Hiring the fourth-year medical students without passing these exams, defies the existence of any rational reason behind the defendants' policy.

432.   US-applicants are predominately or exclusively US-born applicants and there is statistically significant association between these two. Favoring US-national origin and nativism was the reason of, and moving force behind, the defendants' decision to take US-applicants even without passing USMLE Step 2 CK or Step 2 CS.

433.   Strict scrutiny is applied when the motive and purpose is national origin consideration, nativism, and xenophobia.

434.   Besides this disparate treatment between IMGs vs. US-applicants for the requirement of passing USMLE exams before applying to the residency program or ranking for the match, the defendants use different cut-off score for Step1. It is notable that a US-Senior with Step 1 score 180, still have 80% chance to match internal medicine. (Exh.5: Probability of matching to internal medicine based on USMLE Step 1 score). With Plaintiff's score in Step 1 the probably for matching to internal medicine approaches to 100% for US-Seniors (Exh.5). Since 2010, each and every year, plaintiff applied to internal medicine residency program and preliminary medicine and he never

obtained even one interview. The majority of the favored groups of IMGs, identified in Count I, also had USMLE Step 1 score less than the Plaintiff's.

435.    The same is the case for the defendants' ophthalmology residency. With Plaintiff's USMLE Step 1 score, the probability of matching to ophthalmology residency for US-Seniors is about 90 to 93%. (Exh.6 Probability of matching to ophthalmology based on USMLE Step 1 score.) Specifically, Match Poll 2011 (Exh.9) shows "Sands of Sahra", and "Junkemail86" had USMLE Step 1 scores as of the Plaintiff's and received interviews from the defendants' ophthalmology residency and even "Sands of Sahra" matched to the defendants' ophthalmology residency program but the program director and many faculty member told Plaintiff the ophthalmology residency program does not take IMGs.

436.    What the defendants do is solely based on their personal and arbitrary power. *Yick Wo* v. *Hopkins*, 118 U.S. 356, 369.

437.    This disparate treatment with respect to USMLE scores between Plaintiff and the preferred group of applicants, identified in previous counts (I to V) and herein, violates Equal Protection of 14th amendment and does not bass any level of constitutional scrutiny (including rational basis review), as explained above in this count.

438.    It is also based on and motivated by national origin or race/ethnicity considerations, as explained in previous counts (I to V).

439.    Strict scrutiny is applied when the motive behind the alleged discriminatory policy is national origin or race/ethnicity considerations.

440.    Based on the aforementioned accomplishments and qualifications of Plaintiff, but for the defendants' discriminatory, discretionary, and whimsical policies and practices with respect to

the requirement of passing USMLE exams as well as the cut-off for USMLE scores, Plaintiff would be hired.

441.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

442.    The defendants are liable for violation of Equal Protection of 14th amendment of US constitution under 42 USC §1983.

### Count VII- Violation of 42 U.S.C. 2000-e2 (l), and FCRA: discrimination based on national origin and race/ethnicity by using different cut-off for USMLE exam scores or adjust the scores as well as the requirement for passing the USMLE exams

443.    The paragraphs 1 to 442 are fully incorporated by reference and re-alleged herein.

444.    This claim is against the "Trust".

445.    Pursuant to 42 U.S.C. §2000-e2 (l) "It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin."

446.    As explained in previous count, the defendant in internal medicine and preliminary medicine ranks US-applicants and hires them even if these applicants have not taken USMLE Step 2 CK or Step 2 CS but requires IMGs to pass all the USMLE exams. This is practically equivalent to use different cut-off score for USMLE exam Step 2 CK or Step 2 CS between US-applicants and IMGs.

447.    The defendant in ophthalmology residency does not take IMGs, even if the IMG pass all these exams, but it takes US-seniors even if they have not passed USMLE Step 2 CK or Step 2 CS.  This is practically equivalent to using different score cut-off or adjusting the score or otherwise

altering the consequence or the result of the employment-related test; because for the defendant, it does not matter whether or not US-applicants passed USMLE Step 2 CK or Step 2 CS and they take them for ophthalmology anyway, but they exclude IMGs from ophthalmology residency even with perfect score.

448.     US-applicants are predominately or exclusively US-born applicants. As explained in ¶¶ 249- 253 above, there is statistically significant association between these two.

449.     This ostensibly neutral classification is an obvious pretext for an invidious discrimination based on national origin.

> "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification. This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination. *Yick Wo* v. *Hopkins,* 118 U.S. 356; *Guinn* v. *United States,* 238 U.S. 347 " *Feeney*, 442 U.S., at 272

450.     The practice of favoring US-applicants and US-Seniors is used as a proxy for favoring to American national origin.

> "We have warned that an employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination. An example is using gray hair as a proxy for age: there are young people with gray hair (a few), but the "fit" between age and gray hair is sufficiently close that they would form the same basis for invidious classification. *Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161, 1163 (7th Cir.1992).".

> "pregnancy is a proxy for gender and, therefore, discrimination against pregnancy is discrimination against women. See, e.g., *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir.2000)" *Griffin v. Sisters of Saint Francis, Inc.*, 489 F. 3d 838 - Court of Appeals, 7th Circuit 2007, at 843.

> "*Hazen Paper* [Hazen Paper Co. v. Biggins, 507 US 604 - Supreme Court 1993] indicated that discrimination on the basis of pension status could *sometimes* be unlawful under the ADEA, in particular where pension status served as a "proxy for age." *Id.,* at 613, 113 S.Ct. 1701. Suppose, for example, an employer "target[ed] employees with a particular pension status on the assumption that these employees are likely to be older." *Id.,* at 612-613, 113 S.Ct. 1701. In such a case, *Hazen Paper* suggested, age, not pension status, would have "actually motivated" the employer's

decision-making." *Kentucky Retirement Systems v. EEOC*, 128 S. Ct. 2361 (2008) at 2367.

451.    Thus, favoring US-national origin, nativism, and xenophobia were the reasons of, and the moving forces behind, the defendant's decision to hire US-applicants even without passing USMLE Step 2 CK or Step 2 CS.

452.    Also, as explained in the previous count, the defendant adjusts the scores of or uses different cutoff for USMLE Step 1 score in internal medicine and preliminary medicine. The defendant uses this policy to hire the preferred groups of applicants, identified in previous counts (I to V), with lower scores than the non-preferred groups of IMG applicants. Also the preferred group of IMGs, identified in Count I, matched to the defendants' internal medicine and preliminary medicine programs with USMLE scores less than Plaintiff's.

453.    In other words, the preferred applicants have obtained the spots with scores lower than Dr. Pouyeh's. With Plaintiff's score in Step 1 the probability of matching to internal medicine approaches to 100%. (Exh.5) Since 2010, each and every year, plaintiff applied to the defendant's internal medicine residency program and preliminary medicine and he never obtained even one interview but the preferred groups of the applicants matched to (hired for) internal medicine and preliminary medicine program with lower scores than Plaintiff's.

454.    The defendant does not take IMGs for ophthalmology residency although with Plaintiff's USMLE Step 1 score, 93% is the probability to match ophthalmology residency, for US-Seniors. (Exh.6) In fact the defendant had interviewed and hired US-Seniors with Plaintiff's USMLE Step 1 score, as explained in previous count. See ¶¶ 427, 435 and some US-Seniors all obtained interview from Harvard, Johns Hopkins, UCSF, Yale, Stanford, and about 20 other ophthalmology residency programs in the USA.

455.    This disparate treatment with respect to USMLE Step 1 score between Plaintiff and the preferred group of the applicants, identified in previous counts, is based on and motivated by national origin or race/ethnicity considerations.

456.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, because of the defendant's deliberate, purposeful, and intentional discrimination against plaintiff, he was not hired.

457.    As explained above, Dr. Pouyeh has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from the defendant the remedies explained at the end of the complaint.

458.    The defendant is liable under 42 USC §2000-e2 (l) and FCRA.

### Count VIII - Violation of Equal Protection and Due Process of 14th amendment, and 42 U.S.C. §1983: setting a requirement or preference for IMGs applicant to internal medicine residency program and preliminary medicine to pass USMLE Step 2 CS on *the first attempt*

459.    The paragraphs 1 to 457 are fully incorporated by reference and re-alleged herein.

460.    This claim is against all the defendants except for the director of ophthalmology residency program.

#### a)  *Equal Protection and due process*

461.    Plaintiff passed Step 1 and Step 2 CK on the first attempt and with high scores in both of them and these tests are multiple choice questions.

462.    But he failed once USMLE Step 2 CS because he was not familiar with this particular type of examination, which is evaluated by SP "standardized patient". According to statistics for 2013-2014, pass rate for IMGs on second attempt was 66%. This signifies the importance of gaining experience about the nitty-gritty of this particular type of exam from SP (Standardized Patient).

463.    The defendants in internal medicine (and presumably) preliminary medicine have expressed their preference for IMGs who passed the USMLE exams *on the first attempt.* (Exh.2: requirement for internal medicine residency position)

464.    Drawing a line between IMGs who passed USMLE Step 2 CS on the first attempt and who did not, violates Equal Protection of 14th amendment. This classification is not even debatable and there is no rational basis for this type of classification and to discriminate against IMGs who did not pass USMLE Step 2 CS on the first attempt.  "A classification `must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Reed v. Reed, 404 U.S. 71, 75, 92 S.Ct. 251, 254, 30 L. Ed.2d 225, 229 (1971)

465.    First, the defendants do not have such requirement (or preference) for US-applicants and it is only for IMGs. (Exh.2) In fact, the defendants do not even require US-applicants to pass USMLE Step 2 CK or Step 2 CS before submitting their application or before NRMP ranking deadline (See Counts VI and VII), let alone mandate them to pass these exams *on the first attempt*[153]. This shows such classification for IMGs has no rational basis and is arbitrary.

466.    Moreover, this is another example that the defendants treat IMGs differently from US-applicants, and signifies an invidious and intentional discrimination against IMGs in violation of Equal Protection of 14th amendment.

467.    Second, none of the States in the United States require the applicants for medical licensure pass USMLE exams *on the first attempt,* although the States require the examiners pass the USMLE exams. Obviously, if there was a concern for any States' legitimate interests, such as patients' safety, States would require the applicants pass USMLE exams on the first attempt.

---

[153] The defendants do not even require US-applicants complete their medical schools and obtain their medical school diploma before submitting their application. (See Count V)

468.     Third, there is no evidence that the applicants who passed USMLE Step 2 CS on the second attempt endanger patient-safety in post-graduate medical training or are otherwise less competent to perform their duties as a resident compared to the applicant who passed this exam on the first attempt. The law is clear that due process interdicts the adoption by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow from the proven fact. See *Cleveland Board of Education v. LaFleur*, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52; *Vlandis v. Kline*, 1973, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; *Stanley v. Illinois*, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. All the applicants who passed these exams are eligible and competent to enter into a medical residency and as a matter of fact, other residency programs have taken them.

469.     Dr. Pouyeh also failed driving test once in the USA, although he passed driving test on the first attempt in Iran and he had been driving for 8 years in Iran without any car accident before he immigrated to the USA about 8 year ago. The sole reason he failed the driving test in the USA was the difference in taking the driving test between the USA and Iran. Nonetheless, no State deprives a person of driving privileges for the fear of public safety solely because the person failed the driving test once. Plaintiff has been a safe driver and never got a ticket in the USA.

470.     Similarly, no reasonable individuals would fear for their life if they know the pilots for their airplane failed the corresponding exam for pilot-licensure once.

471.     Fourth, post-graduate medical training is a supervised position and the residents and interns report to the faculty and senior residents and follow their directions. There is no extra risk for patients' safety in supervised residency training solely because an applicant once failed USMLE Step 2 CS.

472.     Fifth, US students can take MCAT (Medical College Admission Test) multiple times if they fail the test, or even if they passed, they still can take the test to improve their score for admission to medical school. The same is the case for LSAT (Law School Admission Test). Requiring international applicants pass the USMLE exams on the first attempt is a departure from this established procedure and uncovers invidious discrimination against international applicants[154].

473.     Sixth, the defendants expressed this as a "preference", and not as a "requirement". This gives them arbitrary discretion to hire the preferred group of IMGs, identified in Count I to III, even if these groups of IMGs failed one of the USMLE exams, but exclude the non-preferred group of IMGs from other national/race/ethnic background, such as Plaintiff.

474.     The requirement or preference for IMGs to pass USMLE Step 2 CS *one the first attempt* is totally arbitrary and does not pass rational basis test. Such classification ("first-time" taker vs. "second-time" taker) is totally arbitrary and is not based on any fact or evidence in real world with regard to the competency of the applicants to perform their duties as a resident or later as a licensed physician.

475.     The defendants were motivated by national origin or race is setting this requirement. The desire to discriminate against non-preferred IMGs was the reason of setting this requirement. No other legitimate purpose was pursued in setting this policy.

### b) Substantive Due Process (Liberty)

476.     Even if the defendants required that all applicants pass the USMLE exams on the first attempt, it would still violate substantive due process right for liberty protected by 14th amendment.

477.     People have liberty to pursue any profession or private line of business. *Doe v. Florida Bar*, 630 F. 3d 1336, 1344-5,  CA 11th Cir, (2011), citing "*Conn v. Gabbert,* 526 U.S. 286,

---

[154] USMLE exams cannot be re-taken to improve the score and once a test-taker pass the test, the score remains in their record.

291-92, 119 S.Ct. 1292, 1295-96, 143 L.Ed.2d 399 (1999) (recognizing that an earlier line of cases "indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment")

478. Without a medical board license, the liberty of applicants to practice medicine is completely foreclosed as it is a crime under State's law to practice medicine without a license. All States, including Florida, do not let a medical graduate obtain the license unless the individual has practiced medicine under supervision in an ACGME-approved medical residency program. Medical residency is an integral part of obtaining medical board license.

479. Due process forbids a state actor from excluding an applicant from medical residency position and a particular specialty in medicine, for reasons that have no rational connection to the applicant's "fitness or capacity to practice" medicine as a licensed physician or perform the duty of a medical resident. *Schware v. Board of Bar Examiners of NM*, 353 US 232, 239 (1957)

480. The requirement or preference to pass Step 2 CS on *the first attempt* "directly and substantially" interferes with liberty of an applicant, who failed this exam once, to pursue residency and subsequently to practice medicine unsupervised as a licensed physician.

481. There is no connection between "the applicants' fitness and capacity to practice" medicine and passing or failing USMLE Step 2 CS *on the first attempt*; as explained in the previous paragraphs under Equal Protection. The law is clear that due process interdicts the adoption by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow from the proven fact. See *Cleveland Board of Education v. LaFleur*, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52; *Vlandis v. Kline*, 1973, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; *Stanley v. Illinois*, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551

482.     Some States have limited the number of attempts for each USMLE exam to 4-6 times, but they do not disqualify a physician just because of failing the exam once. Failing an exam for 6 times raises serious questions about the fitness and capacity of an applicant for a particular profession, but failing an exam once, does not.

483.     As explained before, for law school admission, not only there is no limit to take LSAT, even the highest score in any attempts is considered. The defendants cannot hire only "first-time test-takers".

484.     Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, but for the defendants' unconstitutional policies and preferences, plaintiff would be hired.

485.     As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

486.     The defendants have violated Equal Protection and Due Process of 14th amendment to the US constitution and are liable under 42 USC §1983.

## IV. Claims related to setting a cut off of 5-year graduation from medical school in internal medicine and preliminary medicine

### Count IX - Violation of Equal Protection and due process of 14th amendment, and 42 USC §1983: setting a requirement or preference for IMGs to apply to internal medicine and preliminary medicine within 5 years of medical graduation

487.     Dr. Pouyeh fully incorporates by reference paragraphs 1 to 270 herein and re-alleges them.

488.     This claim is against all the defendants, excluding the director of ophthalmology residency program.

489.    Plaintiff graduated in 2004 and applied since 2010, which was after 5 years of his medical graduation.

490.    Between 2004 and 2006, he had to serve his military service, as most males in Iran do. He practiced his profession as a medical officer during his military service and treated soldiers and military personnel.  He then immigrated to the USA in 2007 as a legal permanent resident and then started studying hard to have perfect scores in USMLE exams Step 1 and Step 2 CK, and pass Step 2 CS. (US economic sanctions prohibit banks and private businesses in the USA to have any business interactions with persons in Iran and it is not easy for Iranians to register for the USMLE exams before graduation from their medical school and while they are in Iran.) He completed these exams by 2010.  Then he performed multiple obervership rotations and clinical research projects, to build up his CV with US clinical experience, research and publications, and obtain letters of recommendation from licensed physicians in the USA.

### a)  *Equal Protection and due process*

491.    The defendants have set a requirement or preference for IMGs to apply to internal medicine and preliminary medicine within 5 years of their medical school graduations. (Exh.2)

492.    This type of classification has no rational basis and is not related to any State's legitimate objective.

493.    First, there is no evidence to support that this requirement or preference serves patient safety or public safety, or any other legitimate interests. In reverse, this policy selects and favors the novice, inexperienced, recent medical graduates and excludes seasoned and experienced foreign physicians.

494.    This practice screens out faculty member of another country who are now applying to US medical residency for licensure purposes, doctors who spent some years in research, experienced

doctors in clinics, and other applicants who pursued medical residency and fellowship in another country before applying to the defendants' residency program, or they obtained PhD, or master degrees in addition to their medical degree. The seasoned and experienced physicians, similar to other IMGs and US-MGs, must pass USMLE exams. As long as they have comparable scores to other applicants, they are equally or even more competent to perform the duties of a medical resident than novice recent graduates. No rational person will conclude that these applicants endanger patients' safety solely because they applied to the defendants' residency program in internal medicine or preliminary medicine more than 5 years after their medical school graduation. The law is clear that due process interdicts the adoption by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow from the proven fact. See *Cleveland Board of Education v. LaFleur*, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52; *Vlandis v. Kline*, 1973, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; *Stanley v. Illinois*, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551

495.    Second, there is no explanation and reason why the cut-off is set as 5 years, and not for example, 4 or 6 years. This classification is totally arbitrary and does not pursue any State's legitimate interest. None of the States have set this cut-off as the requirement to complete post-graduate residency for licensure purposes.  This cut-off is only based on the defendants' whimsical decision.

496.    Third, an IMG may not be able to apply to the residency program within 5 years of medical graduation for a variety of reasons: financial restrictions, waiting for obtaining a US visa as well as the time required to be settled down in the USA, not being able to pass all the exams within 4 years of medical graduation and limited spots for taking USMLE exams especially for USMLE Step 2 CS in which the waiting time is between 3 to 6 months, familial obligations or other personal

issues, withholding the medical diploma by medical school until meeting the financial duties or military service duties, the time required to obtain observership in the USA which reaches to 1 year for some IMGs, delay of the faculty to write letters of recommendation, delay in obtaining ECFMG certification, and a combination of these factors. This IMG is identical in all other aspects to another IMG who did not face these obstacles. Drawing a line between these two otherwise identical IMGs bears no rational relationship to any legitimate State's interest.

497.    Fourth, this requirement forces or encourages the IMG applicants to spend *less time* to prepare for the USMLE exams, and study shallowly and just enough to pass the exams with minimum score that meets the defendants' requirement and the defendants do not have any minimum scores (Exh.2). This is *against* State's legitimate interest to preserve public and patient safety. It eliminates the applicants who strived for perfection. Dr. Pouyeh has always believed that he should never study to pass the exam, but study so well and so thoroughly that the subject remains fresh in his mind for the day when he is the only thing between the patient and the grave. The defendants have excluded Plaintiff because he has a high standard and studied hard for the USMLE exams and for his top ideal!

498.    Fifth, it is hard to understand why the year of medical school graduation of IMGs is a factor that acts against their qualifications for medical residency in the eyes of the defendants, when in fact the faculty members of the defendant Jackson Memorial Hospital by the time they are hired as a faculty member, have more than 5 years passed of their medical school graduation (completion of medical residency takes at least 4 years). It is hard to understand if years of medical school graduation is a factor that endangers patient or public safety, why the defendant Jackson Memorial Hospital in reverse advances the faculty member to associate professor and the full professor and

pay a higher salary to these faculty members in spite of the fact that their medical school graduation was 10 or 15 years ago?!

### b)  Substantive due process (liberty)

499.    This cut-off completely bars the applicants who applied after 5 years of their medical graduation from pursuing internal medicine or preliminary medicine. Preliminary medicine is pre-requisite for other subspecialties, such as ophthalmology or dermatology. Thus, these applicants cannot practice their desired profession and their liberty interest to pursue their desired profession is violated.

500.    This requirement "directly or substantially" infringes on the liberty interest of the applicants to pursue their desired profession, and has no rational connection to the applicant's "fitness or capacity to practice that profession". *Schware v. Board of Bar Examiners of NM*, 353 US 232, 239 (1957)

501.    The reverse may have some rational connections. The applicants who are recent graduates of medical schools may presumably be less experienced and less qualified.

502.    The seasoned and experienced physicians, similar to other IMGs, must pass USMLE exams to obtain ECFMG certification before entering to medical residency. As long as they have comparable scores to other applicants and are ECFMG certified, they are equally or even more competent to perform the duties of a medical resident, and later after completion of medical residency, to practice medicine without supervision.

503.    As for Plaintiff, he is not only ECFMG certified, he also passed USMLE Step 3 exam[155], on the first attempt, in 2014. According to USMLE website, passing Step 3 indicates that the examinee is competent to practice medicine *unsupervised* and the majority of the applicants who

---

[155] ECFMG certification is required to take Step 3 exam, while entering into a medical residency is not required.

enter into medical residency, take this exam after the first year of *supervised* medical practice in a medical residency training program. Passing USMLE Step 3 is a qualification that none of the US-MGs in the defendants residency program possessed at the time of hiring.

504.    In addition, Plaintiff has both clinical experience and research experience for 4 years inside and outside of the United States. The defendants have indicated on the website that US clinical experience, preferably 3 to 6 months, is required[156]. (Ech.2) This cuts against the requirement or preference for IMGs who have graduated from medical schools within 5 years. The defendants require two contradictory qualifications at the same time from IMGs. If passing all USMLE Steps and research and clinical experience is desired qualities, the requirement or preference to apply within 5 year of medical graduation is not possible for the majority of IMGs to meet, in light of many other head-wind barriers on their path to apply to US medical residency. "Mean time between graduation and application to residency was 0.3 years for U.S. graduates, 1.5 years for U.S.-born IMGs, and 7.7 years for foreign-born IMGs."[157]

505.    The requirement to apply to the residency program within 5 year of medical graduation is arbitrary as it "imposes ... condition which cannot be readily met" (*Dent v. West Virginia*, 129 US 125 (1889)) by a substantial number of IMGs. Simply, these IMGs have no way to change the date of their medical graduation.

506.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendants and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

---

[156] This does not mean that the requirement is constitutional. Plaintiff does not have standing to challenge this requirement because he meets the requirement for having US clinical experience.

[157] "Comparison of surgical residency applicants from U.S. medical schools with U.S.-born and foreign-born international medical school graduates." J Surg Educ. 2008 Nov-Dec;65(6):406-12; http://www.ncbi.nlm.nih.gov/pubmed/19059170

507.     The defendants have violated Equal Protection and Due Process of 14th amendment to the US constitution and are liable under 42 USC §1983.

### Count X – Violation of 42 U.S.C. § 2000-e et seq and FCRA: Giving preference in internal medicine and preliminary medicine to the applicants who have graduated from medical school within 5 years discriminates based on national origin.

508.     The paragraphs in previous count are incorporated by reference and re-alleged herein.

509.     This claim is against the "Trust".

### a) Disparate impact

510.     "Mean time between graduation and application to residency was 0.3 years for U.S. graduates, 1.5 years for U.S.-born IMGs, and 7.7 years for foreign-born IMGs."[158]

511.     Statistics show, the majority of Americans enter the residency position within 2 years of their medical graduation. As for US-MGs, 94% of them match a residency position before graduation[159] and the remaining obtain the position the year after graduation in 48% of the time[160]. As for US-born IMGs, mean year since graduation and matching is 1.7[161].

512.     Thus, only IMGs who are foreign applicants apply more than 5 years after their medical school graduation. One study found that about 3 out of 4 (75%) IMG enter into medical residency after 5 years[162] and this study did not exclude American IMGs, which the mean year since graduation and matching is 1.5 to 1.7 year.

---

[158] "Comparison of surgical residency applicants from U.S. medical schools with U.S.-born and foreign-born international medical school graduates." J Surg Educ. 2008 Nov-Dec;65(6):406-12; http://www.ncbi.nlm.nih.gov/pubmed/19059170
[159] http://www.nrmp.org/wp-content/uploads/2016/04/Main-Match-Results-and-Data-2016.pdf Table 4, page 15
[160] Id
[161] http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf Table 2, page 5
[162] Jolly P, et al "Participation in U.S. graduate medical education by graduates of international medical schools." Acad Med. 2011 May;86(5):559-64

513.     The requirement to apply to residency position within 5 years adversely affects non-US-born IMGs and is discrimination based on national origin. As explained in ¶ 496, this requirement is another "built-in headwinds" for IMGs.

514.     The requirement is not job-related and consistent with business necessity, as explained in previous count.

### b)  Intentional discrimination

515.     Preceding paragraphs are incorporated by reference herein.

516.     Pursuant to 42 USC 2000e-2(a)(2), it is illegal employment practice "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

517.     This means it is illegal employment practice to classify the applicants, based on national origin considerations, to disqualify the applicants of dis-favored national origin group.

518.     The defendants knew foreign physicians apply years after their medical graduation to medical residency. They knew that with setting this policy, a large number of foreign physicians will be disqualified.

519.     There is no legitimate purpose behind setting this policy.

520.     The defendant adopted this policy solely for the purpose of disqualifying a substantial number of foreign physicians. Discrimination against foreign physicians was the reason and moving force behind setting this policy and preference. But for the desire to discriminate against foreign physicians, the defendants would not set this policy.

521.     It is notable that the defendant expressed it as a "preference" and not "requirement". This gives a leeway for the defendant to hire the preferred group of IMGs, identified in Count I, even

114

if they graduated from medical school more than 5 years after the time they apply to the defendant's preliminary or internal medicine. At the same time, it serves for the defendant as an excuse to discriminate against the non-preferred group of IMGs if they apply more than 5 years after their medical school graduation.

522.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendant and requests from the defendant the remedies explained at the end of the complaint.

523.    The defendants are liable for violation of 42 USC 2000-e et seq. and FCRA.

## V.  Claims related to discrimination in ophthalmology residency

### Count XI -Violation of Equal Protection and Due Process of 14th amendment for exclusion of IMGs from ophthalmology residency

524.    Dr. Pouyeh fully incorporates by reference and re-alleges paragraphs 1 to 270 and 350 to 442 herein.

525.    This claim is against all the defendants, except for the director of Latin America program as well as the past and present directors of internal medicine and preliminary medicine.

526.    Ophthalmology residency program hires 7 residents each year.

527.    Each year, one of the positions in ophthalmology residency is set aside for the US-Seniors of the University of Miami's medical school. (explained in Count IV)

528.    All the time Plaintiff was working as a research fellow at Bascom Palmer Eye Institute , Dr. Steven J. Gedde, the Director of Residency Program and the head of Residency Selection Committee, and other faculty members, including some of the members of Residency Selection Committee (Dr. Craig A. Mckeown and Dr. Neil Gregory), asserted several times and in different occasions that "we do not take foreign medical [school] graduates" and that, "for the past

fifty years, it has been the policy of Bascom Palmer Eye Institute not to take foreign medical [school] graduates".

529.    Only one IMG, who was from Lebanon, was accepted into ophthalmology residency program for the past 10 years and this means only 1.4% of the past ten-year hired applicants were IMGs. (Exh.1 : List of the ophthalmology residents and their medical schools at relevant time)

530.    Only 2 IMGs were accepted since the beginning of the ophthalmology residency program about 55 years ago. ( < 0.5% IMGs in the program).

531.    These figures are even lower than the national average. IMGs constitute 24.2% of the active US workforce physicians[163] and 7.6% of the active ophthalmologists in the USA are IMGs[164]. IMGs have constituted 3% to 6% of the matched applicants in national match for ophthalmology residency (San Francisco Program) between 2006 and 2016[165] and, as explained in ¶ 76, IMGs constitute 25.2% of the applicant pool in SF match.

532.    This means the disparity between IMGs in applicant pool and the hired applicants in the defendants' ophthalmology residency is at least 23.8% (25.2%-1.4%=23.8%).

533.    When Plaintiff asked Dr. Gedde, why the residency program has taken "Hassan Abdul-Aziz" in recent years if they do not take IMGs, he replied plaintiff that he did not want to hire him either and it was against his will and the ophthalmology residency policy to take IMGs, but he was forced to hire him[166].

---

[163] https://members.aamc.org/eweb/upload/Physician%20Specialty%20Databook%202014.pdf , page 24
[164] https://members.aamc.org/eweb/upload/Physician%20Specialty%20Databook%202014.pdf
[165] San Francisco Matching Program statistics. Available at
https://www.sfmatch.org/SpecialtyInsideAll.aspx?id=6&typ=2&name=Ophthalmology# Accessed: 6/18/2016.
[166] Based on this statement, plaintiff did not pursue disparate treatment for taking that Lebanese and not Plaintiff, an Iranian.

534.    A study[167], using multiple regression analysis, found that the predictive factors in success of IMGs in ophthalmology match, with a statistical significance at the level of P-value < 0.05, are letter of recommendation written by US ophthalmologists (3 letters: OR[168]= 6.20, 2 letters: OR=3.98), USMLE Step 1 score > 236  (OR=3.22), publications in journals with impact factor > 3 (1 paper: OR=3.07;  $\geq$ 2 papers: OR=2.99), US-research experience (OR=2.95), Waived Right to access letter of recommendation (OR=2.18), and academic awards (OR=1.12). (Exh.14 : predictive factors in success of IMGs in ophthalmology match)

535.    Dr. Pouyeh has all of these factors. He has 3 strong letters of recommendation written by US ophthalmologists and all were faculty members of Jackson Memorial Hospital/University of Miami at Bascom Palmer Eye Institute and one of them was Chairman ($\P$ 134), his USMLE Step 1 score is equal to 246 (more that > 236 in the study), and he has 17 publications and 4 of these publications are in journals with impact factor > 3 and in 3 of these 4 publications he was first-author ($\P\P$ 114, 121-123 ), he has two years US-research experience at Bascom Palmer Eye Institute and Miami VA Medical Center ($\P$ 114), and he has academic award and exceptional academic achievements in terms of escalating to become the reviewer of a prestigious journal in the field of ophthalmology ($\P\P$ 128 - 129 ), and he waived his right to access some of his letters of recommendation ($\P$ 135 ).

536.    In fact, if he was a US-Senior, with USMLE Step 1 =246, his chance of matching to ophthalmology residency would be about 93%. (Exh.6)

---

[167] Todd H. Driver, et. al., "Predictors of Matching in Ophthalmology Residency for International Medical Graduates", *Ophthalmology*. 2014 Apr;121(4):974-975
[168] OR: Odds Ratio,  the ratio of two odds

537.     "SDN Ophthalmology Match Poll 2011" in Student Doctor Network (SDN) forum [169] shows a forum member under the pseudo-name "Sands of Sahra", who is a US-Senior, applied to 36 programs and received 17 interviews and matched to the defendants' ophthalmology residency program (Bascom Palmer Eye Institute, abbreviated as BPEI) without reporting his/her USMLE Step 2 CK score and with USMLE Step 1 score 249, similar to Plaintiff's USMLE Step 1. (Exh.9). "Junkemail86" is another forum member with similar Step 1 score to Plaintiff and no Step 2 CK score. He/She applied to 38 programs and received 25 interviews, including from the defendants ophthalmology residency program (Bascom), as well as from Johns Hopkins (Wilmer), Harvard (MEEI or Massachusetts Eye and Ear Infirmary), Duke University, Stanford University, UCSF (Universtiy of California, San Francisco), Columbia University, Yale University, among others. Another forum member, "FrankEye", with Step 1 score identical to Plaintiff and no Step 2 CK score, applied to 15 ophthalmology residency programs and received 10 interview invitations, including from Harvard (called Massachusetts Eye and Ear Infirmary, abbreviated as MEEI), Johns Hopkins (called Wilmer), Duke University, Wills Eye Institute, Iowa University, Columbia University, among others. (Exh.9). *An IMG* member of this forum, under pseudo-name of "chyclops", with Step 1 score 251 and Step 2 score 248 and 10 publications in ophthalmology applied to 29 programs and received only 2 interviews. (Exh.9) With 2 interviews, the chance of matching is 20% [170]. Similar to many other ophthalmology residency programs, the defendants' ophthalmology residency program did not invite him/her for interview because he was an IMG. The same year, another member of this forum under the pseudo-name of "Blood n Thunder", a US applicant with Step 1 score 209, Step 2

---

[169] Available at: http://forums.studentdoctor.net/threads/sdn-ophthalmology-2011-match-stats.788298/  Accessed on 6/18/2016.
[170] Salman J. Yousuf, Leslie S. Jones, "Ophthalmology Residency Matching Outcomes for 2011", *Ophthalmology* 2012, 119:642-646. Figure 5.

CK score 221, and no ophthalmology publication applied to 70 programs and obtained 3 interviews and matched ophthalmology. With 3 interviews, the probability of matching is about 35%[171].

538.    As explained in Count V, these US-Seniors have not completed their medical schools and hiring them violates Equal Protection of 14th amendment. It is evident that they are matched even without taking USMLE Step 2 CK, and as explained in Count VI, this is also in violation of Equal Protection of 14th amendment.

539.    In addition, none of the US-Seniors could match Plaintiff's exceptional qualifications in terms of research, clinical experience, and other accomplishments explained before.

540.    This establishes the allegation of purposeful, deliberate, and systematic exclusion of IMGs, including Dr. Pouyeh, from the defendants' ophthalmology residency program.

### a) *Equal Protection*

541.    IMG applicants are similarly situated to US-Seniors that the defendants hire in every aspect. The sole difference is the location of their medical school (inside or outside of the United States) and the fact that US-seniors are not graduated yet (See Count V, ¶¶ 391- 413) and some of them have not even passed the required USMLE exams by the time they submit their application ( See Count VI, ¶¶ 422 - 429 ).

542.    This is in violation of Equal Protection of 14th Amendment and does not pass any level of constitutional scrutiny.

543.    As an initial matter, this type of invidious discrimination does not pass rational basis test. "The *Cleburne* Court reasserted the unremarkable principle that, when a statute imposes a classification on a particular group, its failure to impose the same classification on "other groups

---

[171] Id.

similarly situated in relevant respects" can be probative of a lack of a rational basis". *Bd. of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 n. 4 (2001)

544.    Defendants have taken IMGs in internal medicine. In fact, there is a quota for IMG applicants from Latin America under Harrington Program in internal medicine residency program (See Counts I to III), but IMGs (including Latino IMGs eligible for Harrington Program) are excluded from ophthalmology residency program.

545.    This shows that no rational basis exists to exclude IMGs from ophthalmology when the defendants already set quota for Latino IMGs in internal medicine residency and hire them.

546.    The ophthalmology residency program of the defendants has taken two IMG residents and one of them was in recent years. This shows that there is no legitimate objective and purpose to discriminate against IMGs and it is solely arbitrary and capricious.

547.    Also, plaintiff alleged facts to show there is systematic and arbitrary exclusion of IMGs from all residency programs in the USA, including ophthalmology residency programs. (¶¶ 225- 242) The surveys of program directors are solid proofs how whimsical and arbitrary is the decision of the program directors to hire or not IMGs. The only explanation for the fact that *a fraction* of program directors accept IMGs and this percentage varies in different specialties, is that the decision is totally whimsical.

548.    In addition, Jackson Memorial Hospital has hired in **internal medicine residency program** a resident **from Plaintiff's medical school** ("Tehran University of Medical Sciences") and Plaintiff's country of origin ("Iran"). Her name is Dr. "Tara Keihanian". (Exh.15) There was another resident from "Tehran University of Medical Sciences" in Jackson Memorial Hospital in **diagnostic radiology residency program**. Her name is Dr. "Ladan Lamea". She has completed her residency and now is **a faculty of radiolgy** at Jackson Memorial Hospital. Dr. "Mehdi Nassiri" is another

resident in Jackson Memorial Hospital in **pathology residency program** who also graduated from Plaintiff's medical school. Dr. "Mehrdad Nadji" is also a medical graduate of Tehran University who completed **pathology residency** program at Jackson Memorial Hospital and has been a **faculty of pathology** at Jackson Memorial Hospital and University of Miami for more than 20 years. Dr. Behnam Djahed is another graduate of Plaintiff's university in **family medicine** residency program in Jackson Memorial Hospital, who is now the director of family medicine of University of Miami and Jackson Memorial Hospital.

549.    There is no rational basis a graduate of Tehran University of Medical Sciences would not be able to perform the duties of an ophthalmology resident in the ophthalmology residency program of Jackson Memorial Hospital, when already Jackson Memorial Hospital has hired residents from Plaintiff's medical school in other medical residency programs and also has hired them later as a licensed physician and faculty in its pathology and radiology departments.

550.    This is especially true when Dr. Pouyeh has recommendation letters for ophthalmology residency position from the defendants' faculty at Bascom Palmer Eye Institute, including its Chairman.

551.    Other ophthalmology residency programs in the USA have hired from Plaintiff's medical school graduates ("Tehran University of Medical Sciences"), as well. For example, Dr. "Abed Namavari" in Chiacogo, IL in 2016; Dr. "Mehrad Malihi" in Rutgers, New Jersey in 2012; Dr. "Pejamn Bakhtiari" in Loma Linda, Ca in 2014; Dr. "Babak Jian Seyedahmadi", Rochester, NY before 2012; Dr. "Saloomeh Saati" in Doheny-USC, CA in 2013; "Parisa Emami" in Kresge Eye Institute, MI in 2016; Dr "Azin Abazari" in university of Virginia in 2011; Dr. "Amir Reza Hajrasouliha" in Louisville, KY in 2012[172].

---

[172] The year indicates the year of entrance into residency with +/- 1 year precision.

552.    These graduates of Tehran University of Medical Sciences have never been *ranked* for ophthalmology residency of the defendants' ophthalmology residency program at Bascom Palmer Eye Institute.

553.    Moreover, the defendants take international medical graduates in *clinical* fellowship programs (not to be confused with Plaintiff's *research* fellowship) at Bascom Palmer Eye Institute but have excluded them from residency program. For example, Dr. Homayoun Tabandeh is an Iranian who completed his medical school and residency in ophthalmology in England and then continued his *clinical* fellowship in vitreoretinal surgery at Bascom Palmer Eye Institute. But without completion of residency in an ACGME-approved residency program in the USA, he could not practice in the USA. The defendants' residency program did not hire him for medical residency in ophthalmology despite his unquestionable qualifications and the fact that he finished his clinical fellowship at the same institute, solely because he was an IMG. He nonetheless was accepted to Johns Hopkins ophthalmology residency program (Wilmer) and now he is practicing as an ophthalmologist in California. Another example is Dr. Mohammad Abou Shusha. He is an Egyptian who completed medical school and ophthalmology residency in Egypt and then was accepted in cornea clinical fellowship program at Bascom Palmer Eye Institute. Similarly, he had to complete residency in an ACGME-approved residency program in the USA to be authorized to practice; but the defendants did not hire him for ophthalmology residency at Bascom Palmer Eye Institute solely because he was an IMG. He was accepted to ophthalmology residency program at St Louis, MO and after completion of his residency, now he is a *faculty member* of Bascom Palmer Eye Institute! It is clear that there is no rational basis to exclude IMGs from the defendants' ophthalmology residency program when these two doctors were already accepted to the clinical fellowship programs at the

same institute and furthermore, one of them is now a faculty member of Bascom Palmer Eye Institute after completion of his residency somewhere else.

554.    There is no rational basis to discriminate against International medical school graduates, solely because they graduated from a medical school outside the USA, instead of graduating from a medical school inside the USA.

555.    There is no legitimate objective or purpose to radically exclude IMGs from defendants' ophthalmology residency program and the policy does not pass rational basis test. "Desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest". *Department of Agriculture v. Moreno*, 413 US 528, 534 (1973) [emphasis in original]

556.    Moreover, the motive behind this classification and discrimination is nativism, xenophobia, and national origin considerations and there is close association between matriculating to a US-medical school and being a US-born applicant and matriculating to an international medical school and being a non-US-born applicant (See ¶¶ 249 - 253 ).

557.    Thus, heightened level of constitutional scrutiny is warranted.

### b)  *Substantive Due Process (Liberty) and due process*

558.    The policy to exclude IMGs directly and substantially bars IMGs to pursue ophthalmology residency at the defendants' ophthalmology residency, as well as any other residency program having this policy[173], and later become a licensed physician to practice ophthalmology in the USA.

559.    It infringes upon the liberty of this group of the applicants in violation of 14th amendment of US constitution.

---

[173] If the court upholds the policy, even the few residency programs which used to take IMGs in the past, will not do so in the future.

560.   "Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church." *Schware v. Board of Bar Examiners of NM*, 353 US 232, 239 (1957). If membership of a particular church cannot be a basis for exclusion, the same is true if an applicant is an alumnus of an International medical school.

561.   From the sole fact that a foreign doctor graduated from a medical school outside of the United States, instead of a medical school inside the United States, we cannot conclude the applicant in fact does not have "fitness and capacity" *Schware v. Board of Bar Examiners of NM*, 353 US 232, 239 (1957) to perform the duties of an ophthalmology resident and later become a licensed ophthalmologists in the USA. Simply, there is no rational connection and relationship between the geographic location of the medical school and the fitness and capacity of the applicants to perform their duties as ophthalmology resident and future ophthalmologists[174]. This is especially true if an IMG has comparable scores in USMLE exams as a USMG. The law is clear that due process interdicts the adoption by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow from the proven fact. See *Cleveland Board of Education v. LaFleur*, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52; *Vlandis v. Kline*, 1973, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; *Stanley v. Illinois*, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551

562.   The policy deprives IMGs' liberty to pursue the desired career (ophthalmology residency) and obtain state license to practice as an ophthalmologist later on without due process of law. "Legislation is not open to the charge of depriving one of his rights without due process of law" *Dent v. West Virginia* , 129 US. 124.

---

[174] The law is clear that due process interdicts the adoption by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow from the proven fact. See Cleveland Board of Education v. LaFleur, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52; Vlandis v. Kline, 1973, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; Stanley v. Illinois, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551

563.     The requirement to be a US medical school graduate is arbitrary as it "imposes …

condition which cannot be readily met" (*Dent v. West Virginia*, 129 US 124 (1889)) by IMGs

because an IMG simply cannot become a USMG; unlike in *Dent v. West Virginia*, 129 US 114, 125

(1889), which the applicant could obtain license by passing the required exam.

564.     Based on the plaintiff's aforementioned qualifications and accomplishments and

credentials, but for the defendants' deliberate, purposeful, and intentional discrimination and

deprivation of Plaintiff of his liberty to pursue his desired profession, Plaintiff would be accepted to

the defendants' ophthalmology residency program.

565.     The defendants have violated Equal Protection and Due Process of 14th amendment

and are liable under 42 USC §1983.

566.     As explained above, plaintiff has sustained substantial and irreparable harms from the

acts, omissions, decisions, policies, and preferences of the defendants and requests from all the

defendants named in this claim the remedies explained at the end of the complaint.

## Count XII– Violation of 42 U.S.C. § 2000e and FCRA: Exclusion of IMGs from ophthalmology residency is discrimination based on national origin.

### a) *Disparate impact*

567.     The paragraphs in previous count are fully incorporated and re-alleged herein.

568.     This claim is against the "Trust".

569.     As explained in previous count, the defendant has a policy to exclude IMGs from

ophthalmology residency.

570.     As explained in ¶¶ 249 to 253, there is statistically significant association between

hiring US-Seniors/US-MGs and hiring US-born applicants. Similarly, there is statistically significant

association between hiring/excluding IMGs and hiring/excluding non-US-born applicants. Only

0.3%   (55/(55+18919))  of   US-MGs/US-Seniors   are   international   applicants   and   78.2%

(9904/(9904+2759)) of IMGs are international applicants. Thus, this policy produces 77.9% disparity against international applicants and it is grossly and statistically significant.

571.    Thus, the policy to hire only USMG/US-Seniors disproportionally excludes international applicants and is discrimination based on national origin.

572.    The policy to exclude IMGs from ophthalmology residency position is not job-related and is not consistent with business necessity. As explained in previous count, the defendant has hired IMGs in other residency positions, including from Plaintiff's medical school, as well as IMGs in its clinical fellowship at Bascom Palmer Eye Institute. The defendant has also hired them later as faculty member.

573.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, Plaintiff was excluded because the defendant's policy has adverse impact on international applicants, such as plaintiff.

574.    The defendant is liable under 42 USC 2000-e et seq and FCRA.

575.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendant and requests from the defendant the remedies explained at the end of the complaint.

### b)  Intentional discrimination

576.    Preceding paragraphs in this count are incorporated by reference herein.

577.    42 U.S.C. § 2000e-2 (a)(2) prohibits employment practice "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

578.    The defendant knew and was substantially certain that its policy produces grossly and significantly disproportionate impact against foreign applicants and in favor of American national origin. "one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts." Tison v. Arizona, 481 US 137, 150 (1987)

579.    The motive, purpose, and intention of classifying the applicants into US-Seniors/USMGs vs. IMGs and limiting the hiring of the applicants to US-Seniors/US-MGs is nativism and xenophobia; i.e. national origin considerations.   This policy does not pursue any legitimate purpose.

580.    IMGs, *applicant to the defendants' ophthalmology residency,* are predominately or exclusively of non-American national origin. Although *in theory* we could have US-IMGs (not to be confused with US-MGs) applicant in ophthalmology, *in reality* these applicants generally shy away from applying to ophthalmology residency. As an initial matter, they could not enter medical schools in the USA because of their poor academic performance[175] "The means of the college grade-point averages (GPA) and of the scores on the admission test were lower than those of both accepted and unaccepted applicants to U.S. medical schools"[176] and they end up matriculating to international medical schools, especially in Caribbean countries[177]. One study showed "U.S. citizens who attended medical schools abroad were more likely to attend schools in Central America and the Caribbean than in any other geographic region."[178] 48% of US-IMGs are from Caribbean Medical schools and

---

[175] The New York Times, July 31, 2014, accessed on 7/22/2016 from
http://www.nytimes.com/2014/08/03/education/edlife/second-chance-med-school.html?_r=0
[176] "United States citizens studying medicine abroad. Their backgrounds and test performance" , available at
http://www.ncbi.nlm.nih.gov/pubmed/3785308
[177] Id.
[178] "U.S. citizens who graduated from medical schools outside the United States and Canada and received certification from the Educational Commission for Foreign Medical Graduates, 1983-2002." Acad Med. 2005 May;80(5):473-8
http://www.ncbi.nlm.nih.gov/pubmed/15851461

5% of non-US-IMGs are from Caribbean medical schools[179]. It is not surprising that the drop-out rate from these medical schools reaches up to 50%[180]. According to a paper published in Academic Medicine journal in 2008 "studies indicated that U.S. citizens who completed part or all of their studies abroad did not perform as well on knowledge assessments as did USMGs. More recently, a study of performance of physicians who attended medical schools in the Caribbean showed considerable variation in quality indicators. *Ultimate ECFMG certification rates varied by school from 28% to 86%.*"[181]. Even among those who ultimately obtain ECFMG certification, they mostly apply to family medicine and Psychiatry: *"the highest ratios for U.S. IMGs are found in Family Medicine and Psychiatry"*[182]. As for Family Medicine, the average USMLE Step 1 score of the US-IMGs who matched was 206[183], and for those who did not match, it was 198[184]. For Psychiatry, the average USMLE Step 1 score of US-IMGs who matched was 205[185] and for those who did not match, it was 198[186]. In comparison, the average USMLE Step 1 score of the matched applicants to Ophthalmology in 2013 was 239[187] and for the applicants who did not matched, it was 222[188].

581.     In summary, US applicants in international medical schools generally shy away from applying to Ophthalmology, because of their poor academic performance. Thus, the defendant was

---

[179] "Educational commission for foreign medical graduates certification and specialty board certification among graduates of the Caribbean medical schools". Acad Med. 2006 Oct;81(10 Suppl):S112-5
http://www.ncbi.nlm.nih.gov/pubmed/17001119
[180] http://www.medicalschoolsuccess.com/top-caribbean-medical-schools/
[181] van Zanten, Marta; Boulet, John R. "Medical Education in the Caribbean: Variability in Medical School Programs and Performance of Students" Academic Medicine,October 2008 - Volume 83 - Issue 10 - pp S33-S36 ; available at http://journals.lww.com/academicmedicine/Fulltext/2008/10001/Medical_Education_in_the_Caribbean__Variability_in.9.aspx
[182] Charting Outcome in the Match for International Medical Graduate in 2013, footnote for chart 2
http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf
[183] Charting Outcome in the Match for International Medical Graduate in 2013, page 57 available from http://www.nrmp.org/wp-content/uploads/2014/01/NRMP-and-ECFMG-Publish-Charting-Outcomes-in-the-Match-for-International-Medical-Graduates-Revised.PDF-File.pdf
[184] Id.
[185] Charting Outcome in the Match for International Medical Graduate in 2013, page 169
[186] Id.
[187] https://www.sfmatch.org/SpecialtyInsideAll.aspx?id=6&typ=2&name=Ophthalmology#
[188] Id.

substantially certain that the policy to exclude IMGs predominantly or exclusively eliminates the non-American national origins of the IMG group, such as Plaintiff.

582.    On the flip side, the defendant was substantially certain that, by giving preference to US-Seniors/US-MGs, rarely an international applicant will be hired. According to American Association of Medical College, in 2006-2007 only 0.3% (55 out of 17,361) of the medical students matriculated to the allopathic (M.D. granting) medical schools inside the United States were international applicants[189].

583.    Thus, the defendant was substantially certain (99.7 %) that it effectively excludes international applicants even though it hired from US-MGs/US-Seniors group.

584.    As explained in previous count, the classification of the applicants into whether they matriculated to a medical school inside the USA or outside of the USA is totally arbitrary and does not pursue any *legitimate* purpose.

585.    Based on the rule of exclusion, i.e. from the gross statistical disparity it produces to exclude international applicants in favor of Americans and the substantial certainty of the defendants that this disparity will ensue, the only purpose one can conclude from this classification is the inference of intentional discrimination against international applicants.

> "Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor [or favor] that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews." *Bray v. Alexandria Women's Health Clinic*, 506 US 263 (1993)

586.    Thus, the desire to exclude international applicants and the desire to hire only American national origin, i.e. nativism and xenophobia, was the reason, the purpose, and the intent of setting this policy.  In other word, this "ostensibly neutral classification is an obvious pretext for an invidious discrimination" based on national origin.

---

[189] Available at: https://www.aamc.org/download/321462/data/factstablea4.pdf Accessed on 6/19/2016

"A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification. This rule applies as well to a classification that is **ostensibly neutral but is an obvious pretext for racial discrimination**. *Yick Wo* v. *Hopkins,* 118 U.S. 356; *Guinn* v. *United States,* 238 U.S. 347* " *Feeney*, 442 U.S., at 272

587.    The policy to hire only from US-MGs/US-Seniors is used as a proxy for hiring American national origin.

"We have warned that an employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination. An example is using gray hair as a proxy for age: there are young people with gray hair (a few), but the "fit" between age and gray hair is sufficiently close that they would form the same basis for invidious classification. *Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161, 1163 (7th Cir.1992).".

"pregnancy is a proxy for gender and, therefore, discrimination against pregnancy is discrimination against women. See, e.g., *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir.2000)" *Griffin v. Sisters of Saint Francis, Inc.*, 489 F. 3d 838 - Court of Appeals, 7th Circuit 2007, at 843.

"*Hazen Paper* [Hazen Paper Co. v. Biggins, 507 US 604 - Supreme Court 1993] indicated that discrimination on the basis of pension status could *sometimes* be unlawful under the ADEA, in particular where pension status served as a "proxy for age." *Id.,* at 613, 113 S.Ct. 1701. Suppose, for example, an employer "target[ed] employees with a particular pension status on the assumption that these employees are likely to be older." *Id.,* at 612-613, 113 S.Ct. 1701. In such a case, *Hazen Paper* suggested, age, not pension status, would have "actually motivated" the employer's decision-making." *Kentucky Retirement Systems v. EEOC*, 128 S. Ct. 2361 (2008) at 2367.

588.    The defendant targeted IMGs on the assumption that these applicants are likely to be international applicants. There is no legitimate purpose to exclude IMGs and prefer USMGs. The motive behind this classification and setting this policy is nativism and xenophobia; i.e. national origin considerations.

589.    Based on the plaintiff's aforementioned qualifications and accomplishments and credentials, Plaintiff was not hired because of this policy and the motive behind setting this policy, national origin considerations.

590.    The defendant is liable under 42 USC 2000-e et seq and FCRA.

591.    As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendant and requests from all the defendants named in this claim the remedies explained at the end of the complaint.

## VI. Claims exclusively related to preliminary medicine

### Count XIII–violation of 42 U.S.C § 2000-e and FCRA: "preliminary medicine" hardly ever considers IMGs if they specify "ophthalmology residency" as their desired specialty after preliminary medicine; which disproportionately excludes non-American national origins who plan to pursue ophthalmology.

592.    Paragraphs 1 to 591 are fully incorporated by reference and re-alleged herein.

593.    This claim is against the "Trust".

594.    One year post-graduate internship is mandatory before the start of ophthalmology residency position and some other specialties such as dermatology, radiology, and neurology.

595.    Preliminary medicine position serves as this prerequisite internship for ophthalmology and other specialties.

596.    Preliminary medicine is similar to the first year internal medicine, except that there are some 1-month electives available in preliminary medicine for ophthalmology, neurology, dermatology, or radiology.

597.    <u>Both the "preliminary medicine" and "ophthalmology residency" spots are usually, but not always, secured in the same year. Ophthalmology residency starts the year after completion of preliminary medicine.</u>

598.    In Count I to III, Plaintiff explained discrimination based on race/ethnicity, national origin, and citizenship status in preliminary medicine. In Count IV, plaintiff explained setting a quota and giving preference in preliminary medicine to the applicants who matriculated to University of Miami. In Count V, Dr. Pouyeh explained violation of Equal Protection in preliminary

medicine to hire US-Seniors before medical graduation and without providing similar credentials as IMGs by the time they apply. In Counts VI and VIII, Dr. Pouyeh further explored discrimination in preliminary medicine by hiring US-applicants without passing USMLE exams or hiring these applicants with scores lower than Plaintiff's.  In Counts IX and X, Dr. Pouyeh explained giving preference to IMGs who graduated from medical school within 5 years of the application violates US constitution as well as federal laws.

599.    Finally, in Counts XI and XII, Plaintiff explained the defendants do not consider IMGs for ophthalmology residency; similar to many ophthalmology residency programs in the USA.

600.    Having said that, the defendant's preliminary medicine, similar to most preliminary programs in the USA, does not consider IMGs if these applicants specify "ophthalmology residency" as their desired residency after completion of preliminary medicine.

601.    In contrast, the preliminary position accepts US-MGs/US-seniors if these applicants indicate that they have a plan to pursue ophthalmology. These applicants take the spot in preliminary medicine even if they did not match ophthalmology residency. This helps them to take an ophthalmology spot somewhere in the USA if an ophthalmology resident drops out or dies.

602.    For example, in 2012 a vacancy in the first year of ophthalmology residency was available in Howard University in Washington, DC about 2 or 3 months after the initiation of the residency. If Plaintiff had completed preliminary medicine, Plaintiff could have obtained that ophthalmology residency. Ultimately, a US-MG took the spot because that person had completed preliminary medicine.

603.    Thus, these two practices act in tandem and in a vicious cycle, a.k.a. "Catch-22". Ophthalmology residency excludes IMGs, and preliminary medicine program hardly ever consider them as well. And, because these applicants are excluded from the pre-requisite preliminary

medicine, they are barred from continuing ophthalmology residency the following year; *even if* there is a vacant spot in case one ophthalmology resident drops out or dies.

604.    Plaintiff does not recognize *any non-US born IMGs* in preliminary position of the defendants who also was accepted to an ophthalmology residency. There are some non-American IMGs in preliminary medicine program of the defendant, but they do not pursue ophthalmology residency. They pursue other specialties after preliminary medicine, such as radiology or neurology.

605.    As explained, association between being a US-born applicant and matriculating to a US-medical school is statistically significant. The same is true about the association between being an IMG and a non-US born applicant.

606.    This practice disproportionately excludes foreign applicants who want to pursue ophthalmology after their preliminary medicine and favors the Americans who apply to preliminary medicine and pursue ophthalmology residency.

607.    This policy is not job-related and consistent with business necessity. Considerably, the defendant has set quota for the applicants in preliminary medicine who pursue neurology. (Exh.15: Residents in "preliminary medicine" and "preliminary-neurology"). So, there is no rational reason in terms of job-relatedness and consistence to business necessity to exclude the IMG if the plan is to pursue ophthalmology, instead of, for example, neurology.

608.    Plaintiff was not able to secure a preliminary medicine, despite his aforementioned qualifications, because of this practice. He specified ophthalmology as his subsequent residency after ophthalmology and was excluded from preliminary medicine.

609.    Even if Plaintiff had not specified it, program directors would have asked it. In fact, after an interview for internship in Medstar Harbor hospital in Maryland, the program director told plaintiff because the result of ophthalmology residency match (SF match) is announced before

ranking for NRMP match (or as they call it "ophthalmology is a 'pre-match' residency"), if Plaintiff matched ophthalmology, inform their program before the deadline for ranking for NRMP match.

610. The defendant is liable under 42 USC 2000-e, et seq and FCRA.

611. As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendant and requests from the defendant the remedies explained at the end of the complaint.

## Count XV: Violation of Equal Protection of 14th Amendment and 42 USC § 1983: Setting Quota for Preliminary Medicine –Neurology

612. Dr. Pouyeh incorporates by reference the paragraphs in the previous count herein.

613. This claim is against all the defendants, excluding the director of ophthalmology residency as well as director of Latin America program.

614. The defendants have classified applicants to their preliminary medicine in two categories: those who pursue neurology and those who do not.

615. They have set aside at least 7 positions in their preliminary position for the applicants who pursue neurology, while they exclude IMGs if they want to pursue ophthalmology instead of neurology.

616. This violates Equal Protection of 14th amendment to the United States constitution.

617. The defendants are liable under 42 USC § 1983.

618. As explained above, plaintiff has sustained substantial and irreparable harms from the acts, omissions, decisions, policies, and preferences of the defendant and requests from the defendant the remedies explained at the end of the complaint.

## Count XV: Violation of 42 USC § 2000d-3 based on national origin and race

619. This claim is against the "Trust".

620. 42 USC § 2000d-3 reads

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

621.    The federal fund is paid for paying the salary of medical residents. This fund is called Direct Graduate Medical Education (DGME). It is paid by the Department of Health and Human Service, primarily through Medicaid, to pay the salary of the residents. According to CMS.gov website[190] (Centers for Medicare and Medicaid)

> Section 1886(h) of the Act, as added by section 9202 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 (Pub. L. 99-272) and implemented in regulations at existing §§413.75 through 413.83, establish a methodology for determining payments to hospitals for the costs of approved graduate medical education (GME) programs. Section 1886(h)(2) of the Act, as added by COBRA, sets forth a payment methodology for the determination of a hospital-specific, base-period per resident amount (PRA) that is calculated by dividing a hospital's allowable costs of GME for a base period by its number of residents in the base period.

> Section 1886(h)(4)(F) of the Act established limits on the number of allopathic and osteopathic residents that hospitals may count for purposes of calculating direct GME payments.

622.    Because of Section 1886(h)(4)(F) of the Act, the number of residency program slots has remained fix and the hospitals do not have any other resources to pay residents salary or to increase it.

623.    According to American Medical Association (AMA) news[191],

> While some are lobbying for Congress to increase the amount it spends on graduate medical education, a handful of teaching institutions have found their own sources of money in recent years to expand the number of residency slots their programs offer.

> Although Medicare funding for residents remains frozen at 1996 levels, data recently examined by the Assn. of American Medical Colleges' Center for Workforce Studies show that the total number of residency slots has inched up 4% between 1998 and 2004.

---

[190] https://www.cms.gov/medicare/medicare-fee-for-service-payment/acuteinpatientpps/dgme.html
[191] http://www.amednews.com/article/20060130/profession/301309963/2/

624.   These factual allegations establish federal fund is paid for the primary purpose of employment of medical residents, and Dr. Pouyeh has a claim under 42 USC § 2000d-3.

625.   Plaintiff incorporates by reference and re-alleges paragraphs 1 to 270.

626.   Plaintiff incorporates by reference and re-alleges Counts I, II, and III (paragraphs 271 to 358 ) herein and demands for each count the reliefs at the end of this section under this federal statute.

627.   Plaintiff incorporates by reference and re-alleges Counts IV to VII (paragraphs 359 to 458 ) herein and demands for each count the reliefs at the end of this section under this federal statute.

628.   Plaintiff incorporates by reference and re-alleges Counts VIII, IX, and X (paragraphs 459 to 523) herein and demands for each count the reliefs at the end of this section under this federal statute.

629.   Plaintiff incorporates by reference and re-alleges Counts XI and XII (paragraphs 524 to 590 ) herein and demands for each count the reliefs at the end of this section under this federal statute.

## RELIEFS SOUGHT

630.   Wherefore, Plaintiff, Dr. Pouyeh, requests the following relief as to all counts:

   a) Preliminary and permanent injunction enjoining the defendants from employing the policies, requirements, or preferences explained in the counts; and requiring the defendants to institute policies, practices and programs which provide equal opportunities for individuals and which eradicate the effects of their past and present unlawful practices

b) Preliminary and permanent injunction requiring the defendants hire Plaintiff to preliminary medicine/ophthalmology residency track (his Plan A) or internal medicine residency track (his Plan B)

c) Preliminary and permanent injunction requiring the defendants sponsor for Plaintiff's parents' immigration visa (see harms for explanation);

d) Declarative order that the defendants policies explained in each count are in violation of pertinent federal constitution or statute explained in each count;

e) Compensatory damage for physical pain (back pain and neck pain), and emotional pain for hunger, homelessness, sleep deprivation;

f) Compensation for loss of companionship with the plaintiff's parents, and family, relatives and friends in Iran;

g) Compensatory damages for emotional distress, loss of enjoyment of life, depression and intrusive and relentless suicidal thoughts, loss of the opportunity for companionship and association with other people including the opposite sex, loss of the opportunity to raise a family, humiliation, envy, suppressing the feeling of anger and resent and the desire to retaliate, anxiety and the feeling of perplexity for debt and gloomy future;

h) Paying the medical bills for treatment for depression and hospitalization

i) Compensation for all economic damages, including but not limited to application fees, loss of past, present, and future income, and interests on them;

j) Compensation for the loss of the opportunity of future earnings as an ophthalmologist and retinal surgeon subspecialist from 2010 until instatement

k) Injunctive relief for back pay, front pay, and interests on them;

l) Past and future **out-of-**pocket loss, Costs and fees of the lawsuit and fair compensation for the time and energy plaintiff invested to initiate and pursue this lawsuit;

m) and compensation for any other direct, indirect, consequential, or collateral damages

n) Punitive damages;

o) Any other reliefs that the court deems appropriate to make Plaintiff whole and return Plaintiff's status to the condition as though the discrimination did not happen in the first place, e.g. removing negative points from plaintiff's credit report because of unpaid debts

## REQUEST FOR A JURY TRIAL

631.    Plaintiff requests a jury trial as a matter of right for any issues so triable.

Respectfully Submitted,

Date 8 / 18 / 2016
Tel: 7073768934
Email: bpouyeh@gmail.com
Address: Homeless, Miami, FL

Signed By Bozorgmehr Pouyeh